**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | : | CIVIL ACTION |
| COMMISSION, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 04-1309-KAJ |
| | : | |
| INITIAL SECURITY, | : | |
| | : | |
| Defendant | : | |
| | : | |

---

BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**WHITE AND WILLIAMS LLP**

By: _____
Frank E. Noyes, II (Id. No. 3988)
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
(302) 467-4511

Debbie Rodman Sandler *(Pro Hac Vice)*
Tanya A. Salgado *(Pro Hac Vice)*
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-6368

Attorneys for Defendant, Initial Security

**Table of Contents**

Table of Authorities ............................................................................................................ i

I.   NATURE AND STAGE OF PROCEEDING ................................................................ 1

II.  SUMMARY OF ARGUMENT ...................................................................................... 1

III. STATEMENT OF FACTS  ............................................................................................ 1

IV.  ARGUMENT  .............................................................................................................. 11

    A.        Summary Judgment is warranted on this record. ............................................. 11

    B.        Plaintiff's claim for disparate treatment must fail. ......................................... 11

              1.      Plaintiff's claim for disparate treatment in regard to pay is
                          time-barred. ..................................................................................... 11

              2.      In any event, Mr. Spikes and Mr. Dukes are not comparable .............. 13

    C.        Plaintiff's claim for retaliation must fail, because there is no "casual link.". ... 15

V.   CONCLUSION ........................................................................................................... 18

CERTIFICATE OF SERVICE .............................................................................................. 19

## Table of Authorities

**CASE**                                                                                    **PAGE**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ....................................................................................................11

Best v. Janerich,
    80 F. Supp. 2d 334 ....................................................................................................11

Brower v. Runyon,
    178 F.3d 1002 (8th Cir. 1999) ................................................................................16-17

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ...................................................................................................11

Cooper v. Southwark Metal Co.,
    59 Fair Empl. Prac. Cas (BNA) 1521, 1992 WL 236285 (E.D. Pa. 1992). ......................13

Dowe v. Total Action Against Poverty in Roanoke Valley,
    145 F.3d 653 (4th Cir. 1998). ......................................................................................16

Farrell v. Planters Lifesavers, Co.,
    206 F.3d 271 (3d Cir. 2000) ........................................................................................16

Harden v. Southwark Metal Manufacturing Co.,
    2002 WL 31194220 (E.D. Pa. 2002). ...........................................................................13

Hudson v. Southern Ductile Casting Corp.,
    849 F.2d 1372 (11th Cir. 1988) ...................................................................................16

Krouse v. American Sterilizer Co.,
    126 F.3d 494 (3d Cir. 1997). ................................................................................15, 16

Mandia v. ARCO Chemical Co.,
    618 F.Supp. 1248 (W.D. Pa. 1985) .............................................................................16

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ..................................................................................................13

Miller v. Dept. of Probation and Parole,
    158 F. Supp.2d 406 (D. Del. 2001) ..............................................................................13

National Railroad Passenger Corp. v. Morgan,
    536 U.S. 101 (2002) ..................................................................................................12

Schoch v. First Fidelity Bancorporation,
    912 F.2d 654 (3d Cir. 1990). ......................................................................................11

Talley v. United States Postal Service,
    720 F.2d 505 (8th Cir. 1983) ............................................................................17

**STATUTE**

42 U.S.C. § 2000e-5(e)(1) ................................................................................12

I.    **NATURE AND STAGE OF PROCEEDINGS**

Plaintiff, Equal Employment Opportunity Commission ("EEOC"), has brought this action on behalf of William Spikes against defendant Initial Security ("Initial").  Plaintiff alleges race discrimination in employment under Title VII of the Civil Rights Act and retaliatory discharge; defendant denies these claims.  This matter is before the Court upon defendant's motion for summary judgment.  Defendant seeks the dismissal of plaintiff's Complaint in its entirety.

II.    **SUMMARY OF ARGUMENT**

Plaintiff's complaint consists of two allegations:  He claims that he was subject to disparate treatment on the basis of race due to the fact that Jack Dukes received a higher pay rate than he did; and he alleges that the company retaliated against him by terminating his employment, after he went to the EEOC's offices in June, 2002.  Both claims are legally deficient.

