**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EQUAL EMPLOYMENT OPPORTUNITY     :   CIVIL ACTION
COMMISSION,                             :
              Plaintiff       :
                               :
      v.                         :   04-1309-KAJ
                               :
INITIAL SECURITY,               :
                               :
             Defendant     :
                               :

---

EXHIBITS TO BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**WHITE AND WILLIAMS LLP**

By: _____

Frank E. Noyes, II (Id. No. 3988)
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
(302) 467-4511

Debbie Rodman Sandler *(Pro Hac Vice)*
Tanya A. Salgado *(Pro Hac Vice)*
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-6368

Attorneys for Defendant, Initial Security

# EXHIBIT 1

# EXHIBIT 1

Deposition of:
William H. Spikes                                              March 15, 2005

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2

 3

    EQUAL EMPLOYMENT OPPORTUNITY        )
 4  COMMISSION,                         )        COPY
                                        )
 5              Plaintiff,              )
                                        )
 6  v.                                  )    Civil Action No.
                                        )        04-1309
 7  INITIAL SECURITY,                   )
                                        )
 8              Defendant.              )

 9

10              Deposition of WILLIAM H. SPIKES taken
    pursuant to notice at the offices of White and
11  Williams, 824 North Market Street, Suite 902,
    Wilmington, Delaware, beginning at 10:00 a.m. on
12  Tuesday, March 15, 2005, before Ann M. Calligan,
    Registered Merit Reporter and Notary Public.
13

14

    APPEARANCES:
15
                JUDITH A. O'BOYLE, Esquire
16              RACHEL M. SMITH, Esquire
                EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
17                111 South Independence Mall East
                  21 South 5th Street - Suite 400
18                Philadelphia, Pennsylvania  19106-2515
                  on behalf of the Plaintiff,
19
                TANYA A. SALGADO, Esquire
20              WHITE and WILLIAMS
                  1800 One Liberty Place
21                Philadelphia, Pennsylvania  19103
                    on behalf of the Defendant.
22

