Deposition of:
William H. Spikes                                              March 15, 2005

Page 67

1   Q.   What were the actual functions that were
2   performed on a day-to-day basis?
3   A.   Day-to-day basis, taking up a daily report to
4   the account -- to the Chase manager, finding out from
5   him what -- if there was any important things that you
6   had to relay down to the guards under you. Doing a
7   visual and a walk -- let's say a walk-about. I used
8   to call it a walk-about where you would walk around
9   the whole site to check to see if there were any
10  broken windows or something that one of the rovers
11  missed. To go through the parking garage and make
12  sure that the rovers were doing their job and they
13  were writing out tickets or whatever they were
14  supposed to be doing. So it was -- pretty active day.
15  Q.   You referred to a Chase manager. Was that the
16  individual at Chase that you acted as the liaison
17  between? In other words, you acted as liaison between
18  the Chase manager and Initial Security?
19  A.   No. As between the Chase manager and my
20  guards. In other words, when I went up to him, he
21  would delegate to me what -- you know, what was his
22  wishes for that day or if he had a problem or we --
23  that we needed to beef up security or something to
24  that effect.
25  Q.   When you were first promoted to the position of

Deposition of:
William H. Spikes                                    March 15, 2005

Page 68

1  the site supervisor, who occupied the position of
2  Chase manager?
3     A.  When I was first promoted to that position, it
4  would have been Sam Pratcher.
5     Q.  Did another individual fill that role after Sam
6  Pratcher?
7     A.  At my building I think Bob Bagosy stated that
8  he would be -- if I had any problems, to get in touch
9  with him.
10    Q.  What was Bob Bagosy's job title?
11    A.  I think he was supposed to be security manager
12 or vice-president.  I really, really, really never got
13 a full interpretation of his job title.
14    Q.  So Sam Pratcher was Chase manager when you
15 first became site supervisor?
16    A.  Yes.
17    Q.  Was he the Chase manager the entire time that
18 you were employed as site supervisor at Initial
19 Security?
20    A.  No.
21    Q.  Who came next after him, Bob Bagosy?
22    A.  Bob Bagosy.
23    Q.  Was there anyone after Bob Bagosy?
24    A.  No.  When I left -- when Chase left out of that
25 building, as far as I know, Bob Bagosy was still the

Deposition of:
William H. Spikes

March 15, 2005

Page 69

1  Chase manager.

2  Q. You were listing your job duties as site
3  supervisor. You mentioned a daily report. Was this
4  verbal or was it written down?

5  A. It was combination of both.

6  Q. What was the content of these reports?

7  A. Man hours, checking the daily log that we had
8  in the console area to make sure there was no
9  incident. If there were incident reports, then bring
10 them forth and go over them to see what the response
11 was or what was the outcome of the incident report.

12 Q. Did you actually write out a report to the
13 Chase manager or how did that work?

14 A. Depends on the severity of the incident. If it
15 was -- can be taken care of verbally, it was done
16 verbally. If not, if he said, "Bill, I need a copy of
17 this," then I would have to write out the report.

18 Q. At what time of day did you give the daily
19 report?

20 A. This was in the mornings.

21 Q. And it referred to the previous day or --

22 A. The previous day, yes. The day before.

23 Q. And you said that you also performed what you
24 called a visual walk-about?

25 A. Walk the whole building, yes.

Deposition of:
William H. Spikes                                          March 15, 2005

Page 70

1   Q.   And did you have any other job duties as site
2   supervisor other than what you just listed?
3   A.   I thought that was enough.  No.  Not that I
4   know.
5   Q.   You said that at one point in time Chase left
6   the building?
7   A.   Yes.
8   Q.   Do you remember what time that was, when that
9   happened?
10  A.   December 6th, 2001.
11  Q.   After Chase left the building, was there
12  another management or tenant?
13  A.   Yes.
14  Q.   And who was that?
15  A.   It was REIT Management.
16  Q.   And you remained as site supervisor after REIT
17  Management?
18  A.   Mm-hmm.  Yes.
19  Q.   Did your job duties change after REIT
20  Management came in?
21  A.   The only thing that would change is the
22  reporting to.  As far as walking about the site,
23  checking, doing the visual, stuff like that, no, that
24  did not change.  But as far as the report -- incident
25  reports and stuff like that, we didn't have any.  I

Deposition of:
William H. Spikes                                          March 15, 2005

