Deposition of:
William H. Spikes                                March 15, 2005

Page 129

1   was -- what was going on as far as sending all these
2   here white people and putting them in places of
3   authority and having black guys walking around here
4   with master's and bachelor's degrees training.  What
5   are they training for?
6       Q.    Who was John Theron?
7       A.    He was the district branch manager for Initial.
8       Q.    You say that you spoke to him in November of
9   '97?
10      A.    '97, yeah, because I had been there since
11  September.  So it was around three months later when I
12  got to him.
13      Q.    What was his response?
14      A.    His response to me was he did not know that
15  that was happening and he would look into it and see
16  what's going on.
17      Q.    Did he ever get back to you?
18      A.    No.  I think he got fired.
19      Q.    When was he fired?
20      A.    About a month later.
21      Q.    One month after you made the complaint?
22      A.    Yeah.  Something like that.  I know he was
23  terminated.
24      Q.    Do you believe there was some connection --
25      A.    No.  No.

Deposition of:
William H. Spikes                                    March 15, 2005

Page 130

1   Q.   -- between --
2   A.   No. It's completely different.
3   Q.   Did anyone get back to you in connection with
4   this conversation you had with Mr. Theron?
5   A.   No. I think that conversation died with
6   Mr. Theron when he left. No one else got back to me,
7   no.
8   Q.   Who replaced Mr. Theron as district branch
9   manager?
10  A.   Gordon Ellis.
11  Q.   Did you go to Gordon Ellis and ask him about
12  this complaint that you had made with John Theron?
13  A.   No, I did not.
14  Q.   Why not?
15  A.   Because I went to Bob Armstrong, and that was
16  his job.
17  Q.   Who was Bob Armstrong?
18  A.   The account manager.
19  Q.   When did you go to Bob Armstrong?
20  A.   Maybe about two or three months after I talked
21  to John Theron, and I wanted to find out what was
22  going on.
23  Q.   And what did Bob Armstrong say?
24  A.   Well, there -- right now we are straightening
25  out some problems, Mr. Spikes, but we'll get with you

Deposition of:
William H. Spikes                                            March 15, 2005

Page 131

1   on this because, he says, all the guys that's at the
2   site now have been here a couple months and Initial
3   hasn't sent any white people in this position any
4   more. So maybe your problem is solved. We'll see.
5   That was Mr. Armstrong with his comments.
6       Q.   **Did you feel the problem was solved?**
7       A.   No.
8       Q.   **But you do agree that they were no longer**
9   **sending --**
10      A.   Right. Right.
11      Q.   **-- white employees?**
12      A.   Right. At that moment they were no longer -- I
13  agreed with him on matter, yes, I did.
14      Q.   **But you said that the problem wasn't resolved**
15  **nevertheless?**
16      A.   No.
17      Q.   **And why not?**
18      A.   Because, after Bob Armstrong left his position,
19  it pops up again, the same thing is happening again.
20      Q.   **Are you referring to a specific period of time?**
21      A.   Yes.
22      Q.   **When was that?**
23      A.   It would have to be in 2001 around -- let's
24  see. Sam left around May of 2001.
25      Q.   **What was happening in May of 2001?**

Deposition of:
William H. Spikes                                          March 15, 2005

Page 132

1  A.  Well, guards was getting paid different money.
2  In other words, we had the guards at my site were
3  getting paid less than the guards everywhere else
4  working for Chase.
5  **Q.  So the issue at that point in time was a pay**
6  **rate difference as opposed to the -- I guess you could**
7  **call it a promotion problem which had happened**
8  **earlier, is that correct?**
9  A.  I look at both as being the same.  Okay?  In
10 other words, without promotion, there's no pay.  Vice
11 versa.  So the problem was -- in other words, I looked
12 at it as a problem coming back again, in other words.
13 **Q.  In other words, a problem of, I guess, racist**
14 **decisions?**
15 A.  Right.  In other words, we are playing a game
16 here where, you know, these predominantly black sites
17 here is -- these guys are getting underpaid as far as
18 what everybody else is getting.
19 **Q.  Did you make a complaint regarding the**
20 **difference in pay among guards that you perceived?**
21 A.  Yes, I did.
22 **Q.  And to whom did you make this complaint?**
23 A.  Bob Armstrong.
24 **Q.  And what was --**
25 A.  His reply?

