**EXHIBIT 3**

**EXHIBIT 3**



**WILCOX & FETZER LTD.**

In the Matter Of:

# EEOC

v.

# Initial Security

C.A. # 04-1309

Transcript of:

## Arthur Charles Kitchen

March 17, 2005

**DISK ENCLOSED**

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 58

1  MS. SALGADO: Objection. You can answer.
2  Q. You can answer.
3  A. I failed to document it because I felt, after
4  talking to him, that the problem was rectified.
5  Q. So you didn't put this in writing?
6  A. No.
7  Q. Do you know who Sam Pratcher is?
8  A. Yes.
9  Q. Who was he?
10 A. He was the Chase client responsible for 802
11 Delaware Avenue.
12 Q. Did Sam Pratcher and Mr. Spikes get along well?
13 A. As far as I knew, yes.
14 Q. Did you ever get any complaints about
15 Mr. Spikes's performance by Sam Pratcher?
16 A. Not that I recall.
17 Q. Did Mr. Pratcher ever indicate to you that
18 Mr. Spikes should be promoted to site commander or
19 site supervisor?
20 A. He held that position.
21 Q. So he wouldn't have talked to you; he was
22 already on the job, okay.
23 A. Yes.
24 Q. At any time did Mr. Spikes complain to you that

Page 59

1  he felt that the black guards at the 802 facility were
2  not being promoted properly, whereas white guards who
3  had come in after the black guards had been hired were
4  being promoted?
5  A. No.
6  Q. When you were account manager when did you
7  first meet Wayne Dumford?
8  A. Sometime in the year 2000.
9  Q. What was Wayne's position when you first met
10 him?
11 A. He was maintenance person.
12 Q. He wasn't a supervisor at that time?
13 A. No.
14 Q. And he worked in the Chase building?
15 A. Yes.
16 Q. He worked for Chase?
17 A. No. He worked for PM Realty.
18 Q. So he was a maintenance person working for the
19 Realtor that owned or rented the building to Chase,
20 something like that?
21 A. Yes.
22 Q. Was he like basically a maintenance man?
23 A. Yes.
24 Q. Did Mr. Spikes ever complain to you about the

Page 60

1  way that Wayne Dumford talked in a derogatory fashion
2  towards the black security guards?
3  A. No.
4  Q. Did Mr. Spikes ever complain to you that he
5  thought he should have been paid the same as
6  Mr. Dukes?
7  A. Yes.
8  Q. When did that occur?
9  A. Do not recall the exact date.
10 Q. Do you recall exactly what he said? Just give
11 me your best recollection of that conversation?
12 A. Just that he felt that he should be paid a
13 higher rate than he was getting.
14 Q. Did he ever say it was a fairness issue that he
15 felt that he was similarly situated or equal to
16 Mr. Dukes in some way and why was he not being paid?
17 MS. SALGADO: Objection.
18 Q. You can answer.
19 A. My response to him was that job duties were
20 different, which is why Jack Dukes was paid different,
21 and he was receiving what the contract called for his
22 position to be paid, and if that was an issue, he
23 would have to discuss it with Gordon Ellis.
24 Q. Did you have the authority to recommend a raise

Page 61

1  for Mr. Spikes?
2  A. The raises -- the rates were set by the
3  contract.
4  Q. What's your understanding of Mr. Ellis's
5  discretion? What was his discretion in terms of
6  increasing somebody's salary? Could he do it?
7  A. That was something that he would have to
8  negotiate with the client.
9  Q. So is it your testimony that the rates of pay
10 were supposed to be set by the contract that Initial
11 Security had with the client, which was Chase?
12 A. Yes.
13 Q. Do you recall what rate of pay Mr. Dukes was
14 receiving around the time that Mr. Spikes was
15 complaining to you that he wasn't paid enough?
16 A. I'm not sure what he was getting at that time.
17 Q. Do you know if Mr. Dukes ever earned $16 an
18 hour?
19 A. Yes, I do. His final salary was.
20 Q. Do you recall that Mr. Spikes earned about $12
21 an hour?
22 A. I believe it was 12.50.
23 Q. Okay. Around 12.50. All right.
24    Do you know if Mr. Spikes ever earned more

