**EXHIBIT 6**

**EXHIBIT 6**



**WILCOX & FETZER LTD.**

## In the Matter Of:

# United States Equal Employment Opportunity Commission

## v.

# Initial Security

## C.A. # 04-CV-1309

---

## Transcript of:

## Jack Albert Dukes

## August 1, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 10

1　Q.　The results of that test allowed you to do what
2　in the field of electronics?
3　　A.　It allowed me, well, to select the area of
4　electronics that I wanted to go in to.  I could have gone
5　into radio, navigational aids, radar.  And then I wanted
6　to go into radar because it was the higher -- and the
7　school was longer.  And then in the -- in radar I had a
8　choice of Airborne ACNW, early warning.  And then there
9　was GCA, which was Ground Control Approach, which was
10　only 10,000 feet from the runway.  And my family would be
11　with me all the time.  So I took that.
12　Q.　Okay.  So you specify you took the radar portion?
13　　A.　GCA, electronic school.
14　Q.　At that time you were married?
15　　A.　Yes.
16　Q.　How long did you do the GCA radar job for the
17　air force?
18　　A.　Until I retired from the air force at -- in 1973,
19　November.
20　Q.　Okay.  After you left the air force in 1973, what
21　did you do?
22　　A.　I went to work in Philadelphia for a chemical
23　company called Jordan Chemical.
24　Q.　Where were you located in the air force?

Page 11

1　　A.　When I -- okay.  When I retired from the
2　air force, I was at Langley Field, Virginia.
3　Q.　So from Langley Field, Virginia, you moved to
4　Philadelphia.  How did you come to learn about --
5　　A.　No.  I took a job in Philadelphia.  Okay.  I
6　moved to Delaware.  My brother was a plant manager, and
7　he lived in Delaware.
8　Q.　Okay.  In 1973 you moved to Delaware, took a job
9　in Philadelphia with Jordan Chemical.  What was your
10　position at Jordan Chemical?
11　　A.　At that point in time, maintenance supervisor.
12　Q.　What did that job entail?
13　　A.　Well, it -- at the time I went there, they had
14　outsourced all of their maintenance.  And they wanted to
15　bring it in-house.  So my job was to hire people and form
16　a maintenance team.
17　Q.　Did you do that?
18　　A.　Yes.
19　Q.　Were there any other job duties once this team
20　was formed?
21　　A.　Yes.  Over the years -- and I don't know the
22　dates.  But the production supervisor went to the
23　hospital.  And he quit -- or retired really.  So they
24　made me plant supervisor.  And I took over production and

Page 12

1　shipping.
2　Q.　So you went from the maintenance supervisor to
3　plant supervisor over a period of -- could you
4　guesstimate?
5　　A.　Four or five years.
6　Q.　Okay.
7　　A.　Somewheres in there.
8　Q.　Who was your supervisor when you were maintenance
9　supervisor?
10　　A.　My brother.
11　Q.　Did he recommend you to the plant supervisor
12　position?
13　　A.　Yes.
14　Q.　What's your brother's name?
15　　A.　Edward Dukes.
16　Q.　Was your maintenance supervisor position your
17　first position as a supervisor?
18　　A.　No.  I had to -- yeah.  I'm sorry.  Yes.  I
19　didn't catch your first part there.  But maintenance was
20　my first.
21　Q.　As plant supervisor, what were your jobs and
22　responsibilities?
23　　A.　I was over shipping, production and maintenance.
24　Q.　What does that mean:  over shipping?

Page 13

1　　A.　Okay.  I had all the shipping -- I had two
2　shipping people.  They reported to me.  It was my
3　responsibility to see if they were there on the job,
4　doing their job, training them as to what they needed to
5　do.  And the same with production -- making sure --
6　again, scheduling and training and --
7　Q.　About how -- continue if you're not done your
8　answer.
9　　A.　I'm done.
10　Q.　Okay.  How many persons as plant supervisor
11　reported to you?
12　　A.　Between -- I don't know.  About 35 to 40.
13　Somewheres in there.
14　Q.　How long were you at Jordan Chemical?
15　　A.　To November of 1990.  Now -- okay.  I'm sorry.
16　PPG, Pittsburgh Plate Glass, had bought out Jordan
17　Chemical in -- I believe it was in 1986.
18　Q.　Okay.
19　　A.　Okay.
20　Q.　At that point in time, did you then work for PPG?
21　　A.　Then I worked for PPG.
22　Q.　That was due to the transition in ownership.
23　Correct?
24　　A.　Yes.

4 (Pages 10 to 13)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes
C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 14

1    Q. You said you were with Jordan Chemical/PPG until
2    November of 1990?
3    A. Yes.
4    Q. Were you plant supervisor at that time?
5    A. Yes.
6    Q. Why did you decide to leave that plant?
7    A. Well, in August of '99, I had a heart attack. We
8    blew the roof off the plant.
9    Q. Who's "we"? Could you explain that?
10   A. Okay. I shouldn't have said that. No. We were
11   doing a product for Johnson & Johnson and -- where we had
12   to go up high in temperature and pressure on a tank. And
13   the tank wouldn't hold it. So -- I mean, I didn't
14   personally.
15   Q. I was going to ask you.
16   A. Right.
17   Q. Was it the company or you personally?
18   A. No. It would have been a combination of the lab
19   setting up the formula and miscalculating it.
20   Q. There was some sort of explosion?
21   A. Yeah. The chemical came out of the reactor and
22   went up through and blew the roof -- a section of the
23   roof off.
24   Q. Oh, my.

