United States Equal Employment Opportunity Commission v.                            Initial Security
Jack Albert Dukes                    C.A. # 04-CV-1309                              August 1, 2005

Page 102

1  Q.  Do you recall when Gordon Ellis took on the role
2  of Art Kitchen's supervisor?
3  A.  No.
4  Q.  Did he have an office at 802 Delaware?
5  A.  Art Kitchen?
6  Q.  Did Gordon Ellis --
7  A.  No.
8  Q.  -- have an office --
9  A.  No.
10 Q.  -- at 802 Delaware?
11 A.  No.
12 Q.  Did Art Kitchen --
13 A.  No.
14 Q.  -- have an office at 802 Delaware?
15 A.  No.
16 Q.  Where was Gordon Ellis' office located?
17 A.  At that time they had -- their office was over
18 off 13 and 72 in a development back in there where the
19 post office is.  And I don't know if you're familiar.
20 There's a -- like a farmers' market back in that area.
21 And they had an office back in there.
22 Q.  Both Art Kitchen and Gordon Ellis had an office
23 back in there?
24 A.  Yes.

Page 103

1  Q.  How far away was that from 802 Delaware in miles
2  and/or minutes?
3  A.  Probably ten miles.
4  Q.  Okay.  Did you ever have an occasion at any point
5  in your employment with Initial Security to meet with
6  either Art Kitchen or Gordon Ellis involving any
7  promotion or training or any job-related issues?
8  A.  For me?
9  Q.  Yes.
10 A.  At White Clay -- this isn't --
11     MS. SALGADO:  Just to your best recall.
12     THE WITNESS:  This is when Ellis came down
13 to talk to Bob about the promotion?
14     MS. SMITH:  Well, if you want to --
15     MS. SALGADO:  Just answer her question.  Her
16 question is pretty specific about --
17     THE WITNESS:  Okay.  I think you're asking
18 me have I had any time -- was I involved with Gordon
19 Ellis for a promotion or --
20 BY MR. SMITH:
21 Q.  Well, I'm asking if you ever met personally with
22 either Art Kitchen or Gordon Ellis, or both, involving
23 any employment-related issue?  "Issue" doesn't
24 necessarily mean problem but any employment-related

Page 104

1  activity or question.
2  A.  In that respect, no.
3  Q.  Did you ever meet with them at all for any
4  reason?
5  A.  No.  Not at the office.  Gordon has come down to
6  White Clay, and him and bob talked in my office there.
7  But they weren't -- that was the only thing.
8  Q.  Okay.  Bob who?
9  A.  Bagosy.
10 Q.  What was Bob Bagosy's role or title?
11 A.  He was Chase security manager.
12 Q.  Was Bob Bagosy representative of the client?
13 A.  Bob Bagosy was representing the client.
14 Q.  What issue did you discuss with Bob Bagosy and
15 Gordon Ellis?
16 A.  A raise.
17 Q.  For?
18 A.  Me.
19 Q.  Were you asking for a raise?
20 A.  No.
21 Q.  What was the content of the conversation?
22 A.  While I was at -- down at White Clay, Mr. Bagosy
23 was -- traveled quite a bit.  Okay.  So he wasn't there.
24 He had gone to Tempe, Tampa, and he went to -- out in

Page 105

1  Utah.  And he came back.  And he said to me that my
2  counterpart out there -- some of them were doing less
3  than me, but they were making more money than me.  And
4  they were in civilian clothes.  And he said some of our
5  managers hear said that -- because I sat in a lot of
6  their meetings -- that they'd like you in civilian
7  clothes, that sometimes their supervisor has seen a guard
8  there.  He said tomorrow I want you in civilian clothes.
9  And he says I'm going to -- he said I already checked
10 with Mr. Barrett and I checked with New York.  We're
11 going to give you a raise.  We are can't bring you up to
12 what they're making, but we're going to give you a raise.
13 Q.  You can continue -- I'm sorry -- if you're not
14 done the question.
15 A.  Then he called Gordon.  And 20 minutes later
16 Gordon was down in his office talking.
17 Q.  Okay.  Are you done?  Is that your answer?
18 A.  Sure.
19 Q.  How long had Bob Bagosy represented the client at
20 that point?
21 A.  I don't know.  Maybe a year.
22 Q.  About what year did this conversation take place?
23 A.  Okay.  I guess it was about a year after I had
24 gone down or -- again, I'm not sure on time.  It was

27 (Pages 102 to 105)

Page 106

1  right after I had gone down from 802 to White Clay to be
2  his site commander.
3  Q.  Okay.  Mr. Bagosy, had he been traveling
4  frequently for a period of months?
5  A.  Oh.  He would be traveling sometimes weeks at a
6  time.
7  Q.  But suffice it to say, during the time that he
8  was traveling and the times that he related to you that
9  he noticed other persons in your position who made more
10 money, did this traveling take place well before this
11 conversation or weeks before the conversation?
12 A.  Oh, yeah.
13 Q.  Was that weeks before or months before?
14 A.  Well, I don't really know.  He had gone down to
15 Florida.  He had gone out to New York, because they used
16 him as a troubleshooter.  Mr. Bagosy was aggressive,
17 but --
18 Q.  I was just asking for a time frame.
19      So it's about like maybe weeks and into a
20 few months maybe before he spoke to you?
21 A.  Yeah.  It could have been.  It was just on one of
22 his trips that he made.  That's all I can say.  I don't
23 know exactly.
24 Q.  In mentioning to you he wanted to recommend you

Page 107

1  for a raise, I think that you stated that he mentioned
2  that other site commanders were doing your same job but
3  maybe not as much as what you were doing.  Is that what
4  you --
5  A.  Yes.
6  Q.  -- stated?
7       And that you deserved a raise.  Is that
8  correct?
9  A.  He didn't say I'm going to recommend you.  He
10 said I'm going to give you a raise.
11 Q.  Did you inquire as to what these other site
12 commanders at other locations were doing as far as the
13 duties were involved like that you weren't doing -- or
14 that -- excuse me -- that you were doing that they
15 weren't doing?  Did he specify any particular duties?
16 A.  Okay.  I was in communications with the site
17 commander at Tampa and at Tempe.  We exchange problems
18 that we had on the Casi system and on the picture perfect
19 system.  We've -- it was hard at times to get the access
20 cards, and we would swap.  I would send them some and
21 they would send me some.  So I was in communications with
22 them.
23      Now, you're asking the duties that I was
24 doing --

Page 108

1  Q.  Right.
2  A.  -- above -- okay.  While I was down at
3  White Clay --
4  Q.  Actually, I'm sorry.  Just for a record of
5  clarification:  I am asking you what duties you were
6  doing that were --
7  A.  -- that they -- above --
8  Q.  -- in addition to what the other site commanders
9  in other locations --
10 A.  Okay.  That's what I was going to explain.
11 Q.  -- were doing.
12 A.  Okay.  Number one is that when Mr. Bagosy -- he
13 traveled.  The other -- at the other sites, their site
14 Chase managers did not.  Now, they were put under him,
15 Mr. Bagosy, even though he hadn't been there that long.
16 And in traveling, I represented Mr. Bagosy at -- Clarence
17 Jones is -- a management meeting -- and he was a facility
18 manager where we just discussed the problems that we were
19 having.  Again, he was responsible for all the buildings,
20 parking lot, roads and everything else.  Clarence
21 Jones -- not Clarence Jones, but Sam Patcher who was up
22 at 802 handled 802 --
23 Q.  Was he the client for Chase?
24 A.  He was the client for Chase up there.  He came

Page 109

1  down.  We both went to meetings.  I was surprised that I
2  was going to those meetings as an Initial Security -- and
3  Sam wasn't recognizing -- wasn't going to -- wasn't going
4  for both of them.
5  Q.  I'm sorry.  Could you --
6  A.  That Sam, as a Chase employee, was not
7  representing White Clay and 802.  All right.  I was
8  surprised to the fact that I was going and I wasn't a
9  Chase employee.  But I was going to these management
10 meetings.
11 Q.  Were other site commanders present at these
12 management meetings?
13 A.  There was only one site commander.  That was me.
14 Q.  Oh, at White Clay.
15 A.  At White Clay.
16 Q.  Did any site commanders at 802 attend these
17 meetings?
18 A.  No.
19 Q.  Who asked you to attend these meetings?
20 A.  Who actually attended?
21 Q.  No.
22      Who asked you?
23 A.  Asked?
24 Q.  Who requested it?

United States Equal Employment Opportunity Commission v.  
Jack Albert Dukes    C.A. # 04-CV-1309  
Initial Security  
August 1, 2005

Page 110

1  A. Bob.
2  Q. Bob Bagosy requested it?
3  A. Yes.
4  Q. Well, do you know why he asked you to go to these
5  meetings?
6  A. Well, because White Clay had its own budget. 802
7  had its budget. Bob operated independently from 802.
8  When they made the move at that time and Bob -- Tom
9  Durkens was over all of them.
10  Q. And Tom Durkens is again?
11  A. He was the Chase site commander. He had
12  White Clay and 802.
13      MS. SALGADO: Site commander or security
14  commander?
15      THE WITNESS: Security manager. Excuse me.
16  Okay. Thank you.
17      But when Bob came on -- came into the
18  picture, Sam was down at White Clay for the installation.
19  When they bought the building, they were gutting it out
20  and reforming it to bring the Chase people down. All
21  right. They moved Sam back up to 802. They moved Bob
22  down to White Clay. They said -- like, for example, Bob,
23  this is yours. Sam, this is yours.
24  Q. Who is "they"? Is that Chase?

Page 111

1  A. Chase.
2  Q. Okay.
3  A. All right. This is your budget and this is your
4  budget. So when Sam went to the meetings, he was gone.
5  And Clarence Jones, who was at that time the facility
6  manager, would only discuss 802 with Sam. And he would
7  only discuss what was going on down at White Clay with
8  Bob.
9      When I went to the meetings representing
10  Bob, he done the same thing. It was, Jack, we're going
11  to be putting in fiber optics at so and so,
12  blah-blah-blah-blah. Now, I took notes. If it was very
13  important, I would call Bob on a cellular phone, wherever
14  he was he was at. He could have been in California,
15  Utah, whatever. And I discussed the things that were
16  important. If they weren't, then I would make minutes
17  and put them on his desk, and he would take care of it
18  when he came back.
19  Q. Okay. How did you come to know about the
20  different budgets? Did anyone tell you --
21  A. Sure.
22  Q. -- about that?
23  A. I -- another one of my jobs, if you look at one
24  of the things they have here on the payroll --

Page 112

1  Q. Witness is referring to Dukes 6.
2  A. Okay. I maintained the hours for our security
3  people down at White Clay, and also I was responsible for
4  the state police that were -- that we hired to come in
5  three times a day. I maintained their hours. And when
6  we got the invoice from the state police, I reviewed the
7  invoice. I then sent the invoice to an Ann Hubert, who
8  was accounts payable. And then she --
9  Q. For Chase?
10  A. For Chase.
11  Q. Okay.
12  A. Also when Initial sent down the payroll, I went
13  through and I handled the payroll and checked it out to
14  verify that the payroll was correct. And if there was a
15  problem, I would send it back to Initial, telling them we
16  disagree, blank, blank, blank. And I would send it over.
17  We had our own code. 802 had their code -- financial
18  code. And in talking to Ann, Ann had mentioned -- and
19  then also when we picked up 1201, they had a financial
20  code and they had a budget.
21  Q. So through Ann and your dealing with the payroll,
22  you came to understand that the three different sites had
23  their separate budgets. Is that correct?
24  A. No. Bob told me.

Page 113

1  Q. Oh, Bob Bagosy.
2  A. Bob explained it to me because I would get
3  invoices coming in on -- when I ordered phones and
4  checked to make sure that we got our phones. So I sent
5  it forward to Ann. So there was no problem. If Bob
6  wasn't there, if Ann saw my initials, she went and ahead
7  and paid it out of Bob's budget.
8  Q. Okay. Now, as far as what you're mentioning
9  about the payroll, was that one of your duties that you
10  had that was in addition to the duties that Mr. Bagosy
11  was relating to you that you did over --
12  A. Exactly.
13  Q. -- others?
14  A. And Sam Patcher did his own up at the 802.
15  Q. Did his own?
16  A. Payroll.
17  Q. Payroll.
18      Okay. Now, you mentioned that you attended
19  meetings. Do you remember where meetings were held?
20  A. Yeah. Building 600, where Clarence Jones had
21  his -- the facility manager had his office and his --
22  what do you call the place? -- like this -- conference
23  room.
24  Q. Okay. Was this also in Wilmington, Delaware?

Page 114

1  A. Yeah. It was in the White Clay Center.
2  Q. Not Wilmington, but -- I'm sorry.
3  A. It would have been in Newark.
4  Q. Newark, Delaware?
5  A. Sure.
6  Q. How far away was the White Clay Center from
7  802 Delaware?
8  A. About 14 miles, 15 miles.
9  Q. Any other additional duties that is reflected in
10 Dukes 6 or the exhaustive document that you referred to
11 that is not listed today?
12 A. Listed here?
13 Q. Right. This is Dukes 6.
14 A. Okay.
15 Q. So out of anything in this document --
16 A. That's not on here? Yeah. I also did mail
17 testing, which was a Chase responsibility.
18 Q. Mail testing?
19 A. Mail testing, yeah.
20 Q. What did that involve?
21 A. What this involved is I was given a sum of money.
22 And I was given credit cards. And Chase employees, when
23 they went through orientation, if they were going to
24 Building 5 and dealing with the credit card mail coming

Page 115

1  through -- processing it -- they were told that security
2  would test them for honesty and that they would be tested
3  within the first 30 days and then periodically, depending
4  on the supervisor.
5       Now, what it existed of is I would either
6  take money or I would take a credit card and I would
7  write a statement, if it's a credit card, telling them:
8  "To whom it may concern. I've canceled my account. I'm
9  returning this credit card. If I in a future date would
10 like to have a credit card, I would definitely get back
11 to you." I would send it through the mail.
12      Now, what we would do is the manager or
13 supervisor there would pick out the person. I didn't.
14 They did. And I gave them the envelope. And I took the
15 credit card. I make a fax copy -- a copy of the credit
16 card. I sent a copy over to their manager. I had a
17 copy.
18      And so she would walk around. And I would
19 have a camera. There are cameras that I had there. I
20 could take a front view, back view and both sides view of
21 a person at the same time -- shoot down on it. And they
22 were so good I could read the lettering on the envelopes.
23 And they -- she would then walk up. And I would follow
24 her around. When she stopped, I knew that was the

Page 116

1  person. I honed in on her.
2  Q. I'm sorry.
3       Were you physically following this person
4  around or was this --
5  A. No. By camera.
6  Q. -- from another -- okay.
7  A. I was on camera.
8  Q. From another location?
9  A. Right. I was at my office. This was all part of
10 my office.
11      And then when she stopped, fine. She then
12 would play around with -- they had stacks of mail. And
13 while she was there, she would slip my envelope in the
14 mail.
15 Q. Continue, continue. You can finish answering the
16 question as to what this entailed.
17 A. All right. Now, the idea is I'd watch it come
18 through the machine. Literally, when it brought the
19 envelope in, it cut the top and cut the front. And two
20 suction cups hit it, opened it up. And then the employee
21 would pull out whether it's a check or a receipt. They'd
22 pulled it out. Checks -- they put the check in front of
23 it. If it was a credit card, they would raise their
24 hands. Either a lead worker or manager would come over.

Page 117

1  They had scissors and a box, they would cut it and put it
2  in a box. And then the security -- or the supervisor
3  would tell them they have just passed the security.
4       If I sent money down through the mail and
5  that turned -- when the money came through, I did the
6  same thing. I photographed the money so the serial
7  number was there. And when I sent it through, they're
8  supposed to, when they got the money, stand up.
9       And when they stood up, the supervisor came
10 over. They took the money, went over to a ledger, wrote
11 in the ledger who it all came from, because I had phony
12 addresses and names. All right. And then they're
13 supposed to put the money in a -- normally, if it wasn't
14 being tested, they would put the money in the slot. But
15 since they're being tested and I couldn't get my money
16 back if they put it in the slot, they would tell them at
17 that time -- the supervisor would tell them at that time
18 that they were just tested from security and they passed.
19 Q. Okay. Now this process of mail testing or
20 honesty testing, who instructed you to take on this duty?
21 A. All right. When I was up at 802 and I was at the
22 access administrator and I worked for Dale Hall, Dale
23 Hall was -- he retired or quit Chase. He was leaving
24 Chase and was going with his wife out to Arizona. He had

| United States Equal Employment Opportunity Commission v. Jack Albert Dukes | C.A. # 04-CV-1309 | Initial Security August 1, 2005 |

Page 118

1  a daughter, a gifted daughter, and they were moving out
2  there.
3         Now, Tom Durkens was to come in and relieve
4  Dale Hall. Well, he was supposed to get there two weeks
5  before Dale was to leave. Well, here Dale wasn't aware
6  that Chase gave him two weeks' vacation prior to coming
7  in. When they told this to Dale, Dale said, hey, I've
8  sold my house, everything. I'm leaving. So it happened
9  that the day that Tom was coming in Dale was going. They
10 had enough time to say -- so Dale trained me in these
11 areas so I, in turn, could train and inform Tom when he
12 came in.
13    Q. Okay. So, basically, you're instructed by Dale
14 to run these mail tests at White Clay for a limited
15 amount of time?
16    A. And I was also instructed by Dale how to handle
17 the payroll and everything else, along with some others.
18    Q. With the mail testing, about how long did you
19 perform that duty?
20    A. I performed it until I -- in '92 in June when I
21 left.
22    Q. You began in 1992 performing the mail testing?
23    A. No, no. In '02 when I left. I performed it from
24 there up until I left. I even -- when I was up at 802

Page 119

1  and they moved the mail section down to White Clay, I
2  went down to White Clay and did the testing down there
3  while I was still up at 802.
4     Q. So you were able to perform the testing with the
5  cameras from 802 and from White Clay?
6     A. Sure.
7     Q. Okay. How long did it take you to get trained on
8  that?
9     A. Whoa, whoa, whoa. You said from 802 and there.
10 No. I went down to use the cameras at 802 because the
11 mailroom was down there.
12    Q. The mailroom was still at 802 when you --
13    A. No. When they moved --
14    Q. Oh, when they moved.
15    A. When they moved the mailroom, they moved the
16 whole -- they moved everybody from the 9th floor at 802
17 to Building 500 down at White Clay.
18    Q. Okay.
19    A. No one else down there was certified or could do
20 that.
21    Q. Okay.
22    A. So I was sent down to -- they would call me and
23 say, Jack, on your way home, because I only lived two
24 miles away -- on your way home -- stop or leave early.

Page 120

1  Come down. We want you to do some mail testing. And I'd
2  go down there. And with the cameras and everything, I'd
3  do the mail testing.
4     Q. Just so I'm clear, you were trained by Dale --
5     A. Right.
6     Q. -- on the mail testing?
7        But you were still at 802 as a site
8  commander?
9     A. At that time.
10    Q. At that time.
11       This would be sometime in 1999. Correct?
12    A. I guess so.
13    Q. Was it the turn of the century?
14    A. It would -- right. It would be at that time
15 right after the turn of the century.
16    Q. Okay. So from 2000 to 2002, you performed these
17 mail testings?
18    A. Yes.
19    Q. I was trying to get to that.
20       Did you draft the letter that was used --
21    A. Yes.
22    Q. -- in the envelope?
23       You drafted that letter?
24    A. For the money and for the cards, yes.

Page 121

1     Q. Okay. How long did it take to train you on the
2  mail testing?
3     A. Well, he trained -- he started training -- as
4  soon as he found out that Tom was going on two weeks'
5  leave, we started going over his job. And he trained me
6  on what his responsibilities were.
7     Q. This particular duty, about how long would you
8  say?
9     A. For the mail testing? I think I observed him
10 doing it about four times, and then he sat with me for
11 probably about four more times.
12    Q. You said that, in addition to the duties of a
13 site commander, you did the payroll, which you just
14 described, I believe, in your earlier testimony.
15    A. Yes.
16    Q. Any other duties that are not listed on Dukes 6?
17    A. Well, a lot of the responsibilities that are not
18 on here was I was responsible for CPR/first aid to make
19 sure people were certified. I pulled monthly inventory
20 of all of our equipment. Down at White Clay our -- we
21 had vehicles. We had radios. We had to follow the
22 weather bureau, because at White Clay it was an open
23 campus. So I had those responsibilities. Plus the state
24 police is not on this particular thing.

31 (Pages 118 to 121)

Case 1:04-cv-01309-KAJ   Document 36-7   Filed 08/29/2005   Page 6 of 11

United States Equal Employment Opportunity Commission v.  Initial Security
Jack Albert Dukes         C.A. # 04-CV-1309                August 1, 2005

Page 122

1  Q. Okay. So you're in charge of ensuring that
2  everyone was certified in CPR?
3  A. Yes.
4  Q. Were you, in fact, certified in CPR?
5  A. Yes, I was.
6  Q. Okay. Were all site commanders to your knowledge
7  certified in CPR?
8  A. Yes, they were.
9  Q. To ensure that everyone was certified in CPR,
10 what did you have to do?
11 A. We had to go to class. And they brought somebody
12 in from the Red Cross. And they gave you -- for CPR and
13 first aid, you actually got a card --
14 Q. Right.
15 A. -- that you attended the class and you passed the
16 class. So you had to work on the mannequin. And on
17 first aid they went over the various punctures and the
18 various types of burns and how to treat them, how to
19 bandage them, how to put on splint -- anything general
20 that would happen -- that could happen. We didn't go
21 into major, you know, type things. And also how to work
22 with somebody actually with the CPR if they're having
23 chest pains and things like that.
24 Q. I'm not asking you specifics of the training.

Page 123

1  I'm just trying to ask: As far as your duties as site
2  commander, what was your responsibility in ensuring that
3  people were certified? If, in fact, all other site
4  commanders were certified in CPR, what was, then, your
5  additional duty?
6  A. Oh, no. I'm saying that is not on here.
7  Q. Okay, okay.
8  A. All right.
9  Q. I'm talking about additional duties other than
10 what all the other site commanders were doing.
11 A. Oh, yes. Every other site commander had to --
12 okay. Every other site commander had to do that.
13     I would say the handling of the payroll and
14 handling the budget and things like that and the mail
15 testing were the two, three biggest things that I had.
16 And representing Tom -- I mean Mr. Bagosy -- in various
17 meetings.
18     Now, at White Clay I met -- we had the Casi
19 system. My job down there was to -- we got the Casi
20 system after I went down there -- made sure it was
21 installed, check with the managers to find out the
22 requirements and things like that.
23 Q. You're referring to the Casi-Rusco --
24 A. Rusco.

Page 124

1  Q. -- X-Terminal?
2  A. Yes. The security.
3  Q. This is what you went to training for?
4  A. Yes. At Boca Raton, Florida.
5  Q. This Casi-Rusco, was this present only at
6  White Clay?
7  A. No. Chase was putting the Casi system into all
8  their buildings so that somebody from New York could come
9  down to White Clay with a card and work.
10 Q. Okay. This was only present in Chase-occupied
11 buildings. Correct?
12 A. (The witness indicated.)
13 Q. Is that a yes?
14    I'm sorry.
15 A. Yes.
16 Q. After Chase left 802 Delaware and moved to
17 White Clay, was it going to be implanted at the 802 site?
18 A. I'm not sure. Again, it's something that I just
19 heard. But in talking to one of the maintenance people,
20 they said that the person who owned the buildings wanted
21 all that tore out.
22 Q. A maintenance person from where?
23 A. Down at the White Clay Center -- Chase.
24 Q. Do you remember who that person was?

Page 125

1  A. It was a May Barlow.
2  Q. A May Barlow? A M-a-y or something to that
3  effect?
4  A. Yeah.
5  Q. You mentioned you had gone to training in
6  Boca Raton, Florida, on the Casi-Rusco X-terminal.
7  A. Yes.
8  Q. Who asked you to go to the training?
9  A. Bob Bagosy and New York.
10 Q. Excuse me?
11 A. And New York.
12 Q. What do you mean by "New York"?
13 A. The system was controlled by New York. The
14 categories in which you had to operate the system went by
15 New York. We had sent a Jean Steinns down there. And
16 she came back. And she worked on the system, but she was
17 having problems.
18 Q. Who is Jean Steinns?
19 A. When I went into the site command up at 802, she
20 went in as access administrator.
21 Q. Was she an Initial Security employee?
22 A. (The witness indicated.)
23    MR. COOK: You have to respond verbally.
24

United States Equal Employment Opportunity Commission v.  
Jack Albert Dukes    C.A. # 04-CV-1309

Initial Security  
August 1, 2005

Page 134

1  month, 1st day of 2000.
2  Q. Okay. Where were you located at that time in
3  your employment with Initial Security?
4  A. I was at the White Clay Center.
5  Q. You were at the White Clay Center in December 01
6  of 2000?
7  A. Yes. And I was a site commander.
8  Q. You had mentioned before Bill Spikes' name.
9     Do you know who Bill Spikes is?
10 A. Yes.
11 Q. Who is Bill Spikes, as best as you can recall?
12 A. Bill Spikes was a console operator for me when I
13 was site commander.
14 Q. At some point did you happen to promote
15 Mr. Spikes to the site commander position?
16 A. When I left up there, Sam Patcher, who was the
17 Chase security manager -- he at that time didn't want me
18 to go down to White Clay. He wanted me to stay with him
19 up there.
20 Q. Do you know why that is?
21 A. Well, it's more or less of a feeling that I had.
22 But --
23 Q. Did he ever verbalize anything to you?
24 A. Except that he thought I stabbed him in the back

Page 135

1  because I went down to White Clay. That's about the only
2  thing.
3  Q. How did you come to that understanding?
4  A. Well, he mentioned -- when I told him -- he kept
5  asking me not to go down to White Clay, to stay with him.
6  All right. But White Clay was only two miles from home.
7  And 802 was 15 miles from home. White Clay was being
8  built up. 802 was -- we knew -- everybody knew that
9  Chase was moving out of 802. There was no future at 802.
10 Q. At what point did you come to that understanding?
11 When? About when?
12 A. Oh, when they first -- oh, this was way back when
13 they first signed the lease for White Clay.
14 Q. When was this?
15 A. I couldn't tell you the exact date.
16 Q. Around 1999? Does that sound familiar?
17 A. Well, something I'm uncomfortable with here.
18 You're asking me to give you an estimate and then you're
19 showing me documents that are giving you -- when I'm
20 telling you I don't know the date.
21    MS. SALGADO: It's okay. She's just asking
22 the question. You can give your best estimate.
23    MS. SMITH: I'm not trying to trap you.
24 It's just for information.

Page 136

1    MS. SALGADO: It's not a pop quiz. But just
2  make sure you make it clear.
3    THE WITNESS: Okay. But I'm getting stuff
4  back and saying it wasn't so and so. It was so and so.
5    MS. SALGADO: It's okay.
6    THE WITNESS: Okay.
7    MS. SALGADO: It's okay.
8    THE WITNESS: I do not remember this. I --
9  and like I said, in security we had a close relationship
10 with maintenance. Okay. And I sat in on some of Sam --
11 I mean Clarence Jones' meetings. And so he was the
12 facility manager. And I heard -- oh, the other thing too
13 is in electronics I worked with fiber optics. And Tom
14 Durkens was supposed to go down and tell them how many
15 pairs of fiber optics they were going to need down
16 there -- or at a meeting. And I went to that meeting
17 with him because he wanted me to figure out how many
18 cameras we were going to need, how many card carriers we
19 were going to need and how many fiber optics and so on.
20 So at the meeting is when I got the feeling --
21 BY MS. SMITH:
22 Q. Got the feeling that Sam Patcher wanted you to
23 stay at 802?
24 A. No. Got the feeling that Chase -- 802 was

Page 137

1  history.
2  Q. When you say "history," meaning that Chase --
3  A. That Chase was --
4  Q. -- was going to move out?
5    Did you have any knowledge at that time if
6  any other new clients were going to be moving into 802 or
7  you just knew that Chase was moving out?
8  A. I just knew at that time that Chase was moving
9  out.
10 Q. So you had no idea if any new tenants were going
11 to acquire the building?
12 A. No.
13 Q. Okay. Back to your statement that you thought
14 maybe Sam Patcher thought you had stabbed him in the back
15 by going to White Clay --
16 A. Well, yeah.
17 Q. -- what was that feeling based upon?
18 A. Okay. Sam Patcher came and worked under Tom
19 Durkens. All right. Now, Tom sent Sam down to
20 White Clay for the installation and when they gutted the
21 buildings. And Sam really worked down there. And he was
22 a liaison between security and maintenance, right, on
23 what we needed.
24    Now, Sam came after I had gone down and sat

35 (Pages 134 to 137)

Page 138

1  in the meeting with the fiber optics. And we had done
2  all the conduits and things like this. But Sam actually
3  had an office down there, and he ram-rodded the
4  installation as where the security building would be,
5  where the console building would be.
6       Then when Tom Durkens quit, Sam thought he
7  was going to come up and take over and do exactly what
8  Tom Durkens did -- and that was he would run both
9  White Clay and 802. Instead, they brought in Mr. Bagosy.
10 They put Mr. Bagosy down --
11 Q.  Who is "they"? Is that Chase?
12 A.  Chase.
13 Q.  Okay.
14 A.  New York.
15      They put Mr. Bagosy down at White Clay,
16 brought -- and Sam had an office at 802 already. Sam got
17 802. They told the gentlemen that here's your budget.
18 White Clay had a budget. 802 had a budget. You guys are
19 working independent of each other. It's almost like two
20 facilities there. Because -- in other words, Sam could
21 do -- could give bonuses or anything he wanted out of his
22 budget to anybody working. So anybody working at 802
23 answered to Sam Patcher. All of us working down at
24 White Clay, we answered to Bob Bagosy.

Page 139

1  Q.  As the client of Chase at White Clay?
2  A.  White Clay.
3  Q.  Okay. Because you left to go to White Clay, how
4  did that play into --
5  A.  Well, it's because of the knowledge that I had.
6  Because Bob was getting the job and he really didn't have
7  that much knowledge of the facility and things like that
8  where Sam had already been there.
9  Q.  Right.
10 A.  And so Sam was hoping that, I guess like anybody
11 else would, he was going to fall on his face and so on
12 and so forth. Because he kept saying -- telling me,
13 stick with me, Jack. Stay up here. I want you to stay
14 up here and be my site commander. The Casi system
15 already was put up there at 802.
16 Q.  The Casi system that you were trained on?
17 A.  Yeah.
18 Q.  And -- okay. Continue.
19 A.  He had one at 802.
20      But when Bob asked me to come down, I talked
21 it over with my wife. And my wife is saying, Jack, you
22 don't have to run 95. You don't have to do that. It's
23 almost like a godsend. You're only -- I was 2.3 miles
24 from my driveway to where I park my car in White Clay.

Page 140

1  Q.  So in some respect did Sam Patcher feel somewhat
2  betrayed because you went there --
3  A.  Because I went there.
4  Q.  -- and did not stick with him --
5  A.  Yes.
6  Q.  -- at 802?
7  A.  Yes.
8  Q.  Is that --
9  A.  Yes.
10 Q.  -- the answer to the question?
11 A.  Yeah.
12 Q.  Okay. You had mentioned that the Casi system was
13 in place at 802. Correct?
14 A.  Yes.
15 Q.  Now, was that in place at a time when Bill Spikes
16 was also --
17 A.  The site commander.
18 Q.  -- site commander?
19      Is that correct?
20 A.  Yeah. It was in place when I left, and he
21 relieved me as site commander.
22 Q.  Do you know how Mr. Spikes came to be site
23 commander when you left to go to White Clay?
24 A.  At the time -- I got a call from Gordon Ellis,

Page 141

1  because one of the things is -- I -- Sam kept me up at
2  White Clay longer than he was supposed to.
3  Q.  He kept you up --
4  A.  Up at 802.
5  Q.  Okay.
6  A.  He kept me there for three weeks longer than what
7  New York told him to do. Now, I got a call from Initial
8  saying, Jack, when you leave to go down there, we're
9  going to need a site commander. And they said -- they
10 had two people in mind. One of them was Bill. And they
11 thought a good relationship -- Sam Patcher was
12 Afro-American. Bill was Afro-American. There's a very
13 good relationship. And there was between Bill and Sam.
14 Q.  I'm sorry.
15      Did someone specifically say to you, well,
16 because they're both African-American --
17 A.  No.
18 Q.  -- they have a great relationship?
19 A.  No, no, no, no. They didn't. That's --
20 Q.  That was your perception?
21 A.  That Bill and Sam, they had a good relationship.
22 Q.  Okay.
23 A.  I'm saying that I felt with both.
24      And so they said, "What do you think?"

United States Equal Employment Opportunity Commission v.  
Jack Albert Dukes        C.A. # 04-CV-1309

Initial Security  
August 1, 2005

Page 142

1      And I said, hey, it would be fine.
2   Q. Did they ask you for your recommendation of an
3   individual?
4   A. All they asked me was what did I think about Bill
5   taking over as the site commander. And I said, hey, that
6   would be fine.
7   Q. Were you aware if Mr. Spikes was able to perform
8   all the duties of the site commander that you had had --
9   okay. Are all the duties of a site commander, let's say,
10  that are listed in Dukes 4 something that you assisted in
11  drafting?
12  A. Oh.
13      MS. SALGADO: Objection to form. But you
14  can answer the question.
15      THE WITNESS: Yeah. Wait a minute. Let me
16  pull it out here.
17      MS. SALGADO: Take your time to look at it.
18      THE WITNESS: Yes. This is basic for a
19  basic site commander, yes. He didn't have the
20  qualification as the Casi-Rusco system.
21  BY MS. SMITH:
22  Q. Well, I'm just asking as far as --
23  A. That form there, yes.
24  Q. That two-and-a-half page document with several

Page 143

1   bullet points and different job duties and descriptions
2   on each page, you felt as though Mr. Spikes at the time
3   you gave the okay for his promotion to site commander
4   that he was fully capable of performing these duties
5   listed --
6       MS. SALGADO: Objection to form. You can
7   answer the question.
8   A. Yes.
9   Q. -- in Dukes 4.
10      Okay. Were you aware if Mr. Spikes had
11  trained himself on any of the computer systems or badging
12  systems that were in place at 802?
13  A. I think Bill had trained himself -- or Jean
14  Steinns could have trained him on the picture perfect
15  badging station. All right. And the fingerprinting.
16  All right. There is -- he would be limited because your
17  access on the Casi-Rusco system was given by New York.
18  And Jean Steinns didn't even have what I had under
19  qualifications. I had to come up to 802 in some cases.
20  And I could do it down there. But any changing of the
21  card readers, any changing of category, I had -- I was
22  the only one in the Newark area here or Wilmington area
23  here who had access to do that particular thing.
24  Q. At that time that Mr. Spikes was promoted to site

Page 144

1   commander, how long before had you gone to Boca Raton to
2   train for the Casi-Rusco system?
3   A. I would say I returned -- when I returned from
4   Boca Raton, I had a month before I was going down. I
5   should have left the following week, but Sam kept
6   stalling on it -- finding some kind of a reason he wanted
7   me to check this or do that. And it wasn't until a
8   Mr. Bagosy talked to Mr. Barrett, who is a president of
9   the bank, and Mr. Barrett told Sam release me.
10  Q. Okay. Do you recall if when you went to
11  White Clay that you received an increase in salary?
12  A. No. I did not.
13  Q. Do you recall if it was in fact in April of 2000
14  that you went to White Clay and Mr. Spikes was then
15  promoted to site commander?
16      You can take a minute to think --
17  A. Yeah.
18  Q. -- if you need to.
19  A. It could have been. Again, like I said, it's
20  been a while, so I'm not sure. But yeah.
21  Q. It's a possibility?
22  A. Possibility, yes.
23  Q. Okay. If that is the case, then would it be fair
24  to say that you received a $2,000 bonus while being site

Page 145

1   commander at 802 Delaware?
2   A. No.
3   Q. So would that be fair to say that you received
4   any bonus while you were employed at 802 Delaware Avenue
5   as a site commander?
6   A. I received nothing. No. I did not.
7   Q. So the two bonuses you received, it is your
8   testimony you received them while working at White Clay?
9   A. While working at White Clay.
10  Q. Okay. All right.
11  A. And the money came out of Bob Bagosy's.
12  Q. You're saying it's from the client, Chase?
13  A. Yes. From his account. See, Sam had one and Bob
14  had one.
15  Q. Do you recall what your pay rate was at all at
16  the time you went to White Clay? Not after the raise
17  that Bob Bagosy insisted that you get, but in April of
18  2000 do you remember what your pay rate was?
19  A. No. When I heard I was coming, I asked my wife,
20  and she couldn't really tell me.
21      MS. SALGADO: That's fine. That's fine. If
22  you don't remember --
23      THE WITNESS: Okay.
24      MS. SALGADO: Just do your best.

United States Equal Employment Opportunity Commission v. Jack Albert Dukes    C.A. # 04-CV-1309    Initial Security    August 1, 2005

Page 198

1  disciplined if I went anywheres within the 802 building
2  or, if we still had the 800, over to the 800 building to
3  investigate something. No.
4      Q.  Does that complete your answer?
5      A.  Yes. No would be my answer to yours.
6      Q.  Thank you.
7      A.  I would not be disciplined.
8      Q.  Thank you. Fair enough.
9          Do you know who Wayne Dumford is?
10     A.  No.
11     Q.  Are you aware if any other tenant moved into the
12  802 Delaware Avenue site?
13     A.  Yes, I am.
14     Q.  Do you know who that was?
15     A.  I did know the name -- a crazy name. I think
16  they moved in on the 13th floor, because I had to set up
17  card readers. There are card readers up there. They had
18  Chase cards. And I had to set up the floor, because the
19  floor -- we totally closed it down. And I had to open it
20  up for the access of what their requirements were.
21     Q.  Okay. So the answer to the question is, yes --
22     A.  Yes.
23     Q.  -- there was a tenant there?
24     A.  There was a tenant up there.

Page 199

1          MS. SMITH: Okay. I think that's it.
2  That's all I have.
3          MS. SALGADO: I have a few follow-up
4  questions.
5  BY MS. SALGADO:
6      Q.  Now, Mr. Dukes, are you familiar with a company
7  by the name of Reit Management?
8      A.  Who?
9      Q.  Reit Management?
10     A.  Reit Management?
11     Q.  Yes.
12     A.  No.
13     Q.  Was it your understanding that Chase, as the
14  client that Initial Security provided security forces
15  for, actually had certain expectations as to the staffing
16  of the security guards at the 802 building in terms of
17  the number of security guards per shift?
18     A.  Sure.
19     Q.  Okay. It was Chase's expectations with regard to
20  that?
21     A.  Yes.
22     Q.  In fact, if there had been, say, a different
23  tenant in the building, they may very well have had
24  different security needs. Is that correct?

Page 200

1      A.  Yes.
2      Q.  They may very well have had different
3  expectations with regards to the staffing of security
4  guards at that building. Isn't that right?
5      A.  Yes.
6      Q.  Okay. In fact, when you worked at 802 building,
7  the client that was there was Chase Manhattan. Is that
8  correct?
9      A.  Yes.
10     Q.  Okay. You never worked at that building with any
11  other client that was being provided security services?
12     A.  No.
13     Q.  I believe you mentioned before that Bob Bagosy
14  was the security manager when you were at White Clay.
15     A.  Yes.
16     Q.  I believe that you said that he traveled quite a
17  bit. Is that right?
18     A.  That he did.
19     Q.  I think you said that other security managers who
20  also worked for Chase did not travel as much as he did.
21     A.  That's right.
22     Q.  Did you, in fact, assist him when he traveled?
23     A.  In the traveling?
24     Q.  Well, in the sense of --

Page 201

1      A.  I filled in for him on jobs, if that's what
2  you're referring to.
3      Q.  Yes.
4      A.  Yes.
5      Q.  What kind of things did you fill in for him while
6  he was away?
7      A.  I made Clarence Jones' management meeting, which
8  would be facilities. I met with managers of the building
9  if they had a need where a special project was coming up
10  and they had to bring people in after hours so I could
11  set up their card readers and we would discuss what
12  people or special categories for and things along this
13  line. And I guess dealing with the state police.
14     Q.  Did he, in fact, delegate some degree of
15  authority to you?
16     A.  Yes, he did. Because I could -- there again, I
17  could sign any voucher coming through. I would initial
18  it and send it over to Ann Hubert. And as long as I
19  viewed it and initialed it, she would just send it on.
20     Q.  Was this something that was over and above the
21  typical job duties for a site supervisor?
22     A.  Yeah. I should not have had that responsibility
23  as a security -- as an Initial employee, because I had a
24  problem out in Texas and the guy called in to get some

51 (Pages 198 to 201)

United States Equal Employment Opportunity Commission v.
Jack Albert Dukes   C.A. # 04-CV-1309

Initial Security
August 1, 2005

Page 202

1  information. And he asked me -- he says, well, what do
2  you do? And I said I'm in security.
3     Q. So he was surprised that you had this additional
4  authority?
5     A. Right. That I was handling the security budget.
6     Q. The security manager's duties?
7     A. Yeah.
8     Q. Were you ever involved in new hire orientation as
9  site supervisor?
10    A. Yes, I was. Bob Bagosy -- security -- Bob should
11 have gone to him. But when he was traveling, I would go
12 into HR. And this is what the Excel thing was all about.
13 Because once I was leaving, we made up this display so
14 that they would just show it in a spreadsheet. And that
15 way, if Bob couldn't be there, then they would show it.
16    Q. This was something you did over and above the
17 typical site commander's duties?
18    A. Yes.
19    Q. This was something the Chase security manager
20 would otherwise have been responsible for?
21    A. Yes.
22    Q. You had testified that you wrote certain
23 procedures as well as writing certain job descriptions.
24 Was this something that was over and above the typical

Page 203

1  job duties of a site supervisor?
2     A. Oh, yeah. That was something I volunteered to
3  do.
4         MS. SALGADO: Okay. I don't have any
5  further questions at this point.
6         MS. SMITH: The Commission has no more
7  questions.
8         MS. SALGADO: You have the opportunity to
9  read the transcript and review it for accuracy. For
10 example, if there is a typo --
11        THE WITNESS: No.
12        (The deposition concluded at 3:14 p.m. this
13 same day.)
14            - - - - -

Page 204

INDEX TO TESTIMONY

JACK ALBERT DUKES                           PAGE

Examination by Ms. Smith                     2

- - - - -

INDEX TO EXHIBITS

DUKES DEPOSITION EXHIBIT NO.                 PAGE

1  Four-page Document Entitled Application for   21
   Employment
2  Document Entitled Initial Security: Security  62
   Officer Manual
3  Four-page Document Entitled Stanley Smith     63
   Security, Inc., Policy & Procedures Manual
   Index
4  Three-page Document Entitled Site Commander:  66
   Duties and Responsibilities
5  Four-page Document Entitled Initial Security  72
   Rules and Regulations
6  One-page Document Entitled Duties, Jack Dukes 74
7  One-page Document Entitled ServiceLink, Inc., 88
   Employee Departure Fact Sheet
8  One-page Document Bates stamped              133
   EEOC0000000133
   - - - - -

Page 205

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

I, Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 1st day of August, 2005, the deponent herein, JACK ALBERT DUKES, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.
    I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.
    I further certify that reading and signing of the deposition were waived by the deponent and counsel.
    I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

            Robert Wayne Wilcox, Jr.
            Certification No. 101-RPR
            (Expires January 31, 2008)

DATED: August 3, 2005