**EXHIBIT 10**

**EXHIBIT 10**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Equal Employment Opportunity Commission

v.

# Initial Security

C.A. # 04-1309

Transcript of:

## Deborah Baul

May 24, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497

Page 38

1  that will be accompanied by a written reprimand.
2      Did I read that right?
3  A.  Correct.
4  Q.  Now, I think you just testified a little while
5  ago that there was, the progressive discipline policy
6  was there would be a verbal warning first; is that
7  correct?
8  A.  Yes.
9  Q.  Whose responsibility is it -- well, is there a
10 responsibility to document the verbal counseling?  Do
11 they write it down anywhere, I gave Mr. Spikes a verbal
12 counseling on this date?
13 A.  You should, if you have time.
14 Q.  Who would be the proper person to discipline
15 Mr. Spikes if there was an incident of reporting late?
16 A.  It was me who reported it, and then I reported
17 it to Gordon Ellis.
18 Q.  We will get more specifically into the actual
19 events.
20     Did you ever review Mr. Spikes'
21 personnel file at any time?
22 A.  No.
23 Q.  Did you know whether or not Mr. Spikes ever
24 had received any verbal counseling?

Page 39

1  A.  Other than with me?
2  Q.  Well, we will get to that.
3      Other than --
4  A.  I can't speak for anyone else, no.
5  Q.  But you never reviewed his file to see if
6  there is any documentation of any discipline in there;
7  correct?
8  A.  I can't remember, to be honest with you.  I
9  could have, but I don't want to say yes.  I just -- it
10 probably did, but I can't remember.
11 Q.  It probably did, meaning what, that you don't
12 remember whether or not you ever reviewed the file, his
13 personnel file?
14 A.  I'm going to say no.  I'm going to say no.
15 Q.  You don't remember?
16 A.  No.
17 Q.  But I think you said the proper procedure
18 would be if somebody was late or there was an
19 infraction, the first thing would be a verbal
20 counseling?
21 A.  Correct.
22 Q.  And then it would go to, I think you said the
23 90-day written notice; is that correct?
24 A.  It will go -- written would go written to him

Page 40

1  and he'd be aware of it, that he was written up.
2  Q.  So the intent of the 90-day writeup is to give
3  the employee notice that here's an infraction, you need
4  to improve, something like that?
5  A.  Correct, yes.
6  Q.  Was there ever a time when you wouldn't give
7  the report or the 90-day writeup to the employee, give
8  them notice of it?
9  A.  Unless it was a no call/no show, he just
10 didn't show up, no prior notice for -- just
11 disappeared.  Let's put it that way.  So you're going
12 to assume he's quit.
13 Q.  Calling your attention to that same document,
14 please, Miss Baul, at Page IS329, it talks about in A,
15 B, C there at the bottom, it says, All supervisors and
16 managers are charged with the responsibility of guiding
17 themselves under the following principles.  Give the
18 employee fair warning, progressive discipline is the
19 correct method of discharge.
20     Did I read that correctly?
21 A.  Correct.
22 Q.  So in order to fire Mr. Spikes, would he have
23 had to have received the proper progressive discipline
24 in order to get him to the point of termination?

Page 41

1       MS. SALGADO:  Objection.  You can answer.
2       THE WITNESS:  Huh?
3       MS. SALGADO:  You can answer the
4  question.
5       THE WITNESS:  Oh, okay.
6       Yes.
7  BY MS. SMITH:
8  Q.  Now, in the case of Mr. Spikes, how frequently
9  would you usually go out there when REIT management
10 took over initially?  Did you say once a month?
11 A.  If Janet had called and there started to be
12 problems, then I was out there once a week.
13 Q.  What is your recollection of, after you took
14 over as account manager and rebuilding came under REIT
15 management control, were there any problems at 802
16 Delaware Avenue with regard to the security guards?
17 A.  Yes.
18 Q.  Tell me everything you can recall, what's the
19 first thing that happened if there was more than one
20 thing?
21 A.  Bill arriving late.  Not on post to relieve
22 the nighttime guard.  Nighttime guard was caught
23 sleeping.
24 Q.  Was that Mr. Diallo?

Page 42

1  A. Yes.
2  Q. Do you recall when that occurred?
3  A. No.
4  Q. Do you recall how soon before Mr. Spikes was
5  terminated that had happened?
6  A. I would say within three weeks.
7  Q. How did you learn that there was a problem
8  that this guard was sleeping on the job?
9  A. I had made several telephone calls just to
10 double-check for myself to make sure, one, he was
11 awake, he was still there.
12 Q. Who brought it to your attention that there
13 was a problem with Diallo?
14 A. Wayne, of course.
15 Q. Okay, Wayne.
16    What was the proper chain of command
17 that Wayne should go through in terms of if there is a
18 problem with one of the security guards, should he go
19 to Mr. Spikes first or contact you?
20 A. He should have gone to Spikes, Spikes going to
21 me. In Wayne's case, Wayne would go directly to me
22 because he felt he could not communicate with Bill.
23 Q. Did he ever tell you I feel like I can't
24 communicate with Mr. Spikes?

Page 43

1  A. Ongoing little tiff where, I believe, my
2  opinion is that Bill would always definitely have an
3  answer for Wayne. Not always the answer Wayne was
4  looking for.
5    See, I also knew Mr. Diallo. In the
6  state of Delaware, you can work for two security
7  agencies at the same time, and of course most of our
8  individuals do just that. They work a 40-hour work
9  week and they go from one site to another site. In his
10 case --
11 Q. So Diallo had a second job?
12 A. He was running an 80-hour work week, so it was
13 very important for Mr. Spikes to be there at eight
14 o'clock or this man would fall asleep.
15 Q. You said that Wayne called you and indicated
16 that Mr. Diallo had fallen asleep?
17 A. Yes.
18 Q. Did you bring that to Mr. Spikes' attention?
19 A. Yes.
20 Q. What did he say?
21 A. The time he got there, Mr. Diallo was wide
22 awake.
23 Q. Did you have any further conversations about
24 Diallo with Mr. Spikes?

Page 44

1  A. We took Mr. Diallo out of there because he was
2  sleeping.
3  Q. Did Mr. Spikes recommend that he be removed
4  because of that?
5  A. Uh-huh.
6  Q. But he did what he had to do?
7  A. Uh-huh.
8  Q. Now, you said that this incident with Diallo
9  occurred about three weeks before Mr. Spikes was fired?
10 A. Somewhere in that time frame.
11 Q. Before the problem with Diallo, did you ever
12 have any problem with Mr. Spikes' performance that you
13 heard about from Wayne?
14 A. Not before that.
15 Q. As far as you knew, everything was going okay?
16 A. Yes.
17 Q. After the Diallo incident, what's the next
18 incident you recall regarding Mr. Spikes?
19 A. He's not there on time.
20 Q. Who told you that?
21 A. Wayne. And Janet came in a couple of times in
22 the morning as well and he was not on post.
23 Q. Let me just clear up the post. At the 802
24 facility where REIT Management is located, does the

Page 45

1  post also include the garage?
2  A. It's part of the tour, yes.
3  Q. It's the entire building, plus the garage?
4  A. Yes.
5  Q. And any grounds that would make up the
6  building?
7  A. Yes.
8  Q. For him as site supervisor, would Mr. Spikes'
9  post be that entire facility?
10 A. Yes.
11 Q. So if he was in a garage checking on a spill,
12 would that be on post?
13 A. Yes. However, there is a however there --
14 Q. You can finish.
15 A. Let's use a for instance so you have a good
16 idea of security.
17    You arrive at work, let's say, seven
18 o'clock every morning. But before you arrive, there is
19 someone already there and will stay there until seven
20 until you get there.
21 Q. Right.
22 A. Okay.
23    His procedure then starts relieving that
24 guard.

Page 50

1  Q. You never recorded that?
2  A. I couldn't record it.
3  Q. I am just asking.
4  A. And I will tell you why. Is because under the
5  system that Initial Security has, there is no --
6  everything is a manual process. Everything is all
7  paper. There is no automated system like I had with
8  Gettier Security where I could actually as I'm talking
9  start keying.
10 Q. So basically you'd have to write it down in
11 handwriting --
12 A. Right.
13 Q. -- this happened on this date.
14    You didn't keep any kind of log of those
15 calls at all?
16 A. I probably did, but I don't have them.
17 Q. You don't have them sitting here today?
18 A. No.
19 Q. But is it your recollection that you gave
20 Mr. Spikes a verbal warning on July 31st?
21 A. Yes, I did.
22 Q. And then again on 8-31, did you physically
23 write anything up to record that? Did you verbally
24 warn him again on that occasion?

Page 51

1  A. Yes, I did.
2  Q. You did.
3     Again, you have no record of that
4  either?
5  A. No.
6     I mean other than this document right
7  here.
8  Q. Yes, I understand that.
9  A. Okay.
10 Q. Now --
11 A. Let me back up for a second.
12 Q. There is no question pending, but go ahead,
13 you can amplify.
14 A. If I had written these dates down, obviously I
15 was keeping track.
16 Q. How were you keeping track if you didn't write
17 anything down? How do you know this is correct?
18 A. I had an Excel screen where I would put all my
19 accounts on.
20 Q. So you did put it on computer?
21 A. Yes. I believe I jotted all of these down.
22 But that screen would change every week because
23 depending on the callouts and who was hired being put
24 into those sites.

Page 52

1  Q. Miss Baul, I'm really not trying to give you a
2  hard time. I just want to ask something. You said it
3  was manual. First you said there was no computerized
4  way for you to record those things and you have to do
5  it by handwriting. Now you are saying you have an
6  Excel screen that you would have recorded these things.
7  What is your best recollection of whether or not you
8  ever recorded that you gave --
9  A. I wrote --
10 Q. Let me just finish. -- that you gave
11 Mr. Spikes any kind of verbal counseling prior to this?
12    MS. SALGADO: Are we talking about
13 warning forms or are we talking about something else?
14    THE WITNESS: I don't have warning forms.
15 BY MS. O'BOYLE:
16 Q. You said you gave him a verbal counseling, I
17 think.
18 A. Yes, I told him two times.
19 Q. All I am asking you is, did you document that
20 anywhere? That's all I'm asking you.
21 A. Only on this sheet.
22 Q. That's what I wanted to know.
23    Now, you have the incident on July 31st,
24 8-31, another month that has gone by, and then what led

Page 53

1  you to, what's the event on September 4th that you
2  recall? I don't know if this jogs your memory. What
3  was the event on September 4th? Let me ask you this.
4     In between July 31st and 8-31, were there
5  any other incidents that you can recall regarding
6  Mr. Spikes?
7  A. Janet had given me a call saying he is still
8  not on time for post.
9  Q. She is located in Philadelphia; right?
10 A. Correct.
11 Q. Did she say Wayne told her that?
12 A. She went down there. First Wayne called her
13 one time and then she physically went down herself to
14 check it out to make sure Wayne wasn't lying.
15 Q. Did she have any reason to believe that Wayne
16 would have lied?
17    MS. SALGADO: Objection. You can answer.
18 BY MS. O'BOYLE:
19 Q. Do you know if she said anything to you about
20 it?
21 A. No.
22 Q. Then you said that -- was the next incident
23 the September 4th?
24 A. Yes.

14 (Pages 50 to 53)

Page 54

1  Q. What happened on the 4th, to the best of your
2  recollection?
3  A. I just showed up on post. Actually, I got
4  there early to make sure. Maybe he was there early.
5  However, nighttime shift still there, Lola coming in to
6  relieve the nighttime person, but you're still down
7  short one person.
8  Q. Why did you come on September 4th?
9  A. Surprise visit. To make sure -- because I had
10 already verbally warned him. I told him that he must
11 be on work on time.
12 Q. So you decided just to pop in and see?
13 A. (Witness nods.)
14 Q. Did you have any conversations with Mr. Ellis
15 about these incidents prior to showing up on
16 September 4th?
17 A. He knew I was going, yes.
18 Q. What was the substance of your conversation in
19 that regard, what did you talk to Mr. Ellis about?
20 A. I radioed him to let him know that he was not
21 on post at eight o'clock.
22 Q. You showed up on September 4th. When you
23 first got there, did you meet with Mr. Spikes? What's
24 everything that you can recall on the 4th that had

Page 55

1  happened?
2  A. Mr. Spikes didn't get there until after eight
3  o'clock.
4  Q. Did you learn at any time from Lola why he was
5  going to be late?
6  A. Lola let me know that he was going to be -- he
7  wasn't arriving on post. He had car -- most of the
8  times his excuse was he was having car problems.
9  Q. Was there ever a time when you learned that he
10 had called in and said he would be a few minutes late
11 because he had to pick up a medical prescription?
12 A. No.
13 Q. You never heard of that at any time? You
14 don't remember that?
15 A. I don't remember.
16 Q. The thing about car problems, when did he
17 first tell you he had car problems?
18 A. He told Lola he had car problems.
19 Q. Lola told you that he said that he had car
20 problems?
21 A. Uh-huh.
22 Q. How many times did she say that? Was it just
23 the one time?
24 A. One time that I'm aware of.

Page 56

1  Q. Was that on this occasion, September 4th?
2  A. No. It was prior to that. It was on
3  August 31st.
4  Q. When you showed up on September 4th, what
5  transpired?
6  A. Mr. Spikes arrived later. He said he had car
7  problems.
8  Q. How long after eight o'clock did he arrive, to
9  your recollection?
10 A. He was about 20 minutes late.
11 Q. And do you have an ensuing conversation with
12 him about that?
13 A. Yeah. I told him he must be on time and we've
14 had this conversation time and time again.
15 Q. And what did he say?
16 A. That he was in the building.
17 Q. Now, did you check with Lola as to whether or
18 not that was true, whether he was in the building?
19 A. She says he's somewhere. She can't get ahold
20 of him. There's no radio. So you couldn't verify
21 whether he was in the building or not.
22 Q. Now, after you spoke with Mr. Spikes about it,
23 did you have any further conversations with anyone
24 else?

Page 57

1  A. Just Gordon Ellis.
2  Q. Did you call Gordon Ellis?
3  A. Yes, I did, right when I was sitting there.
4  Q. Where were you physically located when you
5  were making the call?
6  A. In the main office at the monitor so I could
7  watch the monitors for myself to see if I could find
8  him in the garage.
9  Q. Was this the same incident where there was
10 allegedly a spill in the garage?
11 A. Not that I'm aware of.
12 Q. When you said I was sitting at the monitors
13 looking to see what was going on, you called Mr. Ellis
14 and what did you tell him?
15 A. I didn't get ahold of Mr. Ellis. He had no
16 phone. I had to wait until he physically got there or
17 he walked in. I wasn't going to leave the monitors.
18     If I left that location to go look for
19 him, then he could have come in another way and I
20 couldn't prove --
21 Q. Let me go back for a second. Lola was at the
22 console area; is that correct?
23 A. Right.
24 Q. And you were in the office.

15 (Pages 54 to 57)

Page 62

1  A. That's for any of the policies. If you were
2  written up for no call/no show, I could terminate you
3  for that, for not giving prior four-hour notice.
4      If you had -- whatever the violations
5  were within the policy.
6  Q. So it is your testimony that Mr. Spikes was
7  given several verbal counselings by you and that the
8  only written document that you gave to him to notify
9  him of his performance issues would be this document
10 Granberry-1?
11 A. Right.
12 Q. That's accurate?
13 A. Right.
14 Q. You don't have any recollection of any
15 incident where there was some spill in the garage that
16 Mr. Spikes went to clean up, do you recall anything
17 like that?
18 A. No.
19 Q. You don't remember that, having anything to do
20 with his termination?
21 A. Not with his termination, no.
22 Q. Did Mr. Dumford ever ask you to have
23 Mr. Spikes fired?
24 A. Who's Mr. Dumford?

Page 63

1  Q. I am sorry, Wayne.
2  A. He's not the project manager, so it would be
3  an order by Janet.
4  Q. Did Mr. Spikes ever tell you that he intended
5  to go and file a charge of discrimination with the
6  EEOC?
7  A. When he left with Chase, he wanted to file a
8  document against Chase.
9  Q. Is that answer yes? What's your recollection
10 of what Mr. Spikes told you?
11 A. He wanted to file against Chase for
12 discrimination.
13 Q. Did he ever show you any kind of questionnaire
14 that he had received from the EEOC?
15 A. No.
16 Q. Did he ever tell you, I'm going up there, I'm
17 going to file a charge?
18 A. Yes.
19 Q. Did he tell you what the basis of that
20 allegation was, why he felt that way?
21 A. All he said to me was discrimination.
22 Q. Did he ever tell you that he felt he was being
23 underpaid as compared to Jack Dukes?
24 A. I do not recall.

Page 64

1  Q. Did you ever tell him, Bill, do what you have
2  to do?
3  A. I don't recall.
4  Q. You said that he said at some point to you
5  that he wanted to file something against Chase?
6  A. Correct.
7  Q. Was that when you were account manager or as a
8  recruiter?
9  A. Recruiter.
10 Q. And you, besides Pat, were the only HR person
11 there; is that correct?
12 A. Correct.
13 Q. Did you notify anyone of his concerns about
14 discrimination?
15 A. No.
16 Q. Did he ever indicate to you that he felt that
17 the black guards at Initial Security were not being
18 promoted properly?
19 A. No.
20 Q. He never indicated that to you?
21 A. No.
22 Q. Did he ever indicate to you that he felt they
23 weren't being paid the same as white guards?
24 A. No.

Page 65

1  Q. What's the procedure for, at Initial Security,
2  when you were there, for accepting a discrimination
3  complaint?
4  A. That all went through Gordon Ellis, so if
5  there was any complaints --
6  Q. So you wouldn't have any responsibility for
7  that at all?
8  A. No.
9  Q. It is your testimony that he only complained
10 to you that he wanted to file something against Chase,
11 not Initial?
12 A. Correct.
13 Q. Did Mr. Spikes ever show you an actual
14 questionnaire filled out that he was going to give to
15 the EEOC for you to look at?
16 A. He had written something up himself, his own
17 writing.
18 Q. So he had showed you something? Is that yes,
19 he showed you something?
20 A. Yes.
21 Q. To your recollection, was that something to be
22 filed against Chase or Chase and Initial, do you
23 recall?
24     MS. SALGADO: Objection. Asked and

Page 66

1 answered about three times now.
2   MS. O'BOYLE: I am sorry. I just want to
3 be clear.
4 BY MS. O'BOYLE:
5   Q. You said he showed you something that he wrote
6 up.
7   A. For Chase.
8   Q. Only for Chase?
9   A. Correct.
10  Q. Did you ever tell Mr. Spikes to watch his
11 back?
12  A. No.
13  Q. You continued on as account manager until what
14 period of time with Initial?
15  A. I left in, I worked for them for a full year.
16  Q. One year?
17  A. Uh-huh.
18  Q. So 2000, 2001, about 2002?
19  A. Uh-huh.
20  Q. You were still employed when Mr. Spikes was
21 terminated?
22  A. Yes.
23  Q. Why did you leave the company?
24  A. More money.

Page 67

1   Q. Did you ever complain to Mr. Spikes that you
2 left because they brought on a male doing the same
3 position as you and they paid him a lot more money?
4   A. Uh-huh.
5   Q. Was that a phone conversation?
6     MS. SALGADO: Yes?
7 BY MS. O'BOYLE:
8   Q. Is that a yes? You said uh-huh.
9   A. Yes.
10    I'm not sure if that was a phone
11 conversation or not. I think I was gone at that time.
12  Q. You had already left the company?
13  A. I'm not sure, to tell you honestly.
14  Q. What was the basis of your concern that they
15 had brought in somebody else who was doing the same job
16 as you and paid them a lot more than you, the basis of
17 it?
18  A. (Pause.)
19  Q. I am sorry for putting you on the spot. I
20 have to do my job.
21  A. Yeah, you have.
22    Usually as account managers, as you are
23 traveling around from week to week, you get a car
24 allowance. It is not much, but it pays for your gas.

Page 68

1    In this case, I would have to put in my
2 expense vouchers every week in order to get my gas
3 money back.
4   Q. Right.
5   A. So, of course, when they gave me my promotion,
6 they didn't give me my money.
7   Q. You mean when they promoted you from
8 recruiter?
9   A. Right.
10  Q. They didn't give you your money, meaning they
11 didn't pay your expense accounts?
12  A. Well, I had to put in expense where usually
13 you get supplemented instead.
14  Q. Did you learn somebody else who was a male who
15 was in a similar position was getting supplemented and
16 you were not?
17  A. Of course, yes.
18  Q. Who was that person?
19  A. I believe Art Kitchen got supplemented and
20 along with the quality control person.
21  Q. So did they ever pay you the money that you
22 felt was due you?
23  A. No.
24  Q. Was that part of the reason why you left?

Page 69

1   A. Yes.
2   Q. And --
3   A. Well --
4   Q. I'm just asking.
5   A. You're asking. You opened it up.
6     I was on call seven days a week, 24
7 hours a day. I had 7500 hour.
8     Accounts now. I went from 2500 all the
9 way up. So I handled Delaware, Jersey, Maryland.
10  Q. The job was really growing?
11  A. Yes.
12  Q. And a lot more responsibility?
13  A. Yes.
14  Q. So you voluntarily left your position with
15 Initial?
16  A. Yes.
17  Q. Where did you become employed subsequently?
18  A. Gettier Security.
19  Q. You mentioned Gettier before. What was your
20 first position with Gettier?
21  A. Actually I was a patrol supervisor at night.
22  Q. Was that like 2002, in that period?
23  A. Uh-huh.
24  Q. How long after Mr. Spikes was fired -- and I

Page 82

1  going to tell me.
2       MS. SALGADO: Objection.
3  BY MS. O'BOYLE:
4    Q. What do you mean by that?
5       MS. SALGADO: Are we reading minds now?
6       MS. O'BOYLE: No, I am asking. "He
7  wasn't going to tell me," I want to know what she means
8  by that.
9  BY MS. O'BOYLE:
10   Q. Was Gordon secretive?
11   A. I don't know how busy he was or maybe I was
12 more busy than him.
13   Q. He wouldn't have --
14   A. If he did any investigation, Patty would have
15 sat in on it. I wouldn't have been the one that would
16 have sat in.
17   Q. When you were employed as account manager, did
18 you receive any kinds of discrimination complaints from
19 any employees against Initial?
20   A. No, not that I am aware of.
21   Q. You are not aware of any?
22   A. No.
23   Q. You are not aware of any charges being filed
24 by Delaware Department of Labor against Initial

Page 83

1  Security?
2    A. No.
3    Q. You said that Wayne ended up training John
4  McNair. How did that come about, because he wasn't a
5  security person; right?
6    A. No, but he had to train him on the fire
7  alarms.
8    Q. On the building equipment?
9    A. Right, and where they were located.
10   Q. Who trained him on the security functions?
11   A. He already knew those from running another
12 tall big building.
13   Q. You said he left for health issues. Do you
14 recall what that was all about?
15   A. He had a heart problem.
16      MS. O'BOYLE: I think that's all I have,
17 Miss Baul. Thank you very much.
18 BY MS. SALGADO:
19   Q. Did you ever have any conversations with Janet
20 at REIT Management in which Janet gave any indication
21 about her dissatisfaction with Mr. Spikes' performance?
22   A. She had issues with not having somebody on
23 post in the front of the building for fire purposes for
24 the fire company, so those instructions came to Bill

Page 84

1  and we fixed that as soon as that complaint came in.
2       And then Bill not being on post on time.
3    Q. What exactly did she say to you with regard to
4  Mr. Spikes, if you can recall?
5       MS. O'BOYLE: I think she just answered
6  it, but go ahead.
7       THE WITNESS: As far as detail, I can't
8  give you detail. I mean I recall the circumstances,
9  which was, because Chase did not -- they just put a
10 sign that said "moved."
11      They didn't give any indication where
12 they moved to, so they would always have customers in
13 the front banging on the front door.
14      And then if the fire alarms went off,
15 which they went off all the time on an empty building,
16 someone had to be in front with the telephone radioing
17 back, letting them to get the keys to open up the doors
18 in the front so the fire department could come in.
19      That is big fines and that is a big major
20 issue that Janet had.
21 BY MS. SALGADO:
22   Q. Did Janet give any indication about her
23 preference for not having Mr. Spikes at that building,
24 did she have any discussions with you along those

Page 85

1  lines?
2    A. Well, of course, Wayne and Bill were not
3  getting along and him not being on time did not help
4  the situation.
5    Q. So Janet did discuss this with you?
6    A. Yes.
7    Q. Did you have any discussion at any time with
8  Mr. Ellis about if Mr. Spikes were to be transferred
9  that his hourly rate would be an issue?
10   A. It would definitely change based on the
11 billing rate with whatever new site that they were
12 going into.
13   Q. And did you have any discussion about not
14 having a place to put him based on his hourly rate?
15   A. His hourly rate? We had no where to put him
16 on his hourly rate, but we could have put him
17 somewhere, but the rate would have definitely changed.
18   Q. About how much?
19   A. He probably would have went down -- I don't
20 even recall what he made now.
21   Q. So you had no where that you could have put
22 him that he would have stayed at his hourly rate as
23 site supervisor?
24   A. At the same rate, correct.

Page 86

1  Q. Did Wayne ever indicate to you that he did not
2  like Mr. McNair, he had a problem with Mr. McNair, John
3  McNair?
4  A. Yes.
5  Q. They had some sort of personality conflict?
6  A. **He just didn't think his health could walk the**
7  **floors and climb the steps.**
8  Q. Did Mr. McNair complain to you about Wayne?
9  A. Yes.
10 Q. Mr. McNair was white, isn't that right?
11 A. Correct.
12 Q. I am going to direct your attention to
13 Granberry-4. If you could pull that out from the other
14 exhibits.
15     If you could turn to the page that's
16 Bates stamped IS328. If you look around about the
17 middle of the page it starts, "Any employee violating
18 any of the following rules is subject to disciplinary
19 suspension of up to three working days. Some situation
20 may warrant immediate dismissal," and then under B it
21 reads "repeated tardiness," did I read that correctly?
22 A. Correct.
23 Q. Is that your understanding, that repeated
24 tardiness could lead to immediate dismissal?

Page 87

1  A. Yes.
2  Q. There is another document that I need to show
3  her, but it appears that Granberry-2 was only copied on
4  every other page. Did you notice that?
5      What I will do is I'll have to --
6      MS. SMITH: Maybe it was back and front.
7      MS. SALGADO: I thought I was being
8  clever and photocopied during the break, but it appears
9  that it was the wrong page. So if we can just take a
10 minute and I will make the photocopies so that we can
11 have a full exhibit.
12     (Recess.)
13     MS. SALGADO: Mark this Baul-1.
14     (Baul-1 was marked for identification.)
15 BY MS. SALGADO:
16 Q. Directing your attention to Granberry-2, as
17 well as what you have just been handed, which is
18 Baul-1, if you can pull Granberry-2 out. It is the
19 document entitled Employee Handbook.
20     You testified that you have seen this
21 document before?
22 A. (Witness nods.)
23 Q. Is that a yes?
24 A. Yes.

Page 88

1  Q. This is the handbook that each employee
2  receives as part of their new employee orientation;
3  correct?
4  A. Correct.
5  Q. Directing your attention where it begins on
6  Page 38 of Granberry-2, towards the bottom of the page,
7  under No. 4, it reads, "Absence offenses that may
8  result in disciplinary action up to and including
9  suspension/termination based on repeated violations,"
10 and then under heading A it starts "absence."
11     And then if you turn to the document
12 that's marked Baul-1, which is Page 39, under heading B
13 it says "Late. Applies to employees who report to work
14 after the start of his or her scheduled shift."
15     Do you see where I have read? I know I
16 jumped around a little.
17 A. Yes.
18 Q. And it is your understanding that repeated
19 violations of lateness could result in suspension or
20 termination under the company policy?
21 A. Correct.
22 Q. Thank you.
23     I don't have any questions at this
24 point.

Page 89

1  BY MS. O'BOYLE:
2  Q. I have one more question. A couple of
3  questions.
4      This document here, Granberry No. 3,
5  Miss Baul, looking at this document, calling your
6  attention to No. 7, that says excessive absenteeism
7  tardiness, that it should be a reprimand.
8      I think you testified earlier that this
9  was part of a different document. You don't remember
10 exactly what document.
11 A. **This is the one that went probably with the**
12 **employees and their documents.**
13 Q. This was given to the employees, the
14 Granberry-3?
15 A. I believe so.
16 Q. And what about the handbook that was also
17 given?
18 A. **That's -- this one would definitely be because**
19 **it would have, encompass everything.**
20 Q. What if there's a conflict between a document
21 like Granberry-2, the handbook, and then another policy
22 that an employee is given, how do you decide what you
23 follow? What would you have followed? What led you in
24 your decision making as to what kind of discipline to

Page 90

1  give somebody?
2  A.  Okay, if you go to Page 39, No. 2.
3  Q.  Will normally follow the sequence, okay.  I
4  see where you are.
5  A.  Okay?
6  Q.  Yes.
7  A.  So this one --
8  Q.  You are pointing to No. 2?
9  A.  Yes.  On 39.  Is a good guideline to go by,
10  depending on the type of employee and his past history.
11  Q.  Given Mr. Spikes' past history, he had never
12  received any kind of suspensions, had he, in the past,
13  that you know of?
14  A.  Not that I'm aware of, no.
15  Q.  You mentioned that you gave him some oral
16  counselings, and you mentioned about gave him the
17  written warnings that we talked about earlier.
18  A.  Right.
19  Q.  But other than that, you're not aware of
20  anything else that he ever received?
21  A.  Right.  The other two choices, if Gordon had
22  to go by, would have been definitely he could have
23  suspended him.  And at which time we would have put him
24  in a new location and then, of course, monitored him

Page 91

1  quite closely before he made that determination to
2  terminate.
3  Q.  Let me go back to something earlier that you
4  said.  You said that Mr. Spikes did tell you that he
5  wanted to file some kind of a charge against Chase; is
6  that correct?
7  A.  Yes.
8  Q.  He told you he wanted to do that?
9  A.  Yes.
10  Q.  And that was when you were a recruiter?
11  A.  Right.
12  Q.  Did you communicate that complaint to
13  Mr. Ellis at any time?
14  A.  No.
15  Q.  What was your understanding of what the basis
16  was -- what did Mr. Spikes tell you about why he wanted
17  to file against Chase?
18        MS. SALGADO:  Objection.  Asked and
19  answered many times.
20        MS. O'BOYLE:  I thought it wasn't clear.
21        THE WITNESS:  No, he didn't.  And that
22  passed -- just to -- that was his past history that I
23  knew nothing about and didn't want to reflect on it
24  moving forward in to my account at 802.

Page 92

1  BY MS. O'BOYLE:
2  Q.  Did you feel like there was any motivation on
3  the part of Mr. Ellis to terminate Mr. Spikes because
4  he had intended to, or that he felt that Mr. Dumford
5  was racist?
6        MS. SALGADO:  Objection.  You can answer.
7        THE WITNESS:  No.
8  BY MS. O'BOYLE:
9  Q.  When did Mr. Spikes complain to you that he
10  believed that Wayne was a racist in relation to the
11  time of his termination?
12  A.  See, you keep saying racist.
13  Q.  Well, you said that you thought he was a
14  racist.
15        MS. SALGADO:  Let her clarify what she
16  meant.
17        MS. O'BOYLE:  We can read back the
18  question.
19        THE WITNESS:  There was no real
20  allegations that I could prove to any statement to
21  that.
22  BY MS. O'BOYLE:
23  Q.  I am not asking you what the merits of it
24  were.  You testified earlier that Mr. Spikes said to

Page 93

1  you that he believed that Wayne was biased against him
2  because he's black and that you reported that to
3  Mr. Ellis.  That's all I'm saying.
4  A.  Okay.
5  Q.  And that's accurate; correct?
6  A.  Yes.
7  Q.  My question to you is, when do you recall
8  telling Mr. Ellis about that?
9  A.  I can't remember.  I'm sorry.
10  Q.  Was it soon before Mr. Spikes was terminated?
11  A.  It was before.
12  Q.  Let me ask you, were there staff meetings of
13  the site supervisors that were held, when all the site
14  supervisors would get together and meet?
15  A.  There was only one, one time that they did
16  that.
17  Q.  Did you schedule that meeting?
18  A.  Yes.
19  Q.  Was Mr. Spikes invited to that meeting?
20  A.  It was with regards to opening an account at
21  Fleming in Maryland.
22  Q.  Was Mr. Spikes invited to that meeting?
23  A.  I can't remember.
24  Q.  Do you know if the site supervisor from City