Plaintiff's claim for disparate treatment with regard to Mr. Spikes' pay is time-barred, since he filed his charge with the EEOC more than 300 days after the last paycheck under the Chase contract.  Moreover, even if this charge had been timely filed, Mr. Dukes and Mr. Spikes were in no way comparable.  Mr. Dukes earned a higher rate of pay because he performed additional duties above and beyond what was required of a site supervisor, and as a result, Initial's client demanded that he be given a raise.

III.    **STATEMENT OF FACTS**

William Spikes previously worked as a site supervisor for Defendant, Initial Security from 1997 until 2002.  Initial Security provides security services to its clients at various locations.  William Spikes began his employment with Initial Security in September, 1997 as

a rover at a building at 802 Delaware Avenue. Deposition of Mr. Spikes, pp. 51, 55.[1] Mr.
Spikes had been unemployed for approximately two years prior to his application at Initial
Security. Deposition of Mr. Spikes, p. 40. He had last worked as a loader and driver for a
small business in New Jersey, where he worked for less than a year. Exhibit 2. Mr. Spikes
also claims to have worked for several years as a mercenary, a soldier for hire, for the 3M
company in various parts of the world. Deposition of Mr. Spikes, pp. 23-27. As Mr. Spikes
put it, he was "paid to kill." Deposition of Mr. Spikes, pp. 24, 27. In 1984, Mr. Spikes tried
to operate his own auto repair business in Philadelphia, but the business failed. Deposition of
Mr. Spikes, pp. 29-30. He was not employed again until 1994. Deposition of Mr. Spikes, p.
31. For about three years he was simply using the shop as a place to "hang out" although it
was no longer in business. Deposition of Mr. Spikes, p. 31.

Chase Manhattan Bank was Initial's client at the 802 Delaware Avenue location until
December, 2001. Deposition of Mr. Spikes, p. 70. Initial Security provided security services
for Chase pursuant to a contract and was required to meet Chase's expectations regarding the
provision of these services. Deposition of Mr. Spikes, pp. 93-94. The pay rates of Initial's
security personnel were determined by the contract negotiated between Initial and Chase.
Deposition of Mr. Spikes, p. 95. Initial could not pass along any increase in a security
guard's pay rate to Chase without Chase's consent. Deposition of Mr. Kitchen, pp. 61-63.[2]
On the other hand, if Chase wished to increase a security guard's pay rate, and was willing to
pay the difference, it could demand that Initial do so, since it had the power to terminate the
contract. Chase occasionally requested that bonuses be given to certain guards based on

---

[1] Excerpts from the Deposition of Mr. Spikes are attached hereto as Exhibit 1.
[2] Excerpts from the Deposition of Mr. Kitchen are attached hereto as Exhibit 3.

merit, and these bonuses were paid entirely by Chase. William Spikes was at all times paid in accordance with the contract negotiated between Chase and Initial.

William Spikes claims that he verbally complained about disparities in promotions between black security guards and white security guards at the 802 Delaware Avenue building to an Initial Security manager in 1997. Deposition of Mr. Spikes, p. 128. Mr. Spikes' co-worker, Elvis Gissior, prepared a document concerning these issues. Deposition of Mr. Spikes, pp. 118-19. However, he did not give this document to anyone at Initial. Deposition of Mr. Spikes, p. 121. Although Mr. Spikes never filed any written complaint or grievance of discrimination at any time during his employment with Initial Security, he was aware of this process, since a white security guard once lodged a complaint of reverse discrimination against Mr. Spikes. Deposition of Mr. Spikes, pp. 134, 140. Mr. Spikes did not complain that he personally was overlooked for a promotion, and he attributed the alleged problems to Chase. Deposition of Mr. Spikes, p. 122. He admits that this issue involving promotions was resolved not long after he complained, in any event.[3] Deposition of Mr. Spikes, pp. 130-32.

William Spikes was promoted from a rover to a console operator after a few months on the job and received a pay increase in accordance with the contract. Deposition of Mr. Spikes, p. 51. He remained in the position of console operator until April, 2000, when he was promoted to the position of site supervisor of the 802 Delaware Ave. location after the site supervisor, Jack Dukes, was transferred to Chase's new location. Deposition of Mr. Spikes, p. 55. Chase made the decision to move its Delaware operation to a suburban campus location sometime in the late 1990's, and began migrating its employees to the White Clay

---

[3] The EEOC investigated Mr. Spikes' allegations regarding promotions, but did not find cause on this claim. Exhibit 3.

Creek location at the beginning of 1999.  Deposition of Mr. Spikes, p. 73.  In April, 2000,
Chase requested that Jack Dukes, the Site Supervisor of 802 Delaware Ave., be transferred to
the new White Clay Creek location.  Deposition of Mr. Dukes, pp. 134-35.

Jack Dukes began working with Initial Security's predecessor, Servicelink, Inc., in
January, 1991.  Exhibit 5.  He had previously been employed as the production supervisor for
a chemical plant for seventeen years.  Deposition of Mr. Dukes, pp. 11-12[4], Exhibit 5.  He
voluntarily resigned from this position and took an early retirement after suffering a heart
attack which his physician attributed to job related stress.  He then applied for employment at
Initial Security and was assigned to the 802 Delaware Avenue location as a rover.
Deposition of Mr. Dukes, pp. 14-16.  He was promoted to the position of console operator,
where he distinguished himself repeatedly by voluntarily assuming significant administrative
tasks which were well beyond his expected job duties and responsibilities.  He repeatedly
received honors and commendations from Initial and Chase for his superior performance.
Exhibit 7.  In 1994, Mr. Dukes compiled a training manual for console operators which his
supervisor characterized as a "top notch training manual."  Exhibit 8.  Mr. Dukes was
recognized yet again in 1995 for his voluntary preparation of the Rover Training Manual.
Exhibit 9.  His supervisor stated that Mr. Dukes "continues to do an excellent job in any
position he is assigned to perform and his dedication to the Chase site is exemplary."   Mr.
Dukes later voluntarily undertook to learn the duties and responsibilities of the computer
security access system by training with Initial's access administrator.  Deposition of Mr.
Dukes, pp. 51-52.  As a result of his learning these technical skills, he was promoted to the
position of access administrator when the position became vacant.  Deposition of Mr. Dukes,
pp. 54-55.

---

[4] Excerpts from the Deposition of Mr. Dukes are attached hereto and marked as Exhibit 6.

4

Mr. Dukes was promoted to site supervisor in 1999, and as site supervisor, he continued to perform above and beyond his required duties. Deposition of Mr. Dukes, pp. 98-99, 106-22. He voluntarily learned and performed various duties that were in fact the responsibilities of the Chase security manager. When Chase security manager Dale Hall resigned, Mr. Hall trained MR. Dukes on the Chase security manager functions since Mr. Hall's replacement had not yet started. Mr. Dukes was to then train the new Chase security manager, Tom Durkens, on these functions. However, even after Mr. Durkens arrived, Mr. Dukes continued to perform these functions. Deposition of Mr. Dukes, pp. 117-19. The security manager duties which Mr. Hall trained Mr. Dukes on involved a mail testing function, designed to test the honesty of the Chase bank employees who worked in the mailroom. Mr. Dukes would plant money or financial information in an envelope, and then monitor the employee who received the envelope. Deposition of Mr. Dukes, pp. 114-17. Mr. Dukes also attended meetings for the Chase security manager when he was away, conducted new employee orientation, and performed payroll functions, none of which were within the job requirements of a site supervisor. Deposition of Mr. Dukes, pp. 200-02.

Mr. Dukes was transferred to Chase's White Clay Creek location in April, 2000, and continued to perform these additional job duties. Deposition of Mr. Dukes, pp. 118-19. Mr. Dukes' responsibilities increased in other ways after his transfer to White Clay as well. The White Clay campus was a large suburban campus with seven buildings, each of which had multiple entrances. Deposition of Mr. Dukes, p. 82. As Mr. Dukes put it, the difference between the security needs at 802 Delaware Avenue as opposed to White Clay was like "apples and oranges." The security needs at this location were necessarily more demanding.

Robert Bagosy, the Chase security manager at White Clay, traveled frequently, and he delegated many of his responsibilities to Mr. Dukes in his absence. Deposition of Mr.

5

Dukes, pp. 200-202.  In November, 2000, Mr. Dukes received a pay raise to $14.00 per hour at the demand of Mr. Bagosy.  Deposition of Mr. Dukes, pp. 104-05.  Mr. Bagosy had visited Chase's location in Tempe, Arizona, and discovered that Mr. Dukes' counterpart at that location was making significantly more money than Mr. Dukes, despite the fact that Mr. Dukes in fact had additional duties and responsibilities. Deposition of Mr. Dukes, pp. 104-05. Mr. Bagosy spoke with Initial's regional manager, Gordon Ellis, and demanded that Mr. Dukes receive a raise.  Deposition of Mr. Dukes, p. 107.  Since the increased pay rate would be passed along directly to Chase, and since Mr. Dukes' additional duties justified the raise, Mr. Ellis agreed.

Chase's migration from the 802 Delaware Avenue building to White Clay Creek resulted in a significant decrease in activity at the 802 building.  Mr. Spikes does not dispute that the employee migration meant that his duties as site supervisor dramatically decreased over the course of the migration.  Prior to the migration, Chase had 1400 employees at the 802 building; by the end of 2000, Chase had approximately 800 employees at the building. Deposition of Mr. Spikes, pp. 74-75.

Mr. Spikes learned that Mr. Dukes was given a bonus, which Mr. Spikes did not receive, in January or February of 2001.  Deposition of Mr. Spikes, p. 221.  Mr. Spikes claims that he spoke to Art Kitchen, an account manager for Initial, about this issue. Deposition of Mr. Spikes, p. 221.  Mr. Spikes admits that he was told that Bob Bagosy, the Chase security manager, made the decision to give the bonus, not Initial.  Deposition of Mr. Spikes, p. 221.  In fact, the bonus Mr. Dukes received while working at the White Clay campus was paid for entirely by Chase.  Deposition of Mr. Dukes, p. 145.  Mr. Dukes did not receive any bonuses while working at the 802 building; only at White Clay.  Deposition of Mr. Dukes, pp. 145.  Mr. Spikes also claims that he complained about pay rates for security

6

guards at White Clay as opposed to pay rates for security guards at the 802 building.

Deposition of Mr. Spikes, p. 136.  But Mr. Spikes admits that as far as he knew, all of the

guards at White Clay were being paid more than the guards at 802.  Deposition of Mr.

Spikes, p. 133.  He also admits that he was told that the pay rates were determined by Bob

Bagosy, the Chase security manager.  Deposition of Mr. Spikes, p. 136.

       In December, 2001, the 802 building was managed by REIT Management and Initial

Security continued to provide security services at this location.   Deposition of Mr. Spikes, p.

141.  At this point, the building was essentially empty, and as a result the security staffing

needs decreased dramatically.  When Mr. Spikes was site supervisor at the 802 building when

Chase was the client, there were 22 security officers under his supervision.  When REIT

Management became the client at the 802 building, there were seven security officers under

Mr. Spikes' supervision.  Deposition of Mr. Spikes, pp. 114-115.  When REIT Management

came in, they met with certain Initial employees, including Mr. Spikes, and explained the pay

rates under the contract. Deposition of Mr. Spikes, pp. 196-97.  Given the significantly

decreased duties, Mr. Spikes received a 50 cent per hour decrease in his pay rate.  Deposition

of Mr. Spikes, pp. 196-97.  However, Mr. Spikes testified at his deposition that he felt that

his pay rate under the REIT contract was entirely fair and that he at no time considered filing

a charge against REIT management.  Deposition of Mr. Spikes, pp. 196-97.  He testified that

he never felt that his pay rate under the REIT contract was in any way discriminatory:

> Q:  Your belief was that, once REIT came on board, there was
> nothing discriminatory about your pay?
> A:  No, because REIT had a meeting with me and told be
> what I was going to get and what all the guards were going to
> get and what to expect.

Deposition of Mr. Spikes, pp. 196-97.  Sometime in the summer of 2002, Mr. Spikes went to

the EEOC's office in Philadelphia and obtained a questionnaire, which he then filled out.

Deposition of Mr. Spikes, pp. 143-44.  In the questionnaire, he included a written essay which addressed his earlier allegations regarding unfair promotions by Chase Manhattan. Mr. Spikes met with Debby Baul, who was employed by Initial Security as recruiter, and he brought this questionnaire with him.  Deposition of Mr. Spikes, p. 145.  Mr. Spikes told Ms. Baul that he was going to the EEOC to complain about Chase, and he showed her the questionnaire, which dealt with his allegations concerning Chase.  Deposition of Ms. Baul, pp. 63, 64, 91, Exhibit 10.  Since Ms. Baul did not have any connection with the Chase account, which at that time was located only at White Clay, she simply told him to do whatever he felt was necessary.  Ms. Baul understood that Mr. Spikes' complaint was against Chase, not Initial Security.  Deposition of Ms. Baul, p. 63, 66.  Ms. Baul did not tell anyone at Chase about what Mr. Spikes said.   Deposition of Ms. Baul, p. 64.  Mr. Spikes testified at his deposition that he had great respect for Ms. Baul, and he has no reason to believe that Ms. Baul would engage in any discriminatory behavior.  Deposition of Mr. Spikes, p. 166.  Mr. Ellis had no knowledge of Mr. Spikes' visit to the EEOC offices until after Mr. Spikes' termination, when the charge was served.  Deposition of Mr. Ellis, p. 126.[5]  Mr. Spikes did not tell anyone else at Initial about going to the EEOC, except perhaps that he may have mentioned to the console operator, Lola Granberry that he would need to take a day off. Deposition of Mr. Spikes, pp. 145-46.  However, at her deposition, Ms. Granberry testified that she had no idea that Mr. Spikes went to the EEOC, until after his termination of employment.  Deposition of Ms. Granberry, pp. 52-53.[6]

Initial's regional manager, Gordon Ellis, began receiving complaints from REIT Management about Mr. Spikes' performance in 2002.  Exhibit 14; Deposition of Mr. Ellis, p.

---

[5] Excerpts from the Deposition of Mr. Ellis are attached hereto and marked as Exhibit 11.
[6]  Excerpts from the Deposition of Ms. Granberry are attached hereto as Exhibit 13.

121. Janet Ballorino was the property manager at REIT Management who was responsible
for the 802 building, and she complained to Mr. Ellis about problems with Mr. Spikes.
Deposition of Mr. Ellis, pp. 121-22. Mr. Ellis verbally addressed these issues with Mr.
Spikes, but the problems continued. These problems included Mr. Spikes leaving the work
area during working hours without being properly relieved, reporting to work late, problems
with officers sleeping on post, problems with officers failing to wear their uniform, and Mr.
Spikes' frequent lateness. Exhibit 14; Deposition of Mr. Spikes, pp. 156-57. REIT
Management had previously indicated to Gordon Ellis that if Initial performed well at the 802
building, there was an opportunity for Initial to be awarded additional contracts at other REIT
locations. Exhibit 14. Janet Ballorino, property manager for REIT, called Mr. Ellis in the
fall of 2002 and told him that Initial's contract with REIT for the 802 building was in
jeopardy due to Mr. Spikes' poor performance, and that REIT was no longer considering
Initial for their other locations. Exhibit 14. Ms. Ballorino specifically complained about Mr.
Spikes' frequent lateness. Deposition of Ms. Baul, pp. 44-45, 53; Exhibit 14. In response,
Mr. Ellis told Debbie Baul to go the site at the start of Mr. Spikes' shift to see if he was in
fact late. Deposition of Mr. Ellis, p. 108. He was late two days in a row. Deposition of Mr.
Ellis, pp. 112-13. The second day that he was late, he was actually in the garage working on
his own car. Deposition of Mr. Ellis, p. 128. REIT's maintenance supervisor saw Mr. Spikes
working on his own car in the garage, and then called Mr. Ellis and directed him to remove
Mr. Spikes from the premises. Deposition of Mr. Ellis, pp. 117-20. Mr. Ellis believed it was
clear that for an employee to work on his personal car while on duty is a severe violation of
policy. Deposition of Mr. Ellis, pp. 118, 128.

Mr. Ellis then called a meeting with Mr. Spikes to discuss his performance problems,
which included failure to adequately supervise his guards, problems using the computer and

lateness. Deposition of Mr. Ellis, pp. 126-28, 131.  With the exception of the computer

problem, Mr. Spikes did not dispute these issues, and his employment was then terminated.

Exhibit 13.  Transferring Mr. Spikes to another location was not an option, since there was no

position open which was commensurate with Mr. Spikes' rate of pay.  Deposition of Ms.

Baul, pp. 85-86.  Mr. Spikes admits that he was told there was no site supervisor position

open at that time, and that is why he characterized his termination as being due to "lack of

work" for purposes of collecting unemployment compensation.  Deposition of Mr. Spikes, p.

174-75; Exhibit 14.  He also felt that Mr. Spikes' performance problems, which put the REIT

contract in jeopardy, were severe enough to warrant termination.  Deposition of Mr. Ellis, pp.

150-51.  Mr. Ellis' meeting with Mr. Spikes was transcribed in shorthand by Initial's office

manager, and Mr. Spikes admitted at his deposition that the transcript is accurate.  Deposition

of Mr. Spikes, pp. 156, 167.  Mr. Ellis gave Mr. Spikes the opportunity to discuss the

termination during the meeting, but Mr. Spikes never complained that he felt his termination

of employment was discriminatory or retaliatory.  Deposition of Mr. Spikes, p. 167-68.

IV.    **ARGUMENT**

    **A.    Summary Judgment is warranted on this record.**

    Federal Rule of Civil Procedure 56(c) provides that the moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the moving party has satisfied its burden of showing the absence of a genuine issue concerning any material fact, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment."  Id. at 256-57.  "Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials." Best v. Janerich, 80 F. Supp. 2d 334, 335 (M.D. Pa. 1999), citing Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Best, 80 F. Supp. 2d at 336, quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

          **B.    Plaintiff's claim for disparate treatment must fail.**

              **1.    Plaintiff's claim for disparate treatment is time-barred.**

    A Title VII plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days "after the alleged unlawful

employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  "A party, therefore, must file a

charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002).  In this case,

Plaintiff alleges disparate treatment in regard to pay, and claims that Mr. Spikes' pay rate was

unfair because another site supervisor, Jack Dukes, who also worked at a Chase location in

Delaware, received a pay raise in November, 2000, which Mr. Spikes did not receive.

However, Mr. Spikes admits that his pay was fair once the Chase contract at the 802 building

ended:

> Q.  Your belief was that, once REIT came on board, there
> was nothing discriminatory about your pay?
> A.  No, because REIT had a meeting with me and told me
> what I was going to get and what all the guards were going to
> get and what to expect.

Deposition of Mr. Spikes, pp. 196-97.  Chase's contract with Initial Security for the 802

building ended on December 6, 2001.  Deposition of Mr. Spikes, p. 70.  After that date, REIT

Management was Initial's client at 802 Delaware Avenue.  Deposition of Mr. Spikes, p. 70.

REIT Management had its own contract with Initial, and Initial's guards were paid according

to this contract.  Deposition of Mr. Spikes, pp. 94-95.

     The EEOC has not, and cannot allege that there was anything unfair or discriminatory

concerning Mr. Spikes' pay rate once the REIT contract took effect.  Initial Security makes it

clear to all of its security guards that their pay rates may vary depending upon the rates

negotiated with its different clients.  Exhibit 15.  The EEOC's allegations concerning Mr.

Spikes' pay rate are limited solely to his pay rate when Chase was the client at the 802

building.  This claim is time-barred, since the alleged discriminatory treatment ended on

December 6, 2001, when the Chase contract at 802 Delaware Avenue ended.  Mr. Spikes did

not file his charge of discrimination with the EEOC until March, 2003.  Exhibit 16.  This is well beyond the 300-day time limit for filing a charge of discrimination.

**2.    In any event, Mr. Spikes and Mr. Dukes are not comparable.**

Even apart from the fact that Plaintiff's claim for disparate treatment is time-barred, it must fail for the additional reason that Mr. Dukes and Mr. Spikes are in no way comparable. Plaintiff alleges that defendant committed disparate treatment race discrimination by paying a different pay rate to Mr. Spikes and Mr. Dukes.  A *prima facie* case of race-based discrimination is proven by showing (1) plaintiff is a member of a protected class, (2) he was qualified for the job, and (3) he was paid at a lower level than similarly situated white employees.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In a disparate treatment race discrimination case, the plaintiff always bears the burden of proving that race was the determinative factor in the employer's wage payment decision, i.e., plaintiff must prove that defendant acted with a discriminatory purpose.  Cooper v. Southwark Metal Co., 59 Fair Empl. Prac. Cas (BNA) 1521, 1992 WL 236285 (E.D. Pa. 1992), Exhibit 17.

In a disparate treatment case, there must be sufficient evidence to determine whether the other employee is similarly situated to the plaintiff.  Harden v. Southwark Metal Manufacturing Co., 2002 WL 31194220 (E.D. Pa. 2002), Exhibit 18.  For an alleged comparator to be considered similarly situated, a plaintiff must present evidence that the individuals with whom he wishes to be compared are similarly situated in all material aspects.  Miller v. Dept. of Probation and Parole, 158 F. Supp. 2d 406, 411 (D. Del. 2001).

While Mr. Dukes and Mr. Spikes had the same job title, they could not be more differently situated in every other material aspect.  Mr. Dukes' prior work history involved a seventeen year tenure as production supervisor for a chemical plant from which he took an

13

early retirement.  Deposition of Mr. Dukes, pp. 11-12.  Mr. Spikes had been unemployed for two years prior to applying at Initial Security.  Deposition of Mr. Spikes, p. 40.  His employment history included work as a loader and driver, operating a unsuccessful auto repair business, and working as a soldier for hire.  Deposition of Mr. Spikes, pp. 23-27.

Mr. Dukes distinguished himself at Initial Security by taking on additional duties above and beyond what was required of him throughout his entire tenure.  Mr. Dukes mentioned to the Chase security manager Dale Hall. that it might be helpful to have written rules and procedures in place at the 802 building.  Mr. Hall suggested that Mr. Dukes could create these rules and procedures if he wanted them, and Mr. Dukes proceeded to do so. Deposition of Mr. Dukes, pp. 57-60.  Mr. Dukes created job descriptions for every security position at the building.  Deposition of Mr. Dukes, p. 60.  Then Mr. Dukes wrote procedures on how to handle emergencies on the fire alarm system, how the rover should make his rounds, etc.  Deposition of Mr. Dukes, p. 60.  After Mr. Dukes created these job descriptions and procedure manuals, he submitted them to Chase and they were then published and distributed.  Deposition of Mr. Dukes, p. 61.   Mr. Dukes voluntarily undertook these additional tasks, which were over and above what was required of his position as site supervisor.   Deposition of Mr. Dukes, pp. 202-3.  Mr. Dukes also voluntarily undertook to be trained on the security access system, and he later was promoted to access administrator when the position became available.  Deposition of Mr. Dukes, pp. 51-56.

Mr. Spikes' day to day job duties as site supervisor including taking up a daily report to the Chase manager, performing a visual inspection, making rounds, and supervising the rovers.  Deposition of Mr. Spikes, pp. 67-70.  As far as Mr. Spikes was concerned, "that was enough."  Deposition of Mr. Spikes, p. 70.  He did not take on any of the additional duties and responsibilities that Mr. Dukes assumed.

Mr. Dukes' position involved a significantly greater level of responsibility due the fact that he supervised a larger workforce, at a large suburban office complex with several buildings.  In contrast, Mr. Spikes supervised a smaller workforce, a single building with a declining number of employees.  Moreover, Mr. Dukes voluntarily assumed additional duties above and beyond his job requirements which greatly assisted Initial's client, Chase.  Mr. Dukes' additional duties included payroll preparation, conducting mail testing, new hire orientation, and drafting of training manuals and job descriptions.  Because Mr. Dukes performed these additional duties, Chase instructed Initial to give Mr. Dukes a raise and Chase paid for this raise.

**C.    Plaintiff's claim for retaliation must fail, because there is no "causal link."**

In order to satisfy its *prima facie* burden with respect to the retaliation claim, the EEOC must show: (1) that the employee engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with his protected activity; and (3) that there was a causal link between the employee's protected activity and the employer's adverse action.  Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  To establish the "causal link" between the protected activity and the adverse employment action, a plaintiff must show temporal proximity and/or evidence from the defendant's treatment of the plaintiff.  Additionally, the plaintiff must show that the defendant had knowledge of the plaintiff's participation in a protected activity at the time the defendant took the adverse employment action.

The Third Circuit has indicated that the impact of temporal proximity depends on the length of time.  Temporal proximity alone will be insufficient to show establish causation "when the temporal relationship is not 'unusually suggestive.'"  Farrell v. Planters

15

Lifesavers, Co., 206 F.3d 271, 280 (3d Cir. 2000) (internal citations omitted); Krouse v.

American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (holding that nineteen months was

not sufficient to alone establish causal link because not 'unusually suggestive'). In this case,

there was a gap of several months between Mr. Spikes' visit to the EEOC's office and the

termination of his employment, which is insufficient to establish causation.

However, on a more fundamental level, logic requires that for a causal link to exist, it

is necessary that the person who took the adverse employment action was aware that the

employee engaged in a protected employee activity before the adverse employment action.

Without such knowledge, such participation by the employee could not be the cause of the

adverse employment action. Mandia v. ARCO Chemical Co., 618 F.Supp. 1248 (W.D. Pa.

1985). "Since, by definition, an employer cannot take action because of a factor of which it

is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is

absolutely necessary to establish the third element of the prima facie case." Dowe v. Total

Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). In Hudson v.

Southern Ductile Casting Corp., 849 F.2d 1372 (11th Cir. 1988), the Fifth Circuit granted

summary judgment in favor of the defendant because the plaintiff failed to produce any

evidence that the one who made the adverse employment decision knew the plaintiff had

engaged in a protected activity. Id. at 1377. The plaintiff had threatened to file a complaint

with the EEOC, yet he only expressed this threat to an employee who had been discharged

from the company long before the plaintiff was fired, and the plaintiff did not show any

evidence that the persons who decided to terminate him were aware of the threat. In Brower

v. Runyon, 178 F.3d 1002 (8th Cir. 1999), the Eighth Circuit found that the plaintiff did "not

produce sufficient evidence to support an inference that her visit to the Equal Employment

Opportunity ("EEO") office was causally connected to the termination of her contract." Id. at

1006.  The court determined this despite the fact that the plaintiff was terminated only two days after her visit to the EEO because the plaintiff failed to show any evidence that any company officials knew about it.  Id. at 1007.  The transcript of the plaintiff's telephone conversation with her manager did not include any references to the EEO, and there was no evidence that the EEO counselor contacted any company officials regarding the plaintiff's visit.  Id. See also, Talley v. United States Postal Service, 720 F.2d 505, 508 (8th Cir. 1983), where the Eighth Circuit found that the plaintiff could not establish a causal connection because she failed to present any evidence that the supervisor who made the decision to terminate her was aware that she had participated in a protected activity, and the supervisor had a legitimate, non-discriminatory reason for firing her.

          In this case, there is no evidence that the decision maker, Gordon Ellis, had any knowledge of Mr. Spikes' visit to the EEOC's office in Philadelphia.  Deposition of Mr. Ellis, p. 165.  The only person Mr. Spikes told about going to the EEOC was Debby Baul, but he admits that he has no reason to believe that Ms. Baul told anyone else at Initial about this incident.  Deposition of Mr. Spikes, pp. 114-115.  In fact, Ms. Baul testified that she did not do so. Deposition of Ms. Baul, p. 64. Ms. Baul understood that Mr. Spikes intended to file a charge against Chase, not Initial, so she had no reason to tell anyone at Initial in any event. Deposition of Ms. Baul, p. 63, 66.  In the absence of any evidence that the decision maker, Gordon Ellis, had any knowledge of the fact that Mr. Spikes went the EEOC office, there can be no causal link between the protected activity and the adverse employment action.

17

## V.     CONCLUSION

For all the foregoing reasons, defendant respectfully requests that this Honorable

Court grant summary judgment to defendant and dismiss plaintiff's Complaint in its entirety.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By: _____
Frank E. Noyes, II (Id. No. 3988)
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 467-4511

Debbie Rodman Sandler *(Pro Hac Vice)*
Tanya A. Salgado *(Pro Hac Vice)*
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-6368

Attorneys for Defendant, Initial Security

18