23

24

25
```

Deposition of:
William H. Spikes

March 15, 2005

Page 23

1    wasn't -- this was their policy.  They were treating

2    me right.  Okay?  So I had no -- there's nothing for

3    me to complain about.  Okay?  I just didn't like the

4    way they were doing it.  Okay?  But as far as my

5    treatment was fair.  So how can I complain, you know,

6    for somebody else, you know, unless they came and

7    complained to me?

8        **Q.    I'm going back to your position at the Ashburn**

9    **Country Club.**

10       A.    Mm-hmm.

11       **Q.    Did you feel you were treated in a fair manner**

12   **there?**

13       A.    Yes.

14       **Q.    You left the Ridgewood Country Club, I think**

15   **you said, in '81 or '82?**

16       A.    Mm-hmm.

17       **Q.    What did you do after you left that employment?**

18       A.    Do I have to answer this?

19       **Q.    Yes, sir.**

20            **MS. O'BOYLE:  You said what did you do**

21   **after?  You want to know employment?**

22            **MS. SALGADO:  Well, what I meant was**

23   **working.**

24       A.    I was a mercenary.

25       **Q.    Can you explain what you mean by that?**

Page 24

1    A.   A soldier for hire.

2    Q.   **Who retained you for that?**

3    A.   That I can't tell you.  See, that's why we

4    getting into something else.  Okay?  And I --

5    Q.   **Well, the difficulty is, unless it's a matter**

6    **of --**

7    A.   Confidential.

8    Q.   **-- attorney/client privilege, I'm afraid you'll**

9    **have to answer the question.**

10            MS. O'BOYLE:  Can you give us at least

11   some information about it?

12   A.   Okay.  It was for the 3M company.

13   Q.   **You say you are a soldier for hire.  What do**

14   **you mean?  Were you -- I don't understand what you**

15   **mean.**

16   A.   Do you understand what an mercenary is?

17   Q.   **Well, it has a lot of different definitions.**

18   A.   No, it doesn't.

19   Q.   **What I need to know is what your definition is.**

20   A.   A soldier for hire.  I was paid to be a

21   soldier.  I was paid to kill.  I was paid to do things

22   that other soldiers would not do.

23   Q.   **Were you in this country when you did it or --**

24   A.   No.

25   Q.   **-- were you abroad?**

Deposition of:
William H. Spikes

March 15, 2005

Page 25

| | |
|---|---|
| 1 | A.   I was abroad. |
| 2 | Q.   **These were in war zones?** |
| 3 | A.   To them, yes.  It was to protect their |
| 4 | properties and stuff like that. |
| 5 | Q.   **Where were you located?** |
| 6 | A.   I was in Angola for six months.  I went to |
| 7 | Liberia.  I went back to Thailand.  I went to Laos. |
| 8 | And I think about '84 -- I think it was '84, '85, a |
| 9 | friend of mine got killed in Angola.  He had his head |
| 10 | cut off, and I gave it up.  He got caught or |
| 11 | something, and they beheaded him, and I was done with |
| 12 | it.  So they brought me back to the country. |
| 13 | Q.   **How did you find out about this?** |
| 14 | A.   I was a soldier in the beginning. |
| 15 | MS. O'BOYLE:  You mean how did he become |
| 16 | one? |
| 17 | Q.   **How did you become a mercenary, as you call it?** |
| 18 | A.   Through our government. |
| 19 | Q.   **That's how you found out about this type of --** |
| 20 | A.   No.  That's not -- they found me.  All right? |
| 21 | I didn't find out about them.  They found me.  Okay? |
| 22 | And this stems from the war in Vietnam, or they have |
| 23 | what you call an available list.  I guess it would be |
| 24 | like a list that you -- that people do now when they |
| 25 | give somebody's name up and they don't even know about |

Deposition of:
William H. Spikes

March 15, 2005

Page 26

1    it.  You know, invade their privacy, et cetera,

2    et cetera.  The government had a list which they gave

3    to these private companies.

4        Q.    **So it was the 3M company?**

5        A.    Yeah.  You know 3M mining company?

6        Q.    **They had --**

7        A.    The 3M mining company, I did work for them in

8    Vietnam too.  So I had been aware of their system.

9        Q.    **Were you allowed to do that when you were in**

10   **Vietnam?**

11       A.    Our government said so.

12       Q.    **The government knew you were doing this work**

13   **for 3M while you were in Vietnam?**

14       A.    No.  No.  Our government was guarding their

15   mining operations while I was in Vietnam.

16       Q.    **Okay.**

17       A.    Okay?  And I was a guard in that unit that was

18   guarding the mining operation while 3M engineers

19   pursued to do their mining.

20       Q.    **So you weren't paid by 3M company?**

21       A.    Not at that time.  No.

22       Q.    **But then --**

23       A.    Later on I was.

24       Q.    **-- later on you were tapped?**

25       A.    Yes.

Deposition of:
William H. Spikes

March 15, 2005

Page 27

1    Q.    I believe you said you were paid to kill.  Did

2    you, in fact, kill people in connection with this job

3    that you were doing?

4    A.    Yes.

5    Q.    Do you know about how many?

6    A.    Maybe 30 or 40.

7    Q.    In what context did this happen?

8    A.    Gun fights.  Skirmishes.

9    Q.    In connection with people trying to get onto

10   the property?

11   A.    Right.  In other words, there were -- I guess

12   they considered them as rebels or guerillas, whatever.

13   They were trying to more or less sabotage or stuff

14   like that, you know, to stop them from doing that kind

15   of...

16   Q.    What did you do after you came back to the

17   United States?

18   A.    I tried opening my own business in

19   Philadelphia, auto repair area.  25th and Washington.

20   Q.    Going back for a minute, how were you paid when

21   you were an mercenary?  What was the pay structure, if

22   you will?

23   A.    Cash.

24   Q.    What was the amount?

25            MS. O'BOYLE:  For the whole time?

Deposition of:
William H. Spikes

March 15, 2005

Page 29

1    Q.    So the idea of you are not under the

2    jurisdiction of criminal laws, is that the idea?

3    A.    I've known of mercenaries that were tried under

4    international law.  Okay?  But not under our criminal

5    system, no.

6    Q.    So, in fact, the manner in which you killed

7    people, was it unusual, outside of what you would do

8    as a soldier?

9    A.    Rules of engagement were different.  As a

10   soldier you have rules of engagement.  Okay?  There

11   the rules of engagement are totally different.

12   Q.    What are they?

13   A.    What are they?  Shoot and ask questions later.

14   Okay?

15   Q.    Going back to the auto repair shop, 25th and

16   Washington, how did that work out?

17   A.    It didn't.  It cost me a marriage.

18   Q.    Sorry about that.

19           How long did you try to make it go?

20   A.    I tried to make it go for about four years.

21   Q.    What was the time frame for that?

22   A.    I think I started in 19 -- I think I started in

23   1985 or '84, late 84, early '85.  And I gave it up in

24   '87.

25   Q.    How did it come about that you came up with

Deposition of:
William H. Spikes

March 15, 2005

Page 30

1   this idea to run this shop?  Did you have a business

2   background for something like that?

3       A.    Boy, you're getting really -- I used to race

4   cars in North Carolina.  So I was into auto racing.

5   Okay?  Strictly high performance.  You know, if you

6   wanted your car fixed like a normal car, I send you

7   down the street.  If you wanted to go fast, then you

8   pay me.  That's -- go fast operation.  In other words,

9   I was into high performance sports cars and stuff like

10  this.

11      Q.    Did you have a business partner?

12      A.    Yes.

13      Q.    Who was that?

14      A.    David Rutland.

15      Q.    Are you still in contact with Mr. Rutland?

16      A.    No.  No.

17      Q.    What was your employment after the auto repair

18  shop?

19      A.    I got back into security.

20      Q.    Where did you work?

21      A.    I worked at -- I started back with Volt

22  Security in Wilmington, Delaware.

23            MS. O'BOYLE:  Did you say Volt?

24            THE WITNESS:  Volt, yes.

25      Q.    What years were you there?

Page 31

1    A.    In 1990 to '94 or late -- early '95, I think it

2    was, '94.

3    **Q.    That leaves a gap of about three years between**

4    **the auto repair shop and when you went to work at**

5    **Volt.    What was your employment status at that time?**

6    A.    Probably salvaging my business.    In other

7    words, we had -- I was liquidating, selling -- I don't

8    know.    It was a big mess.    You know, in the process of

9    a divorce.    So let's say I had the shop open but it

10   wasn't -- it wasn't doing any business.    I mean, it

11   was just place to hang out in and sort things out.

12   **Q.    What was your source of income for that time**

13   **frame?**

14   A.    Well, I had income.    I had money invested in

15   the business.    So that that was -- you know, that was

16   sufficing at that time.    You know, I still had money

17   left over.    So it was no big issue.

18   **Q.    What was your job title at Volt Security?**

19   A.    Site supervisor.

20   **Q.    What were your job duties?**

21   A.    What was my job duties?    Okay.    As site

22   supervisor, I had to maintain scheduling -- how we

23   say -- coordinating with New Castle County Airport

24   police, secret service when they came in, any

25   government agencies.    I had to more or less coordinate

Deposition of:
William H. Spikes

March 15, 2005

Page 40

1    Q.    **You recovered from that?**

2    A.    Not according to my wife, but yeah, they

3    released me after almost two years of convalescing to

4    say I was okay.

5    Q.    **It took two years?**

6    A.    (Indicating.)

7    Q.    **That's a yes?**

8    A.    Yeah.

9    Q.    **Okay.**

10   A.    That's two years.

11   Q.    **What were you doing during those two years for**

12   **income?**

13   A.    I was on workman's comp.

14   Q.    **What did you do for employment after that?**

15   A.    You mean what did I --

16   Q.    **After you were released from workers' comp to**

17   **work.**

18   A.    I went to work for Initial.

19   Q.    **And what year did you apply at Initial?**

20   A.    That was September 10th, 1997.

21   Q.    **How did you find out about the position at**

22   **Initial?**

23   A.    I had some friends that were still in security,

24   and I was talking to one of them.  And at that time it

25   was called Servicelink, and he informed me that they

Deposition of:
William H. Spikes

March 15, 2005

Page 51

1         Did I read that correctly?

2    A.    Yes, you did.

3    Q.    Did you read this before you signed it?

4          MS. O'BOYLE:  Asked and answered.  You can

5    answer again.

6    A.    No, I did not.

7    Q.    When did you first start working at Initial

8    Security?  It was actually -- what did you say? --

9    Servicelink when you were first hired.  What was the

10   year that you started working there?

11   A.    September 10, '97.

12   Q.    And what was your job position when you were

13   hired?

14   A.    Rover.

15   Q.    Do you remember what your pay rate was at that

16   point in time?

17   A.    7.15 an hour.

18   Q.    How long were you in the position of a rover?

19   A.    Maybe two months.

20   Q.    And then what position were you in after that?

21   A.    Console operator.

22   Q.    Was that considered a promotion?

23   A.    Yes.

24   Q.    And what was your pay rate as console operator?

25   A.    8.15 an hour.

Deposition of:
William H. Spikes

March 15, 2005

Page 55

1  rovers, handled all the reports for that time spot I

2  was on and to report anything that was incident or

3  something to that effect to the site commander.

4     Q.   **You were promoted to site supervisor in April**

5  **of 2000, correct?**

6     A.   Yes.

7     Q.   **You said that Jack Dukes occupied that position**

8  **before you were promoted, correct?**

9     A.   Correct.  Yes.

10    Q.   **What was the name of the building where you**

11 **were working?**

12    A.   802 Delaware Avenue.

13    Q.   **Was there a period of time in which Mr. Dukes**

14 **remained at that location, 802 Delaware Avenue, after**

15 **you were promoted to site supervisor?**

16    A.   Is there a yes or no answer?

17         MS. O'BOYLE:  If you know.

18    Q.   **If you know.  I'm not asking you to answer a**

19 **question if you don't know the question.  Was there a**

20 **period of time in which Jack Dukes remained at the**

21 **site, 802 Delaware Avenue, after you were promoted to**

22 **site supervisor?  In other words, was there an**

23 **overlap?**

24         MS. O'BOYLE:  **Did you go to a different**

25 **job?  I mean, that's what you are asking?  Was he**

Deposition of:
William H. Spikes

March 15, 2005

Page 61

1    system.  He just left.

2       Q.    So the areas where Jack trained you were access

3    codes to the security system?

4               That's a yes?

5    A.    Yes.  Mm-hmm.

6       Q.    He trained you on the special Chase TV system?

7    A.    Right.

8       Q.    For monitoring the employees?

9    A.    Right.

10      Q.    But he did not train you on the badging

11   station?

12   A.    No.  Not the new one, no.

13      Q.    Were you expected to know how to use the

14   badging station in connection with your job duties as

15   site supervisor?

16   A.    Was I -- at that time, no.

17      Q.    When you say at that time, you mean when you

18   were first promoted --

19   A.    Right.  Right.

20      Q.    -- to site supervisor?

21   A.    Yes.  Yes.  No.

22      Q.    Did there come a time when you were expected to

23   operate the badging station?

24   A.    Did it come a time when -- that was my own

25   initiative to learn that.  So I don't -- I don't know

Deposition of:
William H. Spikes

March 15, 2005

Page 62

1    how you want to answer that.

2    **Q.    Can you explain what you mean when you say it**

3    **was your own initiative?**

4    A.    In other words, I had two employees that were

5    there that were badging -- that worked at the badging

6    station.   And I asked them to teach me how to do it,

7    just in case one day somebody's not there.

8    **Q.    When did this happen?**

9    A.    In happened about two weeks after Jack left.

10   **Q.    What were the names of the employees who were**

11   **running the badging station?**

12   A.    One was Christine Brown.   The other was Jeanie

13   Stein.

14   **Q.    What were their job titles?**

15   A.    Their job titles were badging -- I guess you

16   would call them badging -- what would you call them?

17   **Q.    Well, did they have a job title?**

18          **MS. O'BOYLE:   If you know.**

19   A.    Yeah.   More like secretary.   But that would

20   have been -- in other words, they were -- I guess they

21   would be called under administration.   I guess you

22   would call it administration.

23   **Q.    You were the site supervisor.   Did individuals**

24   **have job titles?**

25   A.    Yeah.   The badging person, yeah.   That's -- you

Deposition of:
William H. Spikes

March 15, 2005

1   would ask for a job title.  If I said, go up there to

2   see the badging person, that would be Jeanie Stein or

3   Christine, whoever was up there, the person that does

4   the badges because they were -- they were employed by

5   Initial too.

6      Q.   **So about two weeks after Dukes left you asked**

7   **them to teach you how to operate this badging --**

8      A.   Mm-hmm.

9      Q.   **-- station.**

10          **That's a yes?**

11     A.   Yes.  Yes.

12     Q.   **And did you, in fact, learn how to operate it?**

13     A.   Yes.  With the help of them and Bob Armstrong,

14   the account manager at that time.

15     Q.   **Did you, in fact, operate the badging station?**

16     A.   Yes, I did.

17     Q.   **Did you have any difficulties in doing so?**

18     A.   Of course.  In the beginning.

19     Q.   **Did you ever reach the point where you felt you**

20   **were experienced enough in it not to have problems?**

21     A.   Yeah.  Yeah.

22     Q.   **There was no job title at Initial Security**

23   **called administrative assistant?**

24     A.   I don't know what was at Initial.  Now --

25          MS. O'BOYLE:  Is there a question?  That