Page 73

1   A.   We still had almost 80 percent occupancy on all
2   the floors, even going through the phase.  I think
3   they called it migration.  They migrated from one spot
4   to another.
5   **Q.   Where did they migrate to?**
6   A.   White Clay Center.
7   **Q.   During the course of 2000, how many floors**
8   **migrated to White Clay?**
9   A.   During the course of 2000?  You're asking me
10  how many floors migrated?
11  **Q.   From 802 to White Clay.**
12  A.   Okay.  Let's say -- okay.  To be honest with
13  that answer, the floors didn't migrate.  Let's say
14  half the floors migrated to that area by that time.
15  In other words, there were still -- if you had 1200
16  people on one floor or something like, maybe 600 of
17  them was at White Clay and the other remaining were
18  either at 802.  So it wasn't a -- they didn't
19  completely empty the floors.
20  **Q.   I understand what you are saying.**
21  A.   They took a percentage from each floor as they
22  build up down there.
23  **Q.   So would it be fair to say that, between the**
24  **beginning of the year 2000 and the end of the year**
25  **2000, roughly half of the number of employees --**

Page 93

1          MS. O'BOYLE:  Objection.

2     Q.   **Could you answer my question?**

3     A.   As far as I'm concerned or the company's

4   concerned?

5     Q.   **I'm asking for your opinion.**

6     A.   My opinion was we would call it timing grade.

7   In other words, how much time did you have doing this

8   and stuff like that.  Is that what you're trying to

9   say?

10    Q.   **I'm just asking for your opinion, sir.**

11    A.   You're asking for my opinion?

12    Q.   **Right?**

13    A.   Yes.  To me it would be, yes.

14    Q.   **Is job performance a reason and factor to take**

15  **into consideration in determining employee's pay rate?**

16    A.   Yes.

17    Q.   **Prior job experience, is that also a reasonable**

18  **factor?**

19    A.   Yes.

20    Q.   **Now, we've been talking about Chase at the 802**

21  **Delaware Avenue location.  Was it your understanding**

22  **that Initial Security provided these security services**

23  **pursuant to a contract?**

24    A.   Yes.  That was my understanding, yes.

25    Q.   **And was it your understanding -- I guess you**

Deposition of:
William H. Spikes                                                March 15, 2005

Page 94

```
 1   would refer to Chase as the client or the customer --
 2      A.   Right.
 3      Q.   -- of Initial Security.  Okay?  And was it your
 4   understanding that it was up to Initial Security to
 5   provide quality security services to its customer,
 6   Chase?
 7      A.   Yes.
 8      Q.   And the contract had a time period, isn't that
 9   right?
10      A.   I know nothing of it.
11      Q.   So you don't know if it was indefinite?
12      A.   I don't know anything about it.
13      Q.   Did you have an understanding as to whether or
14   not Chase had the ability to hire a different security
15   service provider, if it became dissatisfied with
16   Initial Security?
17      A.   Yes, I did, yes.
18      Q.   Yes, you understood that that was the case?
19      A.   Right.  I understood that.
20      Q.   And later REIT Management came in to the
21   location at 802 Delaware Avenue?
22      A.   Yes.
23      Q.   It was your understanding that there was a
24   contract between Initial Security and REIT?
25      A.   Yes.
```

Page 95

1    Q.    And again, REIT was considered to be the
2    customer to Initial Security?
3    A.    Yes.
4    Q.    And Initial Security was expected to provide
5    quality security services to REIT?
6    A.    Yes.
7    Q.    Was your understanding that REIT had the
8    ability to retain a different security firm if it
9    became dissatisfied with Initial Security's services?
10   A.    Yes.
11   Q.    And it was your understanding that pay rates
12   for security officers as well as other employees of
13   Initial Security were governed by the contract between
14   Initial Security and Chase?
15   A.    Yes.
16   Q.    And that was true also for REIT?
17   A.    Yes.
18   Q.    And was it your understanding that Initial
19   Security provided security services to entirely
20   different customers other than Chase and other than
21   REIT?
22   A.    Yeah.
23   Q.    Because Initial Security obviously is a large,
24   relatively large company with different locations, and
25   they provide services to other customers as well,

Deposition of:
William H. Spikes

March 15, 2005

Page 114

1   Q.   At what point in time did it decrease from
2   three to two?
3   A.   I would say I think around January of 2002.
4   Q.   For the four to 12 shift, there was only one
5   officer?
6   A.   Mm-hmm.
7   Q.   What was the assignment for that officer?
8   A.   Same as everybody else's assignment.
9   Q.   What was that?
10  A.   To watch the monitors.
11  Q.   Console operator?
12  A.   Yeah.  And walk around the building.
13  Q.   Thank you.
14       I take it, then, that that was the same
15  for the individual on the 12 to eight shift?
16  A.   Yes.  Correct.
17  Q.   How many officers were there when REIT first
18  took over?
19  A.   About seven, and then I lost one, so we were
20  down to six.  But initially when REIT took over, I
21  think there were seven of us.
22  Q.   You didn't replace the officer that left?
23  A.   No.
24  Q.   Do you remember how many officers you had under
25  you when you were first promoted to site supervisor

1  back when it was Chase?

2    A.   22.

3    Q.   You were responsible for scheduling when you

4  were site supervisor, correct?

5    A.   Yes.

6    Q.   What was the arrangement if you needed to take

7  a day off?

8    A.   What was the arrangement?

9    Q.   Yes.

10   A.   I would call the console operator and inform

11 her that I was sending somebody else to take my place

12 and I give them my whereabouts and what time I was

13 expected in.

14   Q.   Did you generally schedule a day off in

15 advance?

16   A.   Only if I had a doctor's appointment and I

17 could put that up on the schedule that that day I

18 would be at the doctor's office, whatever.

19   Q.   And as you said, you would make sure that you

20 would arrange to have someone take your place that

21 day?

22   A.   Yes.  That's correct.

23   Q.   And were there times when you did not make

24 advance arrangements when you needed to take a day

25 off?

Deposition of:
William H. Spikes
March 15, 2005

Page 118

```
 1   document?
 2   A.   Yes, I do.
 3   Q.   Did you prepare this document?
 4   A.   I had it prepared, yes.
 5   Q.   Do you mean that someone typed it for you?
 6   A.   Yes.  That is correct.
 7   Q.   Who typed it for you?
 8   A.   Elvis Gissior.
 9   Q.   Elvis?
10   A.   Gissior.
11   Q.   Do you know how to spell that?
12   A.   G-i-s-s-i-o-r.  I think it's Gissior.
13   Q.   Who is Elvis Gissior?
14   A.   He was a guard at the time.
15   Q.   An Initial Security guard?
16   A.   Mm-hmm.  Yes.
17   Q.   When did you ask him to type this for you?
18   A.   God, I would say I asked him to type this
19   around February of 2000.
20   Q.   What did you do with this document after you
21   asked him to type it for you?
22   A.   I kept it.
23   Q.   Did you actually hand write out notes that you
24   gave to him to type up?
25   A.   No.  I recorded it on a cassette tape, and I
```

Deposition of:
William H. Spikes                                                        March 15, 2005

Page 119

```
 1   gave -- I recorded what I wanted him to type up, and
 2   when he returned it, it was not what I had said, so I
 3   kept it.
 4       Q.   You kept --
 5       A.   The document.
 6       Q.   You're saying that this was not what you
 7   dictated into the tape?
 8       A.   No.  No.  That's why I did not forward it to --
 9       Q.   You mean there were typos or was there --
10       A.   No.  This was not worded -- this is not my way
11   of presenting a problem that I had.  This is -- it had
12   too much anger in it, and I told him about it.  He was
13   putting his personal views in there, and that was not
14   what we had talked about.
15       Q.   How did it come about that you created this
16   document or, rather, that Elvis Gissior typed this
17   document?  How did this come about?
18       A.   We were hired the same day at Initial in 1997.
19   He was there for the transition period, and until he
20   left to go work at Wilmington -- I think it was
21   Wilmington Trust or one of the banks in Wilmington.
22   And he used to work for me part-time, and I was
23   discussing an issue with him.  And he asked me, he
24   says, well, I was back there with you.  He says, why
25   don't you, you know, go back and we'll go over the
```

Deposition of:
William H. Spikes                                      March 15, 2005

Page 120

1   incident and what happened and the time frame.  And
2   you know, I'll type it up.  You just -- so I decided
3   to talk into the cassette and, you know, state my
4   grievances about what I felt was going on at that
5   time.
6       Q.   You said he worked for you part time?
7       A.   Mm-hmm.
8       Q.   You mean he was a guard that he was under your
9   supervision?
10      A.   He was a console operator, yes.
11      Q.   This was in February of 2000, though, correct?
12      A.   Yes.
13      Q.   But you were a console operator in February of
14  2000?
15      A.   Mm-hmm.
16      Q.   That means yes?
17      A.   Yes.  Yes.
18      Q.   So you were both at the same position?  You
19  said he worked under you.
20      A.   Yes, but I was more or less the senior console
21  operator, so...
22      Q.   So if I understand you, what you're saying is
23  that you more or less dictated into a tape recorder?
24      A.   Mm-hmm.
25      Q.   And the understanding was that Elvis going to

Deposition of:
William H. Spikes

March 15, 2005

Page 121

1  type up what you said?

2  A.  Right.

3  Q.  But that didn't happen?

4  A.  No, it didn't.  No.

5  Q.  Can you estimate what percentage of this is

6  attributable to Elvis's own interpretation and what is

7  attributable to what you actually dictated?

8  A.  Okay.  When you get to the part on -- let's

9  call it page 2.  Where he refers to the KKK and this

10 kind of -- this was not -- you know, that conversation

11 was not on the tape.  In other words, that was what he

12 wanted to put in there, and you know, I was pretty

13 upset with that.

14 Q.  So after he typed this up you said you kept

15 this?

16 A.  Yeah.  I kept it.

17 Q.  You did not turn this in to anyone at Initial

18 Security?

19 A.  No.

20 Q.  Did you make any complaint to Initial Security

21 in connection with this document?

22 A.  With this document, no.

23 Q.  What was the grievance that you and Elvis

24 discussed that, I guess, caused this document to come

25 about?

Deposition of:
William H. Spikes                                                March 15, 2005

Page 122

1    A.    What was the grievance that we discussed?

2    **Q.   Yeah.**

3    A.    Okay. What was the grievance was Elvis was
4    supposed to be promoted to console operator, and they
5    did not promote him because of his accent because he
6    was from Kenya. And in the interim, when this was
7    going on, it was -- you know, things were happening,
8    you know, where people were getting promoted and they
9    didn't have the skills or the know-how, you know, to
10   perform the job. But you know, because they were
11   white, they were put in a position of authority over
12   somebody that had been there previously or who had
13   held that position, waiting to get promoted to that
14   position. So Elvis was there for all of this. And
15   you know, when he got to typing, I think that he got
16   very bitter about it.

17   **Q.   Did you turn this document over to the EEOC?**

18   A.    Oh, yes, I did.

19   **Q.   Did you turn this in at the time you filed your**
20   **charge?**

21   A.    No.

22   **Q.   If you turn to the second page, second**
23   **paragraph, I guess it's the third sentence, and it**
24   **begins, "upon my arrival," can you just read that**
25   **sentence out loud?**

Deposition of:
William H. Spikes                                              March 15, 2005

Page 126

```
 1    A.    What position?
 2          MS. O'BOYLE:  I think that was asked and
 3    answered, but he can answer it again.
 4    Q.    He was promoted from one job to the position of
 5    the site supervisor?
 6    A.    Right.
 7    Q.    What position was it that he occupied?
 8          MS. O'BOYLE:  Same objection.
 9    A.    Badging station.
10    Q.    When Dukes was transferred over to White Clay
11    Creek?
12    A.    Mm-hmm.
13    Q.    Did you think that there was anything unfair or
14    discriminatory about the fact that he was transferred
15    to White Clay Creek?
16    A.    Yes.
17    Q.    And what was it about that decision to transfer
18    him there that was discriminatory or unfair?
19    A.    Well, what was unfair was that he was more or
20    less -- how would I say?  He was replacing a black
21    person over there who had asked for a raise.
22    Q.    Who is the individual that you're referring to?
23    A.    At that time it was I think his name was
24    Benson, site commander Benson.
25    Q.    And how do you know about Vincent requesting
```

Deposition of:
William H. Spikes                                           March 15, 2005

Page 128

1    that the company didn't give Benson the raise?
2    A.    Correct.
3    Q.    So the fact that Dukes was transferred to that
4    position in and of itself wasn't discriminatory.  What
5    was discriminatory was the fact that Benson wasn't
6    given a raise?
7    A.    Right.  Right.
8    Q.    Now, I don't know if I asked this or not, so I
9    apologize.  Referring back to exhibit WS-4, if I
10   understand you, you said that the incident that lead
11   to this document being created was unfair promotions
12   within the workplace, is that correct?
13   A.    Yes.  Yes.
14   Q.    And I think you testified to this, but just so
15   that I understand, you never made a complaint to
16   Initial Security in connection with unfair promotions,
17   is that correct?
18   A.    Yes, I did.
19   Q.    Oh, you said, yes, you did?
20   A.    Yes, I did.
21   Q.    When did you make the complaint about unfair
22   promotions?
23   A.    It was made prior -- it was made, let me say,
24   around November of '97 or -- I think it was November
25   of '97 when I met John Theron.  And I asked him why