Deposition of:
William H. Spikes                                                March 15, 2005

Page 133

1   Q.   Strike that.
2        What did you say to Bob Armstrong?
3   A.   I wanted to know why was the guards at White
4   Clay getting paid more?
5   Q.   All of the guards?
6   A.   All the ones I knew about.
7   Q.   What did he say?
8   A.   He told me he would look into it because we
9   were all under the same contract and he could not
10  understand how anybody could get any more money out of
11  that system.  That's what he said.
12  Q.   What did you understand him to mean when he
13  said that?
14       MS. O'BOYLE:  Objection.
15  Q.   I'm asking what he understood?
16       MS. O'BOYLE:  I know.  You can answer.
17  A.   What did I understand?
18  Q.   Yeah.
19  A.   Either he didn't look into it or it was
20  business as usual.
21  Q.   All of the guards that you were aware of who
22  were at White Clay were being paid more than the
23  guards at 802, correct?
24  A.   Mm-hmm.  Yes.
25  Q.   Including white guards?

1  A.   Including white guards.

2  Q.   I mean, including black guards.

3  A.   I don't know about the blacks.  That was the
4  funny thing.  I just know about the white guards.  I
5  don't know what the black guards were getting.  It's
6  the white ones that came back and told me what they
7  were getting.

8  Q.   Did you put this complaint into writing?

9  A.   No, I did not.

10 Q.   The previous complaint that you had made that
11 you initially made to John Theron, did you put that
12 compliant into writing?

13 A.   No, I did not.

14 Q.   Was there a reason why you didn't put either of
15 these complaints into writing?

16 A.   At that time, yes.

17 Q.   What is the reason?

18 A.   I don't know, but it had to be a good one.

19 Q.   Can you enlighten me perhaps?

20 A.   At that time I didn't know who to trust.  So I
21 wasn't putting anything down in writing.

22 Q.   Didn't trust anyone in management?

23 A.   Of course not.

24 Q.   Was there something that was specific to
25 Initial Security, or is this something you had found

Deposition of:
William H. Spikes
March 15, 2005

Page 135

1  to be true in other previous positions?
2  A.  This was something to do with the personnel at
3  that time that was in charge.
4  Q.  And who are the individuals that you're
5  referring to that you did not trust?
6  A.  Well, there was John Theron.  There was Ron
7  Roberts who was the personnel director.  Those were --
8  there was Tom Durkin who was the security manager at
9  Chase.  I mean this was -- whatever.
10 Q.  You said that you made this complaint to Bob
11 Armstrong.  And he gave you a response?
12 A.  Mm-hmm.
13 Q.  Was there any further follow-up in regard to
14 this complaint?
15 A.  With Bob Armstrong?
16 Q.  With Bob Armstrong.
17 A.  No, there wasn't.
18 Q.  Was there any further follow-up with anyone
19 else in regard to this complaint?
20 A.  The next complaint was with Art Kitchen, yes.
21 Q.  You made a complaint to Art Kitchen?
22 A.  Yes.
23 Q.  When did you make this complaint?
24 A.  Let me see.  It had to be around October of
25 2001.  Somewhere about that time period.

Deposition of:
William H. Spikes                                            March 15, 2005

Page 136

```
 1    Q.    And what did you say to Art Kitchen?
 2    A.    I asked Art, is it true that the guards at
 3    White Clay are they getting paid more than we are, and
 4    he asked me where did I hear it from?  And I told him
 5    that certain individuals had told me this.  And he
 6    said, well, Bill, Mr. Bagosy is going to -- it's up to
 7    Mr. Bagosy what happens on that matter.  You know, I
 8    can't be too specific about it.  So we were left with
 9    that.
10    Q.    To the best of your recollection, those are
11    more or less the exact words that were used during
12    that conversation?
13    A.    Probably so, yes.
14    Q.    And who is Bob Bagosy?
15    A.    He was the manager at Chase facility.  He was
16    the head of security at that time.
17    Q.    Did you have any further conversations with Art
18    Kitchen in reference to this issue?
19    A.    Yes, I did.  About maybe a month or a month and
20    a half later, we were outside, and I asked him
21    about -- you know, I said, what's up with the money
22    thing, Art?  I mean, are these guys getting paid more
23    or what?  He says, well, Bill, I'm going to tell you
24    this.  Mr. Bagosy is, you know, doing what he wants to
25    do.  He said, but, I will -- I can't get you any more
```

Deposition of:
William H. Spikes                                                  March 15, 2005

Page 140

1  legal clerk with the Marines, did you come to have any
2  understanding about the significance of reading
3  documents before you signed them?
4    A.   Yes.
5    Q.   This was something important to be done?
6    A.   Yes.
7    Q.   Were you aware of any procedure for lodging a
8  complaint in the nature of an EEO or equal employment
9  complaint with Initial Security?
10   A.   Rephrase the question. In other words, I don't
11 understand the question.
12   Q.   Were you aware of whether or not Initial
13 Security had a policy regarding the filing of
14 complaints for discrimination?
15   A.   No, I was not.
16   Q.   Did anyone ever make a complaint against you
17 that you had acted in a discriminatory manner?
18   A.   Yes.
19   Q.   And was that complaint investigated?
20   A.   Yes.
21        (WS Deposition Exhibit 6 was marked for
22 identification.)
23 BY MS. SALGADO:
24   Q.   You've just been handed a document that's been
25 marked WS-6. This is a four-page document which is

Deposition of:
William H. Spikes                                         March 15, 2005

Page 143

1    A.    My first contact with them.  It would have to
2    be June.  Well, I went for an interview June 21st.  I
3    think it was 21st or -- I keep saying the 21st, but I
4    know it was in June.
5    Q.    **Of what year?**
6    A.    2002.
7    Q.    **By the way, do you keep any sort of a calendar**
8    **or diary, I guess, a calendar type diary for your**
9    **personal use?**
10         **MS. O'BOYLE:  At that time or do you want**
11   **to know if he did at that time?**
12         MS. SALGADO:  Thank you.  At that time as
13   of 2002.
14   A.    I did keep one at that time.
15   Q.    **Did you keep a calendar for personal use?**
16   A.    I would say, yes.
17   Q.    **Do you still have a copy of that?**
18   A.    No.
19   Q.    **How did it come about that you went to the EEOC**
20   **in June of 2002?**
21   A.    It came about because I talked to my personal
22   manager down at Initial and informed her that I had
23   enough and that I was putting a complaint in against
24   Initial.
25   Q.    **Who was the personnel manager?**

1    A.    Debby Baul.

2    Q.    What exactly did you say to Debby Baul during
3    this conversation?

4    A.    I bought her -- I had got a questionnaire from
5    EEOC, and I brought her a rough draft of it, and I let
6    her look at it for a few minutes. She glanced it
7    over. And she informed me, Mr. Spikes, do what you
8    have to do. So I did what I had to do.

9    Q.    How did it happen that you received a
10   questionnaire from the EEOC?

11   A.    I called them, and they sent it to me in the
12   mail.

13   Q.    When did you call the EEOC?

14   A.    That -- I couldn't even answer that. It was
15   prior to June.

16   Q.    Sure.

17   A.    Yes.

18   Q.    So that the EEOC sent you this form and you
19   filled out a rough draft, is that what you are saying?

20   A.    Yes, I did.

21   Q.    And you printed this rough draft to Debby Baul?

22   A.    Yes. I informed Debby Baul what I was doing.

23   Q.    What else was said during that conversation?

24   A.    To -- to what effect? I mean --

25   Q.    Just tell me what you recall that you said

Deposition of:
William H. Spikes                                                    March 15, 2005

Page 145

1  during this conversation other than what you've
2  already told me.
3    A.   Well, I informed her that I was going to file a
4  complaint with EEOC and that they had sent me the
5  paperwork.  And when she looked it over and glanced at
6  it, she says, "Well, whatever is going on at Chase
7  down there," she said, "Mr. Spikes, I don't have a
8  clue because they are not letting me in on anything.
9  So if this is what you have to go on, then go what you
10 got -- you know, do what you got to do."
11   Q.   Did you have any other conversations with
12 anyone at Initial Security about the fact that you had
13 contacted the EEOC?
14   A.   I did at the Initial office?  You mean in
15 management?
16         MS. O'BOYLE:  You want to know with
17 anybody?
18   Q.   With anybody.
19   A.   Well, the console operator, I informed her that
20 I was going to EEOC.
21   Q.   When was that?
22   A.   In June.
23   Q.   What did she say?
24   A.   I don't remember.  I told her somebody else
25 would be in there with her tomorrow.  In other words,

Deposition of:
William H. Spikes                                         March 15, 2005

Page 146

1    I was telling her the day before, that I had somebody
2    coming in to cover me, that would be with her while I
3    went up to Philadelphia.
4      Q.  **Did you say anything else to her in connection**
5    **with the fact that you were going to the EEOC?**
6      A.  I don't think so.
7      Q.  **So you just say, I'm going to the EEOC**
8    **tomorrow, somebody else would be filling in?**
9      A.  Yes.  I explained to her I had some business to
10   take care of.  The only way I could do it was go up to
11   EEOC.  That was that.
12     Q.  **Any other conversations with anyone at Initial**
13   **Security about the fact that you were going to EEOC?**
14     A.  Other than Ms. Baul and the console operator,
15   no.
16             MS. SALGADO:  WS-7.
17             (WS Deposition Exhibit 7 was marked for
18   identification.)
19   BY MS. SALGADO:
20     Q.  **Now, you've just been handed a document which**
21   **has been marked WS-7.  It is a nine-page document.**
22   **It's the complaint in this action.  Have you seen this**
23   **document before?**
24     A.  Yes.
25     Q.  **And did you read this before the EEOC filed it**

Deposition of:
William H. Spikes

March 15, 2005

Page 147

1  with the Court?
2  A. No. I read it after they filed it with the
3  Court.
4  Q. Is everything in this complaint true and
5  accurate?
6      MS. O'BOYLE: Take your time. Read the
7  whole document, please.
8      (Pause.)
9      THE WITNESS: I've read it.
10 BY MS. SALGADO:
11 Q. Is this true and accurate?
12 A. Yes.
13 Q. Turning to paragraph 8, it's on page 4, begins
14 on page 4 consists of subsection A through E. Would
15 you agree with me there's nothing in here about your
16 speaking to Debby Baul about going to the EEOC?
17     MS. O'BOYLE: Objection to the form of the
18 question. You can answer.
19     THE WITNESS: I can answer?
20     MS. O'BOYLE: You can answer.
21 A. Yes. I'll agree.
22 BY MS. SALGADO:
23 Q. When you first went to the EEOC, what did you
24 complain about?
25 A. I complained about the pay disparities. I

Deposition of:
William H. Spikes                                          March 15, 2005

Page 148

1  complained about the black employees, including
2  myself, not getting equal pay under the same contract.
3      Q.   Anything else?
4      A.   No.  That was enough.
5      Q.   By the way, what was the name of the console
6  operator that you told that you were going to the
7  EEOC?
8      A.   Mrs. Lola Granberry.
9      Q.   Do you have any reason to believe that
10 Ms. Granberry told anyone else at Initial Security in
11 management about the fact that you went to the EEOC?
12     A.   Do I have -- repeat the question.
13     Q.   Do you have any reason to believe that she told
14 anyone in management that you went to the EEOC?
15     A.   To be honest, I would say, yes.
16     Q.   What is your basis for that?
17     A.   Because as somebody from management called and
18 wanted to know my whereabouts, she would then know
19 where my whereabouts was because there was nothing
20 secretive about that.  In other words, they had to
21 know where I was at all times.
22     Q.   Are you saying that, when you took a day off
23 during your normally scheduled working hours, you had
24 to let --
25     A.   That is correct.

Deposition of:
William H. Spikes                                            March 15, 2005

Page 156

```
1   the meeting?
2      A.   I think she was taking notes, or supposed to
3   be.
4      Q.   Where did this meeting take place?
5      A.   In Mr. Ellis's office.
6      Q.   That's out at --
7      A.   University -- yeah.
8      Q.   I didn't mean to cut you off.
9           What did Mr. Ellis say during the meeting?
10     A.   What he said was it had been brought to his
11  attention that Mr. Speiring was not in uniform at five
12  o'clock and that I know about Diallo sleeping on post.
13  I told him that matter had been taken care of.  And I
14  think we went into -- he says, well, I'm getting these
15  complaints from Wayne -- no.  I'm getting these
16  complaints from the client.  And I said, well, who's
17  the client?  Wayne?  I says, me and Wayne got a
18  problem, Gordon.
19           And you know, it went on from that.  It
20  just -- you know, and then he asked me about, well,
21  you left -- no.  He says something, the statement --
22  he did not say I left my post.  He says, were you on
23  post when Debby came?  I said yes.  I said, I had been
24  there since 6:15 because I wanted to tell Diallo that
25  he was going to be terminated.  So he says, well, what
```

Deposition of:
William H. Spikes                                        March 15, 2005

Page 157

1  about following day when you came in late?  I says,

2  came in late?  I says, 15 minutes late, Gordon,

3  because I had to pick up a prescription.  He says,

4  well, that's still late.  I says, okay.

5          And I think we left it at that, this

6  conversation.  And that's when he told me that, well,

7  Mr. Spikes, I have lost confidence in your ability to

8  be a site commander.  So your services will no longer

9  be needed or whatever.

10    **Q.   Do you remember anything else from that**

11  **conversation?**

12    A.   That was the end.

13    **Q.   What was your problem with Wayne?**

14    A.   What was my problem?

15    **Q.   You know, maybe I misheard you.  I thought you**

16  **said that you and Wayne had a problem.**

17    A.   We did.

18    **Q.   What was that problem?**

19    A.   What difference is this?  In other words, we

20  had -- in a building of that size, there can only be

21  one king.  Okay?  Somebody got to rule.  Somebody got

22  to follow.  And it was a tug of war going on there.

23  And the main difference -- the reason of the tug of

24  war is because the way Wayne was.  I mean, I'm a black

25  man in my fifties.  Wayne's a white guy that is 35