Page 62

1  than that?
2  A. I do not know.
3  Q. Did you ever tell Mr. Spikes it goes by the
4  contract?
5  A. Yes. Because of fact that I was Jack Dukes's
6  supervisor. I received less than Jack received
7  because Jack Dukes's position was billed directly to
8  the client where mine was a salary position from the
9  office. And so it was different as well.
10 Q. So the company didn't go by the contract then?
11     MS. SALGADO: Objection.
12 Q. Is that correct?
13     MS. SALGADO: Objection.
14 Q. You paid people what you wanted to pay?
15     MS. SALGADO: Objection.
16 Q. I'm asking you, do you believe the company had
17 discretion to pay people whatever they deemed fit?
18     MS. SALGADO: Objection.
19 Q. You can answer.
20 A. They were paid according to what the position
21 called for under the contract.
22 Q. Right. But I believe you just testified that,
23 if Mr. Spikes wanted more money, he would have to take
24 it up with Gordon, is that right?

Page 63

1  A. Right.
2  Q. And did Mr. Ellis, to your knowledge, have the
3  discretion to raise somebody's salary if he wanted to?
4     MS. SALGADO: Objection.
5  Q. You can answer.
6  A. Normally, in order for them to get a pay
7  increase, they would negotiate a billing increase as
8  well.
9  Q. So the answer is, yes, Mr. Ellis could have
10 negotiated a billing increase for a particular
11 individual to raise their pay, is that correct?
12 A. If it's acceptable with the client, yes.
13 Q. Do you know a site commander by the name of
14 Benson, Nate Benson?
15 A. Yes.
16 Q. He's a black individual?
17 A. Yes.
18 Q. Was he assigned as site commander at the White
19 Clay Center at some point?
20 A. Yes.
21 Q. That was prior to Jack Dukes arriving?
22 A. Before Jack was transferred to White Clay.
23 Q. That's correct, yes?
24 A. Yes.

Page 64

1  Q. Do you know what rate of pay Mr. Benson
2  received as site commander at White Clay?
3  A. Yes. He would have received 12.50 as well.
4  Q. Do you know if Mr. Benson ever requested a
5  raise in pay?
6  A. Not to my knowledge.
7  Q. Did Mr. Spikes ever complain to you that he
8  believed that the black employees assigned to 802
9  Delaware Avenue were not being treated the same as
10 white guards at White Clay; there was disparity there?
11 A. Not to me.
12 Q. Did you ever discuss with Mr. Spikes the
13 possibility of him transferring to a Middletown,
14 Delaware, location?
15 A. I did not, no.
16 Q. Do you know whether or not Mr. Ellis got along
17 with Mr. Bagosy?
18 A. Yes, he did.
19 Q. Mr. Bagosy, was he in charge of the security
20 for Chase?
21 A. Yes.
22 Q. So he was the client at some point, right?
23 A. Right.
24 Q. Did you mainly deal directly with Mr. Bagosy

Page 65

1  and then report to Mr. Ellis?
2  A. At 802, I reported to Sam Pratcher, the client,
3  and then to Gordon Ellis. At the White Clay Center, I
4  reported to Robert Bagosy and in turn to Gordon Ellis.
5  Q. I see. Do you remember whether or not there
6  were regular meetings of all the site supervisors?
7  A. At some point there were monthly supervisor
8  meetings.
9  Q. Who conducted those meetings?
10 A. It was the account manager -- not the account
11 manager, but the operations manager.
12 Q. So that would be Debby Baul or Bob Armstrong?
13 A. Yes.
14 Q. For the Chase facility, was that Bob Armstrong?
15 A. Yes.
16 Q. Do you know if Mr. Spikes was ever excluded
17 from those meetings?
18 A. I don't know.
19 Q. Did you ever tell him that you would attend for
20 him and let him know what happened?
21 A. No.
22 Q. Did he ever complain to you that he wasn't
23 being invited to these site supervisor meetings?
24 A. Not to my knowledge.

**EXHIBIT 4**

**EXHIBIT 4**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**

21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515
(215) 440-2600
TTY (215) 440-2610
FAX (215) 440-2632, 2848 & 2604

William Spikes
63 Anderson Drive
Salem, NJ 08079
        Charging Party,

v.                CHARGE NO.: 170-2003-00860 (formerly 170A300860)

Initial Security
802 Delaware Avenue
Wilmington, DE 19801

        Respondent.

### DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the above-cited charge, filed under Title VII of the Civil Rights Act of 1964, as amended. The timeliness and all other jurisdictional requirements for coverage under Title VII have been met.

Charging Party, a Site Supervisor at the Chase Manhattan, Wilmington DE location, alleged that Respondent terminated his employment because of his race (Black) and in retaliation for complaining that he was being paid less because of his race. He also alleged that he believed Black Security Guards were being paid less than non-Black Security Guards and Respondent did not provide Black Security Guards with the same promotional opportunities as the non-Black Security Guards.

Respondent, a security contractor, denies the allegations and contends that it terminated Charging Party's employment because he violated company policy. Respondent further contends that it paid Charging Party according to the contract and since a similarly situated Site Supervisor (White) at Chase Manhattan, Newark, DE location had more responsibilities, worked with computers and supervised twice the number of employees, it paid him more. Respondent also denies that Black Security Guards are not provided with the same promotional opportunities as non-Black Security Guards.

EE0C0000000027

The evidence shows that at the time of the termination of his employment, Charging Party was paid $12.00 per hour in accordance with the billing and pay rates used in the contract bid process for all Delaware Chase Manhattan locations. The pay records indicate that the White comparator was paid $16.00 per hour. However, the contract records show that the Site Supervisors are to be paid $12.00 per hour. Therefore, a review of the contract records clearly shows that Charging Party was treated disparately regarding his rate of pay.

The evidence also shows that Charging Party continuously complained to the Branch Manager (White) that he was paid less than another Site Supervisor (White). The Employee Violation Report indicates that Respondent terminated Charging Party's employment on September 10, 2002, for not being at his front desk post on September 4, 2002 and September 5, 2002. The evidence shows that on September 4, 2002, Charging Party left his front desk post after the Building Facilities Engineer called him and stated that his car was leaking anti-freeze and that he had to clean it up immediately. However, the Console Officer (Black), who worked at the front desk that day, testified that Charging Party was wearing his radio, and she was always in touch with the Charging Party. In addition, she stated that Respondent has since promoted her to a Site Supervisor position and Site Supervisors routinely leave their post to perform regular building checks of the floors and report unsafe conditions.

A review of the evidence also shows that on September 5, 2002, Charging Party called the Console Officer to inform her that he would be late because he was picking up a prescription. He was late by only a few minutes. The Personnel Manager (White) testified that she witnessed him not at his post during this time and decided to terminate Charging Party's employment. The Employee Violation Report indicates that Charging Party did not have the opportunity to respond to the violation allegations. There was no evidence found in the Charging Party's personnel file that indicated he had any performance problems. Moreover, the Personnel Manager (White) admitted that Charging Party did not have any performance problems.

The Commission finds that Respondent's disciplinary actions are unreasonable and demonstrate pretext. It also concludes that Charging Party's race was a factor considered by the Respondent when it paid him less than similarly situated non-Black Site Supervisors. The evidence also shows that Respondent retaliated against Charging Party after he complained that he was being paid less than a similarly situated White Site Supervisor.

However, the evidence does not support Charging Parties allegations that Black Security Officers are treated less favorably than non-Black Security Guards regarding promotional opportunities.

Based on this analysis, I have determined that the evidence obtained during the investigation establishes a violation of Title VII of the Civil Rights Act of 1964, as amended.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. In this regard, conciliation of this matter has begun. Please be advised that upon receipt of this finding, any

EEOC0000000028

reasonable offer to resolve this matter will be considered. Kurt Jung, Federal Investigator, will prepare a monetary demand for monetary losses and other relief for the Charging Party. Again, the Commission is postured to consider any reasonable offer. If an offer has not been previously submitted, Respondent is requested to consider for acceptance, rejection, or proposing a counteroffer to the conciliation proposal which will be forthcoming on behalf of Charging Party. The confidentiality provisions of the statute(s) and Commission Regulations apply to information obtained during conciliation.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

Investigator Kurt Jung will contact the parties to initiate conciliation discussions. If there are any questions or concerns, you may contact him at (215) 440-2660.

On Behalf of the Commission,

6/30/04
DATE

Marie M. Tomasso
District Director

**EXHIBIT 5**

**EXHIBIT 5**

# Application For Employment

REDACTED CONFIDENTIAL

We consider applicants for all positions without regard to race, color, religion, sex, national origin, age, marital or veteran status, the presence of a non-job-related medical condition or handicap, or any other legally protected status.

(PLEASE PRINT)

| Position(s) Applied For | Date of Application |
|---|---|
| SECURITY GUARD | 12-21-90 |

How Did You Learn About Us? tt
☒ Advertisement   ☒ Friend   ☐ Walk-In
☐ Employment Agency   ☐ Relative   ☐ Other _____

| Last Name | First Name | Middle Name |
|---|---|---|
| DUKES | JACK | ALBERT |

| Address Number | Street | City | State | Zip Code |
|---|---|---|---|---|
| 28 GILL | DR | NEWARK | DE | 19713 |

| Telephone Number(s) | Social Security Number |
|---|---|
| 302-731-9013 | ███ ██ ████ |

If you are under 18 years of age, can you provide required proof of your eligibility to work? ☐ Yes ☐ No

Have you ever filed an application with us before? ☐ Yes ☒ No
If Yes, give date _____

Have you ever been employed with us before? ☐ Yes ☒ No
If Yes, give date _____

Are you currently employed? ☐ Yes ☒ No

May we contact your present employer? ☒ Yes ☐ No

Are you prevented from lawfully becoming employed in this country because of Visa or Immigration Status?
*Proof of citizenship or immigration status will be required upon employment.*    ☐ Yes ☒ No

On what date would you be available for work?   IMMEDIATELY

Are you available to work:  ☒ Full Time  ☐ Part Time  ☐ Shift Work  ☐ Temporary

Are you currently on "lay-off" status and subject to recall?  ☐ Yes ☒ No

Can you travel if a job requires it?  ☒ Yes ☐ No

Have you been convicted of a felony within the last 7 years?  ☐ Yes ☒ No
*Conviction will not necessarily disqualify an applicant from employment.*

If Yes, please explain _____

WE ARE AN EQUAL OPPORTUNITY EMPLOYER

IS0000157

|  | Elementary School | High School | Undergraduate College / University | Graduate / Professional |
|---|---|---|---|---|
| School Name and Location | HARRIS PARK HARRISBURG PA | EDISON HARRISBURG PA |  |  |
| Years Completed | 4 5 6 7 8 | 9 10 11 (12) | 1 2 3 4 | 1 2 3 4 |
| Diploma / Degree |  |  |  |  |
| Describe Course of Study |  |  |  |  |
| Describe any specialized training, apprenticeship, skills and extra-curricular activities | US AIR FORCE - NCO ACADEMY - ELECTRONICS TECH SCHOOL MANAGEMENT TRAINING CIVILIAN - MANAGEMET, QUALITY, SAFETY PLANT MAINT + CHEMICAL MANUFACTURING ||||
| Describe any honors you have received | RECEIVED THREE (3) AIR FORCE ACCOMADATION MEDALS ||||
| State any additional information you feel may be helpful to us in considering your application | BEFOR INSTALLATION OF THE ADT SECURITY SYSTEM - I WAS RESPONSIBLE FOR PLANT SECURITY - WE USED GUARDS WITH THE CLOCK + KEY SYSTEM - I SCHEDULED GUARDS & CHECKED TAPES - I AM FAMIALIAR WITH THIS PARTICULAR PHASE OF SECURITY ||||

Indicate any foreign languages you can speak, read and / or write

|  | FLUENT | GOOD | FAIR |
|---|---|---|---|
| SPEAK |  |  |  |
| READ |  |  |  |
| WRITE |  |  |  |

List professional, trade, business or civic activities and offices held.
You may exclude memberships which would reveal sex, race, religion, national origin, age, ancestry, or handicap or other protected status:

# References

Give name, address and telephone number of three references who are not related to you and are not previous employers.

1. JACK FOLTZ - 1830 COLUMBIA AVE  FOLCROFT PA. - 215-583-7000
2. ROBERT RILEY - 26 GILL DR  NEWARK DE - 302-453-0339
3. PAUL ALEXANDER - 524 GLASSOW DR  NEWARK DE - 302-836-0650

Have you ever had any job-related training in the United States military?   ☒ Yes  ☐ No

If Yes, please describe  GENERAL - PULLED SECURITY PATROL OF RADAR SITE

Are you physically or otherwise unable to perform the duties of the job for which you are applying?   ☐ Yes  ☐ No

CONFIDENTIAL

IS0000158

# Employment Experience

Start with your present or last job. Include any job-related military service assignments and volunteer activities. You may exclude organizations which indicate race, color, religion, gender, national origin, handicap or other protected status.

| # | Employer / Address / Telephone / Job Title / Supervisor / Reason for Leaving | Dates Employed From | Dates Employed To | Hourly Rate/Salary Starting | Hourly Rate/Salary Final | Work Performed |
|---|---|---|---|---|---|---|
| 1. | Employer: PPG/MAZER -1986-1990; JORDAN CHEMICAL 1973-1986<br>Address: 1830 COLUMBIA AVE FOLCROFT PA<br>Telephone: 215-583-7000<br>Job Title: PRODUCTION SUP<br>Supervisor: BILL DRUMMOND<br>Reason for Leaving: EARLY RETIREMENT | 1973 | 1990 | 18,000 | 37,000 | SCHEDULING WORK FORCE - SCHEDULING PRODUCTION SCHEDULING - RAW MATERIAL QUALITY + SAFETY |
| 2. | Employer: US AIR FORCE<br>Address: <br>Telephone: <br>Job Title: RADAR MAINT SUP<br>Supervisor: <br>Reason for Leaving: RETIRED | 1951 | 1973 | | | |
| 3. | Employer: <br>Address: <br>Telephone: <br>Job Title: <br>Supervisor: <br>Reason for Leaving: | | | | | |
| 4. | Employer: <br>Address: <br>Telephone: <br>Job Title: <br>Supervisor: <br>Reason for Leaving: | | | | | |

CONFIDENTIAL

If you need additional space, please continue on a separate sheet of paper.

## Special Skills and Qualifications

Summarize special job-related skills and qualifications acquired from employment or other experience.

MILITARY - ELECTRONICS (RADAR MAINT), MANAGEMENT, SUPERVISON + GENERAL SECURITY

CIVILIAN - MANAGEMENT, QUALITY, SAFETY, PLANT MAINT + CHEMICAL MANUFACTURING

I AM WILLING TO PARTICIPATE IN ANY TYPE TRAINING PROGRAM THAT WOULD AID IN MY SECURING A POSITION

IS0000159

# Applicant's Statement

---

I certify that answers given herein are true and complete to the best of my knowledge.

I authorize investigation of all statements contained in this application for employment as may be necessary in arriving at an employment decision.

This application for employment shall be considered active for a period of time not to exceed 45 days. Any applicant wishing to be considered for employment beyond this time period should inquire as to whether or not applications are being accepted at that time.

I hereby understand and acknowledge that, unless otherwise defined by applicable law, any employment relationship with this organization is of an *"at will"* nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause. It is further understood that this *"at will"* employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization.

In the event of employment, I understand that false or misleading information given in my application or interview(s) may result in discharge. I understand, also, that I am required to abide by all rules and regulations of the employer.

_[signed] Jack A Dukes_       12-21-90
Signature of Applicant      Date

**CONFIDENTIAL**

---

### FOR PERSONNEL DEPARTMENT USE ONLY

Arrange Interview ☐ Yes ☐ No

Remarks _____

_____  INTERVIEWER   DATE

Employed ☐ Yes ☐ No   Date of Employment _____

Job Title _____   Hourly Rate/Salary _____  Department _____

By _____
NAME AND TITLE    DATE

NOTES _____

_____

_____

_____

---

This Application For Employment and Employment Data Record is sold for general use throughout the United States. Amsterdam Printing and Litho Corp. assumes no responsibility for the use of said form or any questions which, when asked by the employer of the job applicant, may violate State and/or Federal Law.

IS0000160