Page 15

1        Were you injured in that explosion?
2    A. Yes.
3    Q. Did that cause your heart attack?
4    A. What happened on this -- I went into the office.
5    And this is when I found out that our engineers did not
6    do their homework right. Along with them -- I was in the
7    process -- I was going to fire one of them. And I was
8    standing there talking to the office manager. And it all
9    broke loose -- chest pains and all the sweats. And I
10   passed out and ended up in the hospital.
11   Q. How long were you hospitalized?
12   A. Boy, I'm not sure. I'd say three to four days.
13   Q. You fully recovered from that?
14   A. Oh, sure.
15   Q. So the heart attack, did that prompt you, then,
16   to leave --
17   A. Yes.
18   Q. -- PPG?
19   A. Yeah. I went to -- my heart doctor told me --
20   well, the hospital found out it was work-related stress
21   that was the cause of the heart attack.
22   Q. I see.
23   A. And I went to -- out to Pittsburgh to
24   headquarters, PPG, talked to their doctors and talked to

Page 16

1    the EO out there. And he said that -- I apologize -- but
2    if he didn't have a job that didn't have stress in it he
3    would put it in there because everybody needs to have
4    some stress for motivation. They said I could stay on or
5    I could retire, but my wife said I was going to retire.
6    Q. So you retired, then, from PPG?
7    A. Yes.
8    Q. Did you ever apply for workman's compensation or
9    receive any workman's compensation?
10   A. No.
11   Q. After your retirement from PPG, what did you do
12   after that?
13   A. I took a month off, and I decided to go into a
14   job that didn't have stress. Yeah. So I went to -- at
15   that time it wasn't Initial. They had another name. And
16   I applied for a job in security, thinking security did
17   not have stress.
18   Q. Okay. Do you remember the name of Initial
19   Security at the time you applied?
20   A. I believe it was SecurGuard or something like
21   that.
22   Q. Did you apply for a job with SecurGuard around
23   between November or December of 1990?
24   A. Yeah. It was around -- when I went in and talked

Page 17

1    to the gentleman, Art Kitchen, it was around the 18th or
2    19th of December.
3    Q. How did you come to this company, SecurGuard, or
4    what Initial Security used to be?
5    A. I saw the advertisement in the phone book.
6    Q. Okay. You mentioned you spoke to a gentleman
7    named Art Kitchen?
8    A. Yeah.
9    Q. Do you remember what position Mr. Kitchen had at
10   the time?
11   A. Yeah. He was account manager for several
12   accounts that they had, and he also was the person who
13   interviewed new hires.
14   Q. Did you in fact interview with Mr. Kitchen?
15   A. Yes.
16   Q. Did you have any prior security guard experience
17   at the time?
18   A. No.
19   Q. Do you remember your date of hire?
20   A. Okay. Right -- I think -- okay. Again, I'm not
21   exactly sure of these dates, but it was right after
22   Christmas. They called me and said they were going to
23   put me at -- in a hospital in -- up in Wilmington. Oh,
24   God. I can't think of the name of it. Crozier. And

5 (Pages 14 to 17)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes

C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 50

1    Q.  Was that a fairly simple process?

2    A.  Yes.

3    Q.  Okay.  Do you recall how long it took to be

4    trained on the computer?

5    A.  A couple of nights with Don.  A couple of

6    evening shifts, I would say, with Don.

7    Q.  You said you were console operator for how long?

8    A.  Oh, boy.  I am not -- I'm not sure of the date or

9    the time.  I know I went from the console operator to the

10   access administrator position.

11   Q.  Would you say it was more than two years you were

12   in the console position?

13   A.  Yeah.  I would say.  I would think so, yes.

14   Q.  About three years?

15   A.  I'm guessing here.  I don't want to run out of

16   my -- I was down there 20-some years at Chase.  All told,

17   from when I went into the console till I went up there,

18   yeah, I would say three years would be good.  I think so.

19   Q.  So around 1977, your next step was the --

20   A.  Access administrator.

21   Q.  Access administrator.

22       Was that a promotion?

23   A.  Yes.

24   Q.  Was this also termed as the badging

Page 51

1    administrator?

2    A.  Mm-hmm.

3    Q.  Was this also an administrative assistant

4    position?

5    A.  Yeah.  It had an extensive job title.  You worked

6    with the Chase security manager -- his office.  You were

7    tentatively responsible for fingerprinting, new hires,

8    working with HR.  And you would photograph and issue

9    access cards.  And you would put that information into

10   the system.  Now, it had to come -- that office was up on

11   the main floor.  They had to come down to security to put

12   that information into the system.

13       When I was a console operator, the access

14   administrator position was held by a young lady named --

15   I just know her first name -- Kim.  And then what

16   happened is Kim had to -- she was doing all the

17   fingerprinting and putting some material in.  And then

18   she had to come down and put the -- and fill out cards

19   and put this information in the computer.  And they were

20   running her crazy.

21       So one day I asked her -- I said, Kim, if

22   you train me -- I'm down here.  I'll input this

23   information.  Just come down.  There's a window with a

24   slot.  Put the card in there, or cards, and I'll go ahead

Page 52

1    and enter them in the system.  And that way you could get

2    back up there and -- because sometimes HR would give her

3    20, 30 people that she had to fill out cards, fingerprint

4    and do all this.  So she had done this.  She taught me

5    how to enter the people in.  She taught me how to change

6    status levels if they move from one department to

7    another.  So that when she wasn't there, if somebody came

8    in the office and wanted something done, Dale Hall would

9    just send them down to -- tell them to go down to talk to

10   Dukes -- I was on the console there -- and he'll take

11   care of you.  So then I was working.

12       And also, when she went on vacation, she

13   trained me on making the access cards and fingerprinting.

14   So that during that -- now, the only time I really done

15   this was when HR was having their new hire day.  Right?

16   And so what they would do is have the -- one of the

17   rovers stand by at the console and I would go up there

18   and work her job.

19   Q.  Okay.  So at that point were you officially a

20   console operator and access administrator?

21   A.  No.  When I was working for Kim, I was just a

22   console operator.  She was the access administrator.  Kim

23   quit.  We found out that we were making up 1201 Market

24   Street and she was going to have to fingerprint and make

Page 53

1    access cards for 1100 people.  And she asked for a raise.

2    And Dale told her she couldn't do it because her pay was

3    under contract from security.  And so she quit.

4    Q.  Was it your understanding that Kim was an Initial

5    Security employee?

6    A.  Oh, she was.  But she was not part of what they

7    called a security force.  She worked up there as an

8    access administrator.  In other words, she did not make

9    rounds.  She did not go out on investigations.  She did

10   not come down and run the security force.  She was

11   separate.

12   Q.  So it's only those persons who were doing the

13   rounds and were considered security force that had any

14   opportunity for raises for different duties?

15   A.  Right.  The site commander over the security

16   force would have been the console operators, your rovers

17   and your lobby guards.

18   Q.  Other than that, a person's salary like somebody

19   like Kim's is under contract, and they cannot fluctuate

20   what she earned?

21       MS. SALGADO:  Objection to the form of the

22   question.  You can answer.

23       THE WITNESS:  I beg your pardon?

24

14 (Pages 50 to 53)

United States Equal Employment Opportunity Commission v.                    Initial Security
Jack Albert Dukes                          C.A. # 04-CV-1309                 August 1, 2005

Page 54

1    BY MS. SMITH:
2    Q.  To the best of your recollection, is that
3    correct?
4    A.  Initial Security -- I don't know if they could.
5    I know they wouldn't.
6    Q.  Okay.  Now, when you were helping Kim with the
7    access cards prior to your becoming the access
8    administrator, did you receive any difference in your
9    pay?
10   A.  No.
11   Q.  Did you receive an increase?  Is that no?
12   A.  No.
13   Q.  How did you become the access administrator?
14   A.  Well, when Kim went back to Initial and
15   complained that she was getting all this additional work
16   and asked for a raise, Initial Security told them that,
17   again, it was part of the job.  It's the access
18   administrator's job and that there was nothing she could
19   do.  She is under contract.  And unless Chase wanted to
20   do something, their hands were tied.
21   Q.  Do you --
22   A.  Go ahead.
23   Q.  Do you recall what her salary was or what --
24   A.  No.  I'm sorry.

Page 55

1    Q.  -- raise she asked for?
2    A.  I really didn't keep track of salaries, because
3    she asked me about salaries.  And I couldn't -- I didn't
4    know when I got my raise.
5    Q.  Okay.  Well, we'll get into that as well.
6         But when you became access administrator,
7    did you receive a raise?
8    A.  Did I receive a raise?  Yes.  I moved to the
9    salary that that position held under the contract.
10   Q.  Were you then a salaried employee --
11   A.  No.
12   Q.  -- as opposed to hourly?
13   A.  Hourly.  No.  Always hourly.
14   Q.  What was your hourly rate?
15   A.  I don't remember.
16   Q.  Was it more than what you were --
17   A.  It was more than as a console operator.
18   Q.  Let's see.
19        Was it more than $6 an hour?
20   A.  I don't remember.  Honestly, I don't remember
21   what the salary was at that time.  I know that if I got a
22   raise.  And at that time the salary was site commander,
23   access administrator and console operator.  I really at
24   this point could not tell you what my salary would have

Page 56

1    been back then.
2    Q.  Okay.  Do you remember around what month within
3    1997 you became access administrator, if, in fact, it was
4    in 1997?
5    A.  Yeah.  No, I don't.  I'm trying to think.  I
6    don't really remember.
7         MS. SALGADO:  That's fine.  If it comes back
8    to you later --
9         THE WITNESS:  Okay.
10        MS. SALGADO:  -- you can mention it.
11        THE WITNESS:  The only thing I know is it
12   might have been during the summer months, because when I
13   had to badge the people from down at 1201, it was like
14   they came in with short sleeves.  Some of them had shorts
15   on, you know.
16   BY MS. SMITH:
17   Q.  So it was the summer of 1997 about?
18   A.  Yeah.  It would have been -- yeah.  I would say.
19   Q.  That's fine.
20        At that time who was the account manager?
21   Was it still Art Kitchen?
22   A.  Still Art Kitchen.
23   Q.  Was he aware that you were trained as the access
24   administrator?

Page 57

1    A.  Yeah.  So was Dale.
2    Q.  Dale worked for Chase.  Correct?
3    A.  Dale was -- at that time Peter Karl -- and Dale
4    was his assistant.  Chase built another company, a bank
5    out in Tempe, Arizona, and Peter went out there to set up
6    and take over the security out there.  And Dale moved up
7    into Peter's slot.  And so Dale was the Chase security
8    manager.
9    Q.  Okay.  Is that title interchangeable with
10   building manager?
11   A.  No.
12   Q.  So security manager Dale -- what was his last
13   name?
14   A.  Hall.
15   Q.  Hall.
16        He was aware and Art Kitchen, you said, was
17   aware that you had been trained.  Did Art Kitchen, at any
18   time prior to your ascending into the access
19   administrator position, offer any formal training to you
20   on the access administrator duties?
21   A.  No.  I learned a lot of it because I wrote the --
22   working with Kim, I wrote the procedure for the access
23   administrator and her job description.
24   Q.  So you wrote out a job description and procedure

15 (Pages 54 to 57)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes                    C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 58

1  manual. Did anyone request you to do that?
2      A.  Okay. I don't want to get into a long story.
3          One day Dave Smith gave an order, when I was
4  a rover, to the console operator of what to do that
5  evening. And, again, this was when I was on the swing
6  shift. And the man followed the order.
7          The next day a Chase manager complained what
8  the man did, and he said he was told to do it by the site
9  commander. And Dave Smith said he didn't do it. And
10 Dale came down. And they were going to send the console
11 operator -- and this was Don Evans -- back to Initial.
12         And I remember I came down in on a
13 conversation. And, again, I mentioned to Dale, well,
14 this is not fair. We don't have rules here. You don't
15 have a job description. We don't have procedures. And
16 being in the military, we did have manuals and
17 regulations. And I mentioned it to Dale.
18         Well, Dale says, "What about it?"
19         And I mentioned again about manuals and
20 regulations. And he says, "Well, write them if you want
21 them."
22         So I wrote the job descriptions and all the
23 training manuals for every position at 802.
24      Q.  So it's my understanding that at the time you

Page 59

1  were a -- were you a rover at that time?
2      A.  No. I wrote them while I was console operator.
3      Q.  While you were a console operator?
4      A.  Yes.
5      Q.  This was around 1994?
6      A.  Well, I wrote them on the mid shift. Remember, I
7  was with Don on the 4:00 to 12:00.
8      Q.  Right.
9      A.  Right. And so when I went on the mid shift,
10 which was 12:00 to 8:00 in the morning. It's dead.
11 Nothing is happening except the rovers making the rounds.
12 Chase is only about ten percent of the people in the
13 building at that time. I had all the time in the world
14 to write them.
15     Q.  I'm sorry.
16         You said that Chase was only about how many
17 people in the building?
18     A.  I'd say maybe ten percent.
19     Q.  Ten percent.
20     A.  Only the mailroom had personnel in there. Most
21 of them had gone home earlier, you know. So, actually,
22 there's only about two floors that actually had occupied
23 people on my shift.
24     Q.  Okay.

Page 60

1      A.  The rest of them were gone. So I had all the
2  time in the world to write these procedures. And I wrote
3  them, turned them over to Dale Hall. He reviewed them.
4  He made notes and changes so they corresponded with what
5  Chase wanted and then published it.
6      Q.  Now, you wrote a procedure manual?
7      A.  I wrote a procedure -- first I wrote a job
8  description on every position. And then I wrote
9  procedures on how to handle emergencies on the fire alarm
10 system, how the rover should make his rounds, how -- what
11 the console operator should do, how -- so on and so
12 forth.
13     Q.  Prior to that time, there were no procedure
14 manuals?
15     A.  All we had was the equipment manuals that came
16 with the -- the manuals that came with the equipment.
17 And a lot of people can't dissect those. And being in
18 electronics, I worked off of manuals like that, so I
19 could go in and pull things out.
20     Q.  Aside from the fire alarm and security system
21 training that everyone had from Chase, as far as job
22 descriptions and things like that, you had not been
23 formally trained --
24     A.  Right.

Page 61

1      Q.  -- by Initial Security or Chase.
2      A.  No.
3      Q.  Is that correct?
4      A.  Right.
5      Q.  Okay.
6      A.  A lot of it came because I held the positions and
7  I knew what I was supposed to be doing.
8      Q.  After you authored the information that was
9  contained in your procedure manuals, you then submitted
10 it to Chase?
11     A.  Chase and then Art Kitchen.
12     Q.  Okay. From that time are you aware if these
13 training manuals were adopted and distributed?
14     A.  Oh, sure.
15     Q.  Was it based on only the information that you
16 provided them despite not having the formal training from
17 either company?
18     A.  Well, I would say that the training that we had
19 really came from just those manuals.
20     Q.  From what you wrote --
21     A.  Wrote.
22     Q.  -- in the manuals?
23     A.  Right.
24         MS. SMITH: Okay. Can I have this marked?

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes                    C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 62

1    (Dukes Deposition Exhibit No. 2 was marked
2  for identification.)
3  BY MS. SMITH:
4    Q.  You can take a look at that.
5    A.  Okay.
6    Q.  All right.
7    A.  This is not the manual I had written.
8    Q.  I just wanted to ask you:  Do you recognize this
9  document?
10   A.  No.  I -- this looks like something that Art
11 Kitchen could have written after he relieved me at
12 White Clay.
13   Q.  Okay.  So this is nothing that --
14   A.  No.
15   Q.  -- you authored?
16   A.  No.  And --
17   Q.  Okay.  This document marked Dukes 2 you believe
18 was a manual for the White Clay location for Chase?
19   A.  Yeah.  Now, I want to -- okay.  We'll get back --
20 we'll get to that when we go there.
21   Q.  For now I just want to know if you've ever seen
22 this --
23   A.  No.  I have not seen --
24   Q.  -- in your employment at 802.

Page 63

1    A.  No.  I have not seen this manual in this -- no.
2    Q.  But did you see this manual at White Clay?
3    A.  No.
4    Q.  You can put this away for now.
5    A.  Okay.
6    Q.  I'll show you something else.
7        MS. SMITH:  Mark that as Dukes 3.
8        (Dukes Deposition Exhibit No. 3 was marked
9  for identification.)
10 BY MS. SMITH:
11   Q.  You can take a second to look through that.
12       Did you have the opportunity to review
13 Dukes 3, Bates stamped IS285 and then IS314 and -316?
14   A.  Yes.
15   Q.  Okay.  Have you ever seen this document before?
16   A.  I have seen a lot of what the duties -- because a
17 lot of them are what I wrote.  This particular thing, no.
18 I believe it was written after I left.
19   Q.  Okay.
20   A.  No.
21   Q.  You left what year?
22   A.  I left in June of '02.
23   Q.  Was that due to retirement?
24   A.  Yes.

Page 64

1    Q.  Okay.  We'll get into that later.
2        But I just wanted to ask if you've ever seen
3  this.
4    A.  No.  I have not seen this particular one.
5        MS. SMITH:  Can you mark this as Dukes 4?
6        THE WITNESS:  Because I know Art reviewed --
7  was the security portion that reviewed all of mine.  And
8  he had made some changes.  And I -- well, we'll go into
9  that later.
10       MS. SMITH:  No.  You can finish your
11 statement.
12       THE WITNESS:  Okay.  When he took over for
13 me, Chase -- I wanted to leave when -- I told Chase that
14 I was going to retire when I was 70.  Fifty-one years of
15 working was enough.  And I was 70 in April '02, the 6th.
16 And at that time -- Art Kitchen, who was at that time
17 still the -- what do we call it? -- the representative
18 for this contract.  Okay.  He came up to me and said,
19 "Jack, I want to apply for the job.  You're making more
20 than me."  So I said okay.  I don't care who applies for
21 the job.  And Bob asked me -- he knew that my wife was
22 with the school system and she was going to retire at the
23 end of that year also.
24       MS. SALGADO:  Does this have to do with the

Page 65

1  manual?  I think the question had to do with whether or
2  not you saw Exhibit Dukes 3.
3        THE WITNESS:  Okay.  What I was just trying
4  to say:  This particular thing -- Art at that time said
5  that he was going to rewrite them and put them on the
6  computer and things like that.
7  BY MS. SMITH:
8    Q.  What year was that?
9    A.  This would have been in '02.  He took over in
10 April of '02.
11   Q.  Okay.  As a site commander at White Clay?
12   A.  As site commander at White Clay.  And he would
13 have been site commander at that time for 1201 also.
14   Q.  For the two sites?
15   A.  Because 802 is not out of the picture.
16   Q.  As far as Chase was concerned?
17   A.  As far as Chase was concerned.
18   Q.  But it was still an open and operating building
19 in 2002.  Correct?
20   A.  No.  They had already turned the building back
21 over to the owner before I left.
22   Q.  The owner of the actual physical building?
23   A.  Yeah.
24   Q.  Okay.  Are you aware if there were any security

17 (Pages 62 to 65)

United States Equal Employment Opportunity Commission v.                          Initial Security
Jack Albert Dukes                          C.A. # 04-CV-1309                          August 1, 2005

Page 82

BY MS. SMITH:
1
2   Q.  Okay.  So you basically replicated what you did
3   as a console operator at 802 and did that same service, I
4   guess, of trying to compose --
5   A.  Yes.
6   Q.  -- a procedure manual at White Clay using your
7   duties?
8   A.  But what you have to understand -- I almost know
9   what you're saying.  You're talking apples and oranges.
10  At 802 -- it was a high-rise.  White Clay was a campus --
11  seven buildings spread out.  Our rovers were in vehicles
12  down at 802 -- I mean at White Clay.  They weren't there.
13  The console operator -- even the -- you take -- for
14  example, the 600 building had seven exit doors.  So it
15  was an altogether different scenario.  The policies, the
16  rules and everything -- the whole procedure was
17  different.  So I couldn't have taken anything --
18  Q.  I'm sorry.  I'm not asking you if you replicated
19  word for word what you did at 802.  I'm just saying you
20  replicated the act of composing the procedure manual.
21  A.  Yes.
22  Q.  At that time at White Clay, were you a site
23  commander?
24  A.  Yes.

Page 83

1   Q.  Did you then take your duties as a site
2   commander, commit them to paper or writing and use that
3   to compose a training manual for White Clay?
4   A.  Yes.
5   Q.  Is it the case, then, that before you wrote this
6   training manual that there were no training manuals or
7   procedure manuals in writing in effect at White Clay at
8   the time you were a site commander?
9   A.  Yes.  There were manuals in effect, but the
10  manuals that we had there were from the Bank of New York.
11  Q.  For a different client?  Is that what you're
12  saying?
13  A.  That's who -- okay.  They got the White Clay
14  Center from the Bank of New York.  The Bank of New York
15  was leasing it.  They moved out.  Chase moved in.  And
16  when Chase moved in there, at that time the security
17  manager was Tom Durkens.  He asked the security people
18  down there if they'd stay.  The site commander down
19  there, she agreed.  And I would say that two-thirds of
20  the force agreed to stay.  The equipment that they had
21  down there was different than -- their security equipment
22  and their fire alarm equipment was different from what we
23  had up at 802, but they were getting the Casi in down
24  there.

Page 84

1   Q.  Oh.
2       Is that the Casi-Rusco --
3   A.  Security.
4   Q.  -- security system --
5   A.  Yes.
6   Q.  -- that you had to be trained on in Boca Raton?
7   A.  Yes.
8   Q.  Is it your testimony that prior to taking the
9   position of the site commander at Initial Security that
10  Initial Security did not have any procedure manuals or
11  job descriptions for the client, Chase, at that
12  particular site?  Is that correct?
13  A.  Right.
14  Q.  Okay.
15  A.  That is at White Clay.
16      MS. SMITH:  All right.  I think we can take
17  a break.
18      (A recess was taken.)
19      (Terrence Cook entered the conference room.)
20      - - - - -
21      JACK ALBERT DUKES, resumes
22      MS. SMITH:  Can you read back the last
23  question and answer, please?
24      (The reporter read the requested portion.)

Page 85

1   BY MS. SMITH:
2   Q.  Did you hear the court reporter's reading back of
3   the testimony?  Did you just hear the series of questions
4   that he just read?
5   A.  Not really.  I wasn't paying attention.
6   Q.  That's okay.
7       MS. SMITH:  If you could just please read
8   back when he mentioned or referred to Dukes 6 when he
9   said "this," at least that's what I'm going to try to
10  establish.
11      (The reporter read the requested portion.)
12      THE WITNESS:  Yes.
13  BY MS. SMITH:
14  Q.  When you said this is at White Clay, are you
15  referring to these duties and responsibilities that are
16  reflected in Dukes 6?  What did this refer to?
17  A.  This is a portion.  No.  I didn't write this.
18  But -- okay.  This was taken from what I had written.
19  But this is a portion of the job description that I had
20  at White Clay.
21  Q.  Okay.  You testified that you wrote something
22  that was exhaustive of all your duties and
23  responsibilities as a site commander at White Clay.  Is
24  that correct?  I'll repeat the question if you need me

22 (Pages 82 to 85)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes                C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 74

1    A. Yeah.
2    Q. -- Dukes 5?
3    A. So I knew they were apparently given to more than
4    just me.
5    Q. When you say "they," was it Initial Security or
6    Chase?
7    A. It was Initial Security people. Guards.
8    Q. Do you know if this came down from the account
9    managers?
10   A. No. This came from -- well, at that time it
11   wasn't Gordon Ellis. It was another guy when I -- but
12   Gordon Ellis was -- I was with Gordon Ellis as the head
13   of security more than I was with this other guy. It came
14   from his office from -- from the Initial Security office
15   itself.
16   Q. Was this, I guess, the prevailing rules and
17   regulations that were in effect the entire time that you
18   were employed with Initial Security?
19   A. Yeah.
20   Q. Okay. Actually, we'll revisit this. I just
21   wanted to see if you recognize this document.
22       MS. SMITH: One last one. This is Dukes 6.
23       (Dukes Deposition Exhibit No. 6 was marked
24   for identification.)

Page 75

1    BY MS. SMITH:
2    Q. Take a look at that document marked Dukes 6. It
3    has no Bates stamp.
4    A. (The witness complied with counsel's request.)
5    Q. Did you have an opportunity to review
6    Dukes 6?
7    A. This?
8    Q. Yes.
9    A. Yes.
10   Q. Do you recognize the document?
11   A. Not as this document. I think this is something
12   that -- these are some of the jobs that I was responsible
13   for down at the White Clay Center.
14   Q. Oh, this is at White Clay.
15   A. Yeah. This would be White Clay.
16   Q. You don't know who composed this document?
17   A. I believe Art Kitchen. Like I said, Art
18   Kitchen -- for Chase -- not for Chase but for Initial --
19   Art did set up some of their -- he didn't only have our
20   account. He had other accounts which were smaller. And
21   he did set up procedures for them. And I got -- I had
22   that when he worked with me -- and mine -- he took some
23   of that information and helped set up. And I'm sure that
24   when he came -- he relieved me. And I'm sure that he had

Page 76

1    done this change. This is not the format that I had
2    used.
3    Q. But you composed something that pretty much
4    outlined what your duties were as a --
5    A. Sure. And a lot of them are -- but the way he
6    has it written down --
7    Q. I'm sorry. I didn't finish the question.
8    A. I'm sorry.
9    Q. Just so the record is clear: Is this something
10   that outlined your duties and responsibilities as a site
11   commander or all of your duties from the time that you
12   came to Initial Security?
13   A. No. This was as a site commander -- part of my
14   duties as a site commander.
15   Q. This is not encompassing all of your duties?
16   A. No. Not for 802. I mean for -- not for
17   White Clay Center.
18   Q. Does this entail all of your duties that you
19   performed at the 802 Delaware site?
20   A. No. It would not apply to Bill. The maintenance
21   of the Casi-Rusco system -- no. I was sent to Boca Raton
22   and trained on the Casi system. And all Bill could have
23   done on the Casi system was pull up somebody's name.
24   Q. Are you speaking about Bill Spikes?

Page 77

1    A. Bill Spikes.
2    Q. Well, I haven't asked about him, per se, yet.
3    A. Okay. What I'm -- well, then, I'll put it this
4    way. At 802, the site commander -- I could have done
5    this as 802, but another site commander could not have
6    done that at 802. So it would not be for a site
7    commander at the 802 building.
8    Q. That wasn't part of the site commander's duties
9    is what you are saying at 802 unless you had gone to this
10   training?
11   A. Exactly. The access administrator would have
12   done that.
13   Q. Okay. The bullet point down, I guess, one, two,
14   three, four, five from the bottom -- keep standard
15   operating procedures updated --
16   A. Right.
17   Q. -- was there a manual that you're familiar with
18   that was the standard operating procedures?
19   A. Yeah. It's the one I wrote.
20   Q. Okay.
21   A. This would be on operating procedures on all
22   equipment.
23   Q. Do you remember what the booklet looked like --
24   how many pages?

20 (Pages 74 to 77)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes

Initial Security
August 1, 2005

C.A. # 04-CV-1309

Page 94

1 such as inputting the information and getting all the
2 cards and --
3    A.  Right.  Into the system.
4    Q.  -- into the system or system -- now, you said that you
5 wrote up the job description for the access
6 administrator.  Is that correct?
7    A.  Right.
8    Q.  Did you write this up at the time you were a
9 console operator?
10    A.  Yes.  I sat down with Dale Hall, and this is what
11 he said he wanted the access administrator to do.
12    Q.  Is there a reason why Dale Hall, who the Chase --
13    A.  Security manager.
14    Q.  -- security manager, went to you as a console
15 operator to write the procedures for a nonsecurity force
16 position?
17    A.  Okay.  Yeah.  Because I was writing all the rest.
18 But maybe we have a misunderstanding.  She was in
19 security.  She was not a Chase employee.  The position
20 was not a Chase position.  It was a security position.
21 It's just that her position -- she could not dictate to
22 the rover, the console, so on and so forth.
23    Q.  Okay.  Now, was the answer to my question, which
24 was why he went to you as a console operator to write a

Page 95

1 procedure for a position that was not a security force
2 position, because you were already writing other
3 procedures?
4    A.  Yes.
5    Q.  Is that correct?
6    A.  That's correct.
7    Q.  When you became access administrator, did you
8 have any supervisory authority over the console operator,
9 site commander or rover?
10    A.  No.
11    Q.  How would you describe your relationship as an
12 access administrator to a rover and a console operator
13 and/or site commander?
14    A.  As a fellow security employee -- Initial
15 Security.  We moved the monitor where we put the
16 information in from behind the console operator and moved
17 it further down so that I could pull a chair up and enter
18 my own.  But just going down and having coffee and saying
19 hi.  In other words, no disciplinary.  Nothing -- I had
20 no -- to answer your question, no.
21    Q.  Okay.
22    A.  No authority.
23    Q.  Were you viewed in any way as a superior?
24    A.  Except for the fact that I was making more money

Page 96

1 than the rover and things like that.  No, I wouldn't say
2 a superior.
3    Q.  In your opinion, because you were paid more than
4 the security office personnel or security force, do you
5 believe that Initial Security viewed you as a more
6 superior position?
7        MS. SALGADO:  Objection to form.  You can
8 answer the question.
9    A.  Okay.  No.  I don't think so.  Initial Security
10 informed us right from the get-go that the access
11 administrator had no authority and was not part of the,
12 say, security force -- that security building.
13    Q.  Who do you recall saying this to you?
14    A.  I beg your pardon?
15    Q.  You said Initial Security.
16        Do you know who in Initial Security?
17    A.  Art Kitchen.
18    Q.  This is around 1997?
19    A.  Oh, no.  This was when I first came there and he
20 described the positions.
21    Q.  Okay.
22    A.  And he said, will you have the access
23 administrator that works with the Chase security
24 manager -- and she is not part of the security --

Page 97

1 building security.  But she is -- at that time -- well,
2 it was SecurGuard but a security personnel.
3    Q.  Okay.
4    A.  She wore the uniform and everything else.
5    Q.  She was in uniform, but she didn't have the
6 duties of patrolling?
7    A.  Exactly.  Right.
8    Q.  I believe it was your testimony that, as a person
9 who issued badges, that was part of the access
10 administrator job.  Correct?
11    A.  Exactly.
12    Q.  You mentioned that you stayed on as access
13 administrator until you went to White Clay.
14    A.  Yes.
15    Q.  And then --
16    A.  Oh, no, no, no.  I'm sorry.  Whoa.  No.  I moved
17 from there down to site commander.  I was site commander
18 when I left to go to White Clay.
19    Q.  Okay.  I was going to ask you about that.
20    A.  All right.  Yeah.
21    Q.  Do you recall about when you became site
22 commander at 802 Delaware?
23    A.  Okay.  I was still working for Tom Durkens.  And
24 the site commander had cancer of the throat.  And so they

25 (Pages 94 to 97)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes                    C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 98

1  had to replace a site commander. And Tom sent me down to
2  do the job and I just stayed on. I don't know -- again,
3  you're asking for dates.
4       MS. SALGADO: Just your best estimate.
5       THE WITNESS: Probably a year before I went
6  to -- down to White Clay.
7  BY MS. SMITH:
8  Q. So around 2001 maybe you were site commander?
9  A. Well, I went to White Clay what: 2001.
10 Q. Oh, okay.
11 A. Around in there. So I'd say probably about 2000.
12 I was site commander at the turn of the century.
13 Q. Okay. Turn of the new century, to clarify.
14       So maybe in 1999?
15 A. Yeah. It could be.
16 Q. Into 2000.
17       So I guess it would be fair to say that you
18 were an access administrator for approximately three
19 years and there was a site commander who had cancer of
20 the throat. Do you remember that person's name?
21 A. No.
22 Q. Okay. Did that person pass on and that's why --
23 A. No. He couldn't -- really couldn't speak. And
24 his problem with the medication caused him to fall

Page 99

1  asleep. And he'd be sitting down there. And this
2  is -- it was all glass where the console is. So as
3  you're walking down the hall, you're looking seeing
4  everything that's going on there.
5       But Mr. Barrett walked by, and there he is
6  head back sleeping. So they -- Chase talked to him, and
7  they found out that he really couldn't respond or
8  couldn't go around. So they asked
9  Initial to take him back. And they did. But other than
10 that, I was not privy to their meeting. But this was
11 what I was informed.
12 Q. Okay. So the bottom line is he was essentially
13 removed as site commander --
14 A. Yes.
15 Q. -- at 802 Delaware Avenue?
16 A. Right.
17 Q. At the client's request?
18 A. At the client's request.
19 Q. Just really quickly, you said where the site
20 commander was sitting was all glass.
21 A. Yeah.
22 Q. Could you describe that setup for me, please, as
23 far as square footage and the area?
24 A. Okay. All right. Let's say this is our console.

Page 100

1  As you come in the back door, the back entrance to the
2  building, the hallway -- this was all glass. Then over
3  here we had two windows that were -- and the console
4  operator -- his station was here.
5  Q. So when you're indicating with your hands, you're
6  moving to your right and to your left.
7  A. Right.
8  Q. So there was a hallway.
9       Then to the left of the hallway --
10 A. To my right.
11 Q. To your right?
12 A. Right. And right to my left there's a large
13 window that looked down into the loading dock so that the
14 console operator had full view of the loading dock and
15 also anybody coming down the hallway.
16 Q. Okay.
17 A. And anybody coming down that hallway -- the whole
18 hallway was glass, except for the door, naturally. I
19 mean...
20 Q. So when you were coming down the hallway, the
21 walls on either side was glass? You could see through?
22 A. Just the wall leading into the console. The
23 other side was a cinder block wall which was a part of
24 the wall of the entrance to the garage.

Page 101

1       MS. SMITH: Okay. All right. Could you
2  read back my last question right before the glass
3  question?
4       (The reporter read the requested portion.)
5  BY MS. SMITH:
6  Q. Okay. So the gentleman with throat cancer was
7  eventually removed, and you became site commander?
8  A. Yes.
9  Q. Was that considered a promotion?
10 A. Yeah. Because it was more money than I was
11 making as access administrator. And it was Tom Durkens
12 who was the Chase security manager.
13 Q. Do you know who Tom Durkens spoke to as far as
14 recommending you?
15 A. It would have been to Gordon Ellis at Initial.
16 Q. Now, who is Gordon Ellis?
17 A. He was the head of Initial Security.
18 Q. When you say the "head," was he president?
19 A. No. Initial Security was like a chain. I would
20 say he would be the manager of this particular location.
21 Q. Did he take over Art Kitchen's duty?
22 A. Art Kitchen worked for him.
23 Q. Okay. So he was Art Kitchen's superior?
24 A. Yes.

26 (Pages 98 to 101)