# EXHIBIT 11

EXHIBIT 11



**WILCOX & FETZER LTD.**

In the Matter Of:

# EEOC
## v.
# Initial Security

C.A. # 04-1309

Transcript of:

## Gordon Ellis

March 17, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 106

1  A. I don't know that.
2  Q. You don't know.
3     On that occasion was Debby Baul present?
4  A. Yes.
5  Q. Do you have reason to know why she was there on
6  that day?
7  A. At my direction.
8  Q. Why?
9  A. The client had called me, Wayne.
10 Q. He called. When did he call you?
11 A. It's in the morning.
12 Q. Same day?
13 A. As it was happening.
14 Q. What did he say?
15 A. He said, "Gordon, you are not going to believe
16 this. Spikes is out there working on his car. You
17 got to get him off my site. I don't want him back."
18    There may have been a few expletives in
19 there.
20 Q. Did he use the F word?
21 A. Could have.
22 Q. Is that the way Wayne talks sometimes? Does he
23 use expletives?
24 A. On occasion.

Page 107

1  Q. Let's go back for a second. Was it your
2  understanding that he was working on his car meaning
3  doing mechanical work or that he was cleaning up this
4  antifreeze?
5  A. Mechanical work.
6  Q. You said he called you as it was happening. It
7  was in the morning you said. Is that correct?
8  A. I believe. I can't recall specifically.
9  Q. Do you recall Mr. Spikes's normal start time?
10 A. Not specifically.
11 Q. Would it have been fairly early in the morning
12 that he normally would start, seven or eight?
13 A. I would guess seven or eight.
14 Q. You said that this incident occurred either
15 before or after another incident with the
16 prescription?
17 A. After.
18 Q. That was after. So it's your understanding
19 that the prescription issue came up afterward?
20 A. No doubt in my mind.
21 Q. I'm sorry. The prescription incident occurred
22 first?
23 A. Prescription incident was first. The car
24 was...

Page 108

1  Q. Now, the prescription incident, what's your
2  understanding of the prescription incident?
3  A. I had received a call from Wayne indicating
4  that Bill Spikes was always late and never on the site
5  and that he was late every day. So I instructed Debby
6  Baul to be at the post at the time of the start of
7  Bill's shift to, number 1, see if he was late that day
8  and, number 2, talk to him about his attendance.
9  Q. Let me go back. Now, the prescription you say
10 Wayne had a called. That was on the day of the
11 prescription incident where he came in a few minutes
12 late, is that correct?
13 A. I believe it was the day before.
14 Q. The day before?
15 A. Yes. Wayne called and said, "Spikes is late to
16 work every day. There's long periods of time where I
17 can't locate him on the site. I can't get him on the
18 radio or it takes him an extended period to respond to
19 a call from me. You got to go something about this."
20    So I said, "Tomorrow morning, Debby, be
21 there when Bill is due to start."
22 Q. And that was the next day, was when the
23 prescription incident occurred, where he went and came
24 back a couple minutes late?

Page 109

1  A. Debby was there at the beginning of his shift.
2  Bill was not. Bill arrived subsequent to that, and
3  Debby asked him, "Where have you been?" He said, "I
4  had to pick up a prescription."
5  Q. Had you ever received complaints regarding
6  Mr. Spikes's alleged lateness from Debby Baul?
7     MS. SALGADO: Objection. You can answer.
8  Q. Or lateness problem?
9  A. I believe so, yes, but I can't specifically
10 remember when it would have been prior to this.
11 Q. How about Art Kitchen, did he ever mention
12 anything to you about Mr. Spikes being late, that that
13 was a problem?
14 A. Not that I recall.
15 Q. How about with Bob Armstrong, any concerns that
16 Bob had at all?
17 A. No.
18    No. And here's --
19 Q. There's no question pending?
20 A. Okay.
21 Q. Do you know if Mr. Spikes and Wayne had ever
22 had any incidents in the past where Mr. Spikes had
23 complained, as I said, before that Wayne had talked
24 down or had talked in a derogatory fashion towards the

28 (Pages 106 to 109)

Page 110

1  black guards?
2  A. No.
3  Q. I think earlier you testified that the proper
4  procedure for discipline would be that the complaint
5  would go through the account manager and may come to
6  you or could come to you directly, correct?
7  A. Yes.
8  Q. When Chase was the account, and I guess it was
9  Sam Pratcher, at some point did you ever receive
10 complaints from Sam Pratcher about Mr. Spikes's
11 lateness, alleged lateness?
12 A. No.
13 Q. Is it fair to say this was the first time that
14 you had received a complaint from a client, Wayne,
15 that Mr. Spikes was always late?
16 A. Yes.
17 Q. Is that correct?
18 A. Yes.
19 Q. What did you do to investigate whether that was
20 true that he was always late?
21 A. I asked Debby to go down there and witness the
22 one day and talk to him about his latenesses.
23 Q. At that time did you have any intention to fire
24 him?

Page 111

1  A. No.
2  Q. What would be the appropriate discipline to
3  take against Mr. Spikes if he was late on two
4  occasions? And I believe I can refer you to --
5  A. First two occasions?
6  Q. Yes. Yes. You just testified this is the
7  first time this was raised to you that he was late?
8        MS. SALGADO: Objection.
9  Q. The specific incident that we know of.
10 A. I didn't know that we were talking about this
11 specific time. I thought we were talking in general.
12 Q. Let me make it specific. I believe you just
13 testified that nobody else other than you possibly
14 think Debby Baul may have mentioned to you, but you
15 don't have a specific recollection of that, so nobody
16 else that you can recall other than Wayne telling you
17 that Mr. Spikes was always late and the specific
18 incident, the prescription incident and the incident
19 when he went to clean up the antifreeze in the garage,
20 but there are no other incidents that you were aware
21 of when he was late?
22       MS. SALGADO: Objection to form.
23 A. No. I believe there were. I believe -- it was
24 the prescription incident was the first day. And I

Page 112

1  asked Debby. She came back and she said, "I was
2  there. He was late. Prescription." Told me the
3  circumstances and what not. I said, "Go back tomorrow
4  morning."
5  Q. And the next day was the day when Wayne told
6  him to go down and check the car in the garage, right?
7  A. Well, first Debby was there in the morning and
8  Bill was late.
9  Q. Right. We got one instance of late.
10 A. And then Debby left there and came back to the
11 office. No. That's the second late. There was a
12 prescription one day. And then, immediately, the next
13 day, Debby was there again at the shift change.
14 Q. Okay. That was the incident where he was
15 allegedly working on the car according to Wayne?
16 A. Same day.
17 Q. You are saying the same day.
18 A. Same day.
19 Q. The first day --
20 A. Different times. The first day was the
21 prescription incident.
22 Q. Okay.
23 A. As I recall, I sent Debby back the very next
24 day to be there at the beginning of Bill's shift,

Page 113

1  which she was, and he was late.
2        MS. O'BOYLE: Let's mark this next.
3        (Ellis Deposition Exhibit 4 was marked for
4  identification.)
5  BY MS. O'BOYLE:
6  Q. Mr. Ellis, we place before you what's been
7  marked for identification as Ellis number 4. Please
8  take a look at this, and I will then ask you some
9  questions about it.
10 A. Mm-hmm.
11 Q. Have you seen this before?
12 A. Yes.
13 Q. Now, this is filled out by Debby Baul?
14 A. Yes.
15 Q. Everything on this document is her handwriting?
16 A. I believe it is.
17 Q. That's her signature at the bottom, if you
18 know?
19 A. It appears that way, yes.
20 Q. Now, "Employee named Bill Spikes, date 9/6/02."
21 I read that right? That's at the top, correct?
22 A. Yes.
23 Q. Is this the date that Debby filled this out for
24 him?

Page 114

1  A.  I believe so.
2  Q.  And it says under warning, "date of violation
3  9/4 and 5."  Did I read that right?
4  A.  That's correct.
5  Q.  Time of violation.  8:00 a.m.  I read that
6  right?
7  A.  Yes.
8  Q.  This is for 802 -- it says Market Street, but
9  is that the Delaware Avenue facility?
10  A.  Yes.
11  Q.  Just reading the description, "On September 4
12  and 5, Mr. Spikes was not at post at 8:00.  Arrived at
13  post 9/4, 8:20, 9/5, 8:45.  Both times he was working
14  on his car.  Is that your understanding that there was
15  two different days he was working on his car?
16  A.  I don't recall it that way.
17  Q.  Then this says, "I made a visit to the site and
18  waited for Bill to arrive on post."
19       Then she has a star.  "Prior situations
20  was on July 31st.  Did not arrive on post until 9:00.
21  By phone conversation, not at site again.  I called at
22  8:31, not on post until 9:00.  Car problems.  By
23  phone, 'I was not on site.'"
24       Did I read that right?

Page 115

1  A.  Yes.
2  Q.  Do you know if Debby Baul after wrote up
3  Mr. Spikes for any incidents relating to this July
4  31st issue or August 31st issue?  She said 8/31?
5  A.  I don't know.
6  Q.  You don't know.  Do you know if Mr. Spikes's
7  employment history with Initial Security, whether he
8  had ever received any discipline prior to this?
9  A.  I can't say for certain.
10  Q.  You don't know?
11  A.  I don't know.
12  Q.  Would you agree with me that this document 081,
13  this employee violation report, references two
14  back-to-back days, 9/4 and 9/5, is that correct?
15  A.  Correct.
16  Q.  And does this refresh your recollection as to
17  when the prescription incident occurred and the car
18  incident that they were within one day of each other?
19  A.  That's been my recollection all along.
20  Q.  I believe you testified that you believe that
21  there was the prescription incident first where he was
22  late in the morning.
23  A.  Correct.
24  Q.  And then you said --

Page 116

1  A.  The next day.
2  Q.  -- the next day that he was late, you're
3  saying?
4  A.  Correct.
5  Q.  Generally late in the morning?
6  A.  Yes.
7  Q.  And then what was the day -- what's the
8  understanding --
9  A.  On that second day, on that same day.
10  Q.  What do you mean the same day.  You said next
11  day, same day.  What do you mean?
12  A.  The first day was the prescription incident.
13  Q.  Okay.  Right.
14  A.  I sent Debby back the next day.
15  Q.  The following day you sent her back?
16  A.  Yes.  He was late.
17  Q.  Your testimony is she was --
18  A.  Later on that day, the client called me about
19  him working on his car.  So the second lateness and
20  the car incident being reported by the client were on
21  the same day.
22  Q.  So your testimony is that it's your
23  understanding that the car, when Wayne say he's
24  working on the car, that that was in the afternoon?

Page 117

1  A.  No.  It was later on in the morning of the day
2  after the prescription incident.
3  Q.  Now, given that you never received any
4  complaints about Mr. Spikes in terms of being late and
5  you already testified to that --
6       MS. SALGADO:  Objection.
7  Q.  Okay.  Except for what you think maybe Debby
8  Baul may have mentioned to you, why did you decide to
9  discharge him?
10      MS. SALGADO:  Objection.  Argumentative.
11  Q.  Rather than warn him, reprimand him?
12  A.  I didn't decide to discharge him.
13  Q.  Who did?
14  A.  I didn't discharge him.
15  Q.  Who did?  Is it your understanding that he
16  wasn't fired?
17  A.  I ended Bill's employment at that facility, but
18  not with the company.  And I asked him to come into
19  the office and speak to me about it.
20  Q.  Hang on to that.
21       I believe you testified you told Debby, go
22  down there, check on Bill, see what's going on?
23  A.  Yes.
24  Q.  Did you ask Wayne, "Why do you want me to get

30 (Pages 114 to 117)

Page 118

1  rid of Bill? He's been here for five years. He's
2  been a long-time employee. What's the urgency in
3  getting rid of him?" Wayne basically said, "I want
4  him gone," right?
5  A. Yes. He wanted him off the site.
6  Q. Why? Did you ask him, well, why?
7  A. Well, it was clear -- it was understood that
8  working on your personal car while you were on duty is
9  severe violation of policy.
10 Q. And you were at the fact-finding conference
11 with the EEOC, right?
12 A. Yes.
13 Q. And you heard Mr. Spikes's explanation of this
14 and that, is that correct?
15 A. Did I hear it?
16 Q. And do you recall him testifying, that his
17 testimony before the commission in the EEOC proceeding
18 was that he had gone down to the garage at Wayne's
19 request to check on a car.
20 A. That was his testimony.
21       MS. SALGADO: Objection.
22       MS. O'BOYLE: That was his testimony.
23 Okay? Mr. Spikes's testimony.
24       MS. SALGADO: He can answer the question.

Page 119

1  I made an objection. I don't have any transcript.
2  I've never seen a transcript produced.
3  BY MS. O'BOYLE:
4  Q. Do you recall, at the fact-finding conference,
5  Mr. Spikes saying he had gone down at Wayne's request
6  to check on the car. The car turned out to be his
7  car, and that was leaking antifreeze?
8        MS. SALGADO: Objection.
9  Q. Is that correct? Do you remember him saying
10 that?
11 A. Yes. Paraphrasing, yes.
12 Q. And do you recall Mr. Spikes saying that or
13 denying that he ever worked on his car in any
14 mechanical fashion, that he --
15 A. I do not recall that.
16 Q. Did you ever ask Mr. Spikes what he was doing
17 with the car?
18 A. No.
19 Q. At any time?
20 A. I can't recall specifically, no.
21 Q. So you assumed, based on what Wayne had told
22 you, that Mr. Spikes was actually doing mechanical
23 work on his car, is that correct?
24 A. No.

Page 120

1  Q. How am I wrong?
2  A. What is accurate is that a client has a right
3  to deny access to their property to any individual.
4  Q. Right. That's not what I asked you, I believe.
5  A. No. And the client called me and asked that
6  Bill not be allowed on his property any more. So I
7  removed Bill at the client's request.
8  Q. When you say, "I removed Bill," how did you do
9  that?
10 A. I sent Debby down to relieve him of duty.
11 Q. Did you ever consider Mr. Spike's long term
12 employment with Initial Security and his good
13 performance overall?
14 A. Yes.
15 Q. And what made you decide to relieve him of his
16 duties, rather than give him discipline which is
17 appropriate?
18 A. I didn't have the ability to have him continue
19 to work there if the client doesn't want him on the
20 property.
21 Q. Well, so any client can say to you, "I don't
22 want him here, he's gone" and you have to fire that
23 person?
24 A. I have remove him from the facility, not

Page 121

1  necessarily end their employment with the company.
2  Q. Did you ever talk to Wayne about working with
3  Mr. Spikes?
4  A. No.
5  Q. You never mentioned it, you just said, "Okay.
6  Fine. I'll get rid of him, that's it"?
7  A. Yes.
8  Q. At any time --
9  A. Well, paraphrasing. I don't know if I used the
10 term "I'll get rid of him," but I did agree to have
11 Bill removed from his site. And this is based on we
12 had a number of complaints about the performance of
13 the security officers assigned to the account, that
14 Bill was responsible for supervising. So this wasn't
15 a single incident of poor performance. This was an
16 ongoing example of poor performance at the site.
17 Q. When did you receive these complaints
18 about Bill? Was that all from Wayne?
19 A. No. I also received them from Janet.
20 Q. Janet was also for REIT Management, correct?
21 A. Yes. She was Wayne's supervisor.
22 Q. So Wayne would report these complaints to
23 Janet, and then Janet would tell you, is that correct?
24 A. Janet also visited the site and witnessed

31 (Pages 118 to 121)

Page 122

1  things herself.
2  Q. What was her name?
3  A. Ballerino. B-a-l-l-e-r...
4  Q. What did she tell you about Mr. Spikes?
5  A. Not specifically about Mr. Spikes, but about
6  the performance of security officers assigned to the
7  account that reported to Mr. Spikes.
8  Q. Did you investigate her complaints?
9  A. Yes.
10 Q. Was that in discussions with Mr. Spikes?
11 A. Yes.
12 Q. What was his response?
13 A. He would take care of it.
14 Q. He did? Did he take discipline against the
15 guards?
16 A. I believe he did, but it didn't resolve the
17 problem.
18 Q. Why there was an on going problem? Was Wayne
19 constantly complaining about Mr. Spikes?
20     MS. SALGADO: Objection.
21 A. No. Wayne was frequently complaining about the
22 performance of the officers assigned to his account,
23 of which Bill was the supervisor.
24 Q. How often was Wayne complaining to you?

Page 123

1  A. In the six months prior to this incident -- I'm
2  using six months just as a random time frame -- four
3  or five times.
4  Q. Four or five times within the period of time
5  since Wayne became the client --
6  A. Yes.
7  Q. -- or REIT Management?
8  Were there other supervisors who were
9  responsible for taking discipline against the guards
10 other than Mr. Spikes or the console operator?
11 A. Anyone in the chain of command above Mr. Spikes
12 has the authority to take disciplinary action against
13 security officers that reported to Mr. Spikes.
14 Q. Would you agree with me the console operators
15 are a step above the guards?
16 A. In function, but not in reporting.
17 Q. So Mr. Spikes is the first line of discipline
18 for the guards?
19 A. Correct.
20 Q. So your testimony is that you removed
21 Mr. Spikes from the site. I believe you testified at
22 the fact-finding conference that Mr. Spikes was
23 terminated for violation of company policy. Do you
24 recall that?

Page 124

1     MS. SALGADO: Objection.
2  A. Not specifically.
3  Q. Do you recall testifying at the unemployment
4  compensation hearing that Mr. Spikes was terminated
5  for violation of company policy and rules?
6     MS. SALGADO: Objection.
7  A. Not specifically.
8  Q. You don't remember. So it's now your testimony
9  that you didn't terminate Mr. Spikes; you removed him
10 from the property at the request of the client, is
11 that correct?
12 A. On that day, yes.
13 Q. Do you recall Mr. Young who was the
14 investigator at the EEOC, Kurt Young, at the EEOC
15 conference, showing you a list of rules and asking you
16 which rule he violated?
17 A. I don't recall that.
18 Q. Have you ever reviewed any document that was
19 submitted to the EEOC as part of the EEOC
20 investigation of the charge that was filed by
21 Mr. Spikes?
22 A. I would have reviewed them, yes.
23 Q. Did Mr. Sloven ever show you a position
24 statement that was issued by Initial Security?

Page 125

1  A. No.
2  Q. Do you know if any of the documents ever
3  asserted that Mr. Spikes was fired for violation of
4  company policy?
5  A. Which documents?
6  Q. Documents that were submitted to EEOC?
7     MS. SALGADO: Objection.
8  A. That I submitted? Initially?
9  Q. No. That you saw. You said you may have seen
10 documents.
11    MS. SALGADO: He said he didn't see
12 documents.
13 Q. Let me clear that up. I'm confused. I
14 apologize if I misstated something.
15 A. There was an initial EEO fact-finding
16 conference that I attended. Any documents that they
17 had in their possession at that time I would have
18 produced and reviewed prior to giving them to them.
19 Any documents that were produced by Initial, I would
20 have produced, would have been my responsibility to
21 produce, review, and give to them.
22 Q. Is Mr. Sloven also --
23 A. Was not involved at that time.
24 Q. Really?

Page 126

1  A. Not that I recall.
2  Q. Did Debby Baul ever indicate to you at any time
3  that Mr. Spikes had told her that he was going to the
4  EEOC to file a charge?
5  A. At any time?
6  Q. At any time. Well, prior to what you say
7  wasn't a termination, but prior to you removing him
8  from the site.
9  A. No.
10 Q. Did you learn from anyone that Mr. Spikes had
11 to have coverage for an appointment to go visit the
12 EEOC?
13 A. No.
14 Q. Did Wayne ever complain to you Mr. Spikes had
15 taken a day off?
16 A. I can't recall that specifically, no.
17 Q. Let's go to the discussion that you mentioned.
18 You said you removed him from the site, and then you
19 called -- I think you said you called Mr. Spikes in to
20 talk to you. Is that how you think -- I think that's
21 what you said. Something like that. You said you
22 removed him from the site.
23 A. Yes. I sent Debby down to relieve him of duty.
24 Q. Tell me everything that happened after that?

Page 127

1  That you can remember?
2  A. I believe I asked her to ask Bill to come to
3  the office and speak with me. I believe that's how
4  Bill got the message to come see me.
5  Q. That was on the same day that you asked her to
6  relieve him?
7  A. Correct.
8  Q. Was that September 5th?
9  A. I don't recall specifically, based on this, I
10 would say, yes.
11 Q. Did Bill come to the office to meet you?
12 A. Yes.
13 Q. Was anybody else present?
14 A. Yes. Patricia Browan.
15 Q. Was she taking notes?
16 A. Correct.
17 Q. And during that conversation what transpired?
18 Who said what that you can recall?
19 A. I can't recall specifically.
20 Q. What did you tell him about why he had been
21 relieved?
22 A. For violation of company policy.
23 Q. I'm a little confused. You told Mr. Spikes
24 it's your recollection that during that meeting you

Page 128

1  told him that he was being removed for violation of
2  company policy?
3  A. Correct.
4  Q. You earlier testified that you removed him and
5  you did not discharge him but you removed him at the
6  client's request with the idea of going somewhere
7  else, is that correct?
8  A. No. I didn't say that.
9  Q. Well, you said violation of company policy.
10 What policy did he violate?
11 A. He was performing personal duties rather than
12 security duties while on the clock.
13 Q. That was based on what your understanding was
14 from Wayne?
15 A. And also from Debby. When he came down, his
16 first statement to me was that he came down, his hands
17 were greasy, and he said, "I had been working on my
18 car."
19 Q. Now, with the violation of company policy,
20 which is what you just said --
21 A. Correct.
22 Q. -- then wouldn't this policy, which is Ellis
23 number 3 on page 327, apply for discipline? If it's a
24 violation of a company policy, doesn't this procedure

Page 129

1  apply to Mr. Spikes?
2  A. Depending on the offense, yes, at the manager's
3  discretion.
4  Q. Well, reporting late would be the one incident
5  where he came in late --
6  A. Yes.
7  Q. -- getting the prescription?
8  A. Yes.
9  Q. I believe you testified that he left his post
10 or he left the area to go work on the car.
11 A. Correct.
12 Q. So would that also be being off the post or
13 reporting late?
14 A. Abandoning post, yeah.
15 Q. Also an appropriate discipline would be the
16 written reprimand?
17     MS. SALGADO: Objection.
18 Q. Based on 3.4 here.
19 A. No. It would fall under --
20 Q. Okay. What would it fall under?
21 A. Let me find it.
22     Possibly 3.5.2, letter L.
23 Q. Right. Gross dereliction of duty?
24 A. To include unauthorized, unexcused failure to

EEOC v. Initial Security
Gordon Ellis                C.A. # 04-1309                March 17, 2005

Page 130
1  report for duty as scheduled or unexcused desertion of
2  post without posted relief.
3  Q. If the client Wayne calls Mr. Spikes to go down
4  there, wouldn't you assume that he should follow the
5  client's direction?
6  A. I believe he should investigate, yes.
7  Q. So he did that?
8  A. He did investigate.
9  Q. And he didn't desert his post without relief
10 because the console operator was there, isn't that
11 correct?
12 A. In my mind, there became a difference between
13 investigating the incident and then the investigation
14 stopped and he began to work on his car.
15 Q. How do you know he was working -- did you ever
16 ask him? I believe you already testified that you
17 never discussed what he was doing with his car, is
18 that correct? You said you didn't ask him?
19      MS. SALGADO: Objection.
20 A. I believe he volunteered it in that interview
21 in the office that Patty took notes.
22      It would also fall under 3.5.2 on
23 page 328.
24 Q. Did you use this?

Page 131
1  A. Letter A, conducting personal business or work
2  on company time.
3  Q. I'm still confused about the violation of
4  company policy. Your earlier testimony was that you
5  didn't terminate him for violation of company policy,
6  that you removed him at the behest of the client.
7  That's the first thing you said?
8  A. I believe I can clarify this.
9  Q. Sure.
10 A. At time that Wayne called me and I sent Debby
11 down there, Debby did not terminate him from the
12 company at that time. She removed name from duty. I
13 had him removed from duty, removed from that site, and
14 asked him to report to me at the office so that we
15 could discuss it.
16      At the time he was in the office, and we
17 discussed it, that's the time that -- the time that he
18 was terminated.
19 Q. Okay. And your meeting with him was what time
20 of the day?
21 A. I can't recall.
22 Q. Was it soon after this incident with the garage
23 thing?
24 A. I believe so.

Page 132
1  Q. So it was in the morning you think?
2  A. I can't recall. I'm not sure it was the same
3  day.
4  Q. I thought you earlier testified it was the same
5  day.
6  A. My meeting with Bill?
7  Q. Yes.
8  A. And the garage incident?
9  Q. Yes.
10 A. I never testified that.
11 Q. I believe that's what the record shows, but --
12 all right.
13      I believe you also testified that you told
14 Debby to go down there and check out, see if Bill was
15 late, and she did that?
16 A. Correct.
17 Q. He was late on the one morning. The first
18 morning was the prescription incident?
19 A. Correct.
20 Q. Second time, that day you said, go down there
21 tomorrow and see if he comes in late?
22 A. Correct.
23 Q. She goes in and your testimony is that he
24 wasn't there because he was working on his car?

Page 133
1  A. No.
2  Q. What is your testimony? You're saying that
3  Debby said that he's late again?
4  A. Yes. I was not aware he was late due to
5  working on his car.
6  Q. So you're saying something happened later that
7  day with the working on the car?
8  A. Yes.
9  Q. That's the second incident you're talking about
10 allegedly? The second incident was when he went to
11 the garage to check on his car, is that correct?
12 A. Second incident for that day.
13 Q. That day?
14 A. Correct.
15 Q. And then at some point, you said to Debby,
16 relieve him of his duty?
17 A. Right.
18 Q. Tell him to come and see me.
19 A. Correct.
20 Q. How long after that discussion did he come and
21 see you? What's your recollection of that?
22 A. I can't recollect specifically. It was within
23 a day or two. It may have been the same day. I don't
24 recall.

Page 154

1  Q. Did you ever review this document to make sure
2  it was accurate?
3  A. Not that I recall.
4  Q. So this document, the factual portion of the
5  document may not be -- it's not to your recollection
6  exactly what happened?
7  A. It does not match my recollection.
8  Q. You mentioned that you fired Mr. Spikes for the
9  serious nature of the violations, is that correct?
10  A. Right.
11  Q. And if this was such a serious thing that
12  warranted termination, why didn't you review the
13  employee violation report --
14      MS. SALGADO: Objection.
15  Q. -- that documented the incidents that came to
16  your attention?
17      MS. SALGADO: Objection.
18  Q. You can answer.
19  A. Could you repeat that?
20  Q. Yeah. You testified that you terminated
21  Mr. Spikes for what you considered to be serious
22  violations --
23  A. Numerous. Yes.
24  Q. -- of company policy?

Page 155

1  A. Correct. Performance.
2  Q. And if it was such a serious violation to
3  warrant termination, why didn't you review this
4  document, Ellis 4, to make it accurately reflect the
5  events?
6      MS. SALGADO: Objection.
7  Q. You can answer.
8  A. I don't know.
9      MS. O'BOYLE: Now, I think we are on
10  Ellis 12.
11      (Ellis Deposition Exhibit 12 was marked
12  for identification.)
13  BY MS. O'BOYLE:
14  Q. Have you seen this document before?
15  A. I know I should have. I can't specifically
16  recall seeing it.
17  Q. Now, just call your attention to the bottom
18  where it says appearances, and it says people's names,
19  John Bockius, appeals referee, William Spikes,
20  claimant, Lola Granberry, claimant witness, Gordon
21  Ellis, employer witness Tim Nolan, observer. Did I
22  read that right?
23  A. Yes.
24  Q. Do you recall testifying before the Delaware

Page 156

1  Department of Labor?
2  A. Yes.
3  Q. This is Mr. Spikes's unemployment compensation
4  hearing?
5  A. Yes.
6  Q. Reviewing the first page, this is all what
7  Mr. Spikes said. And first of all, this testimony is
8  under oath, right, the testimony that was given?
9  A. Yes. Yes.
10  Q. And you said you don't recall ever seeing this?
11  A. No, I don't specifically.
12  Q. Reading the second paragraph and the third
13  paragraph before you get to the findings of fact,
14  talking about what Mr. Spikes testified, does this
15  comport with your recollection of what transpired at
16  the hearing?
17      MS. SALGADO: Take your time.
18  A. The dates for the incidents seem different from
19  my recollection.
20  Q. Now, the last page, call your attention to the
21  paragraph that says, "whereas the employer."
22  A. Yes.
23  Q. I'm just going to read that first kind of long
24  sentence. But let me read that.

Page 157

1      "Whereas the employer contended that the
2  contract requires that two officers be on duty from
3  8:00 to 4:00 p.m. and failure to do so could have
4  possible" -- I guess they mean possibly --
5  "jeopardized the contract, the employer did not
6  establish that the contract, in fact, was lost, nor
7  was the company penalized in reference to the
8  claimant's tardiness on those two days in question."
9      Did I read that right?
10  A. Yes.
11  Q. Did you argue at that unemployment compensation
12  hearing that Mr. Spikes's tardiness on one occasion
13  with the prescription and the other day with the
14  garage incident, that that could have endangered the
15  contract with REIT Management?
16  A. I don't think it -- I don't think specifically,
17  no, I don't.
18  Q. What did you argue? What did you testify as to
19  the reason why Mr. Spikes was terminated at those
20  hearings?
21  A. That he was not on post during his prescribed
22  time.
23  Q. At some point in time, you learned that
24  Mr. Spikes had filed a EEOC charge, is that correct?

Page 162

1  clients hire a contractor to perform a function for
2  various reasons. One of the reasons is that they
3  don't want to have the exposure to liability for
4  employee-related problems. This was an
5  employee-related problems. They hire us. They are
6  our employees. So that, you know, we defend ourselves
7  and shield the client from them. That's why they hire
8  us. It's part of one of the reasons. And I felt
9  that, if we brought up the contracts and the clients,
10 that the clients would be dragged into this, and one
11 of the reasons why they hired us was so that they
12 wouldn't be dragged into incidents like this.
13   Q. Now, the second page here, it's a 365. It's a
14 handwritten document. Did you prepare this?
15   A. No.
16   Q. Do you know who's handwriting it is?
17   A. Do I know or will I guess?
18   Q. Do you know who wrote this?
19   A. I do not.
20       MS. O'BOYLE: Let's take a two-minute
21 break, and we'll see if we have anything else. Thank
22 you.
23       (Recess taken.)
24 BY MS. O'BOYLE:

Page 163

1   Q. Mr. Ellis, we are back on the record. I just
2  have one little bit of questioning I failed to do.
3       After you were fired from Initial
4  Security, were you employed there after?
5   A. Yes.
6   Q. And where is that?
7   A. Bowles Corporate Services.
8   Q. Where are they located?
9   A. The main office?
10  Q. Where did you work?
11  A. Philadelphia.
12  Q. When did you become employed by them?
13  A. July of 2004.
14  Q. Did you collect unemployment after being fired
15 from Initial Security?
16  A. Yes.
17  Q. So did you have a hard time getting another
18 job, and that's why there was such a delay there?
19  A. Yes.
20  Q. And what is a your position with Bowler?
21  A. Bowles.
22  Q. Bowles. I'm sorry. Bowles corporation.
23  A. Region vice-president.
24  Q. And you're still employed there now?

Page 164

1   A. Correct.
2   Q. To whom do you report there?
3   A. Albert.
4   Q. What's his last name?
5   A. Barrette, B-a-r-r-e-t-t-e.
6   Q. Have you had any employees other than
7  Mr. Spikes ever complain that you discriminated
8  against them?
9   A. Me personally?
10  Q. Yeah.
11      MS. SALGADO: Objection.
12  Q. Well, actually, let me strike that. Mr. Spikes
13 doesn't say that you personally discriminated against
14 him. He says the company did.
15      Did you receive any complaints of
16 discrimination where the employee was alleging
17 discrimination by the company other than Mr. Spikes
18 when those verbal folks would walk in and complain?
19  A. The term "the company" --
20      MS. SALGADO: Objection.
21  A. The term "the company" would refer to other
22 employees of the company also, correct?
23  Q. Right.
24  A. So a security officer alleging mistreatment or

Page 165

1  discrimination by another employee would qualify?
2   Q. Well, it depends. Strike that. Let me go
3  back.
4       Aside from Mr. Spike's charge. Have you
5  ever been implicated in any other discrimination
6  action?
7       MS. SALGADO: Objection.
8   Q. Say discrimination lawsuit?
9   A. My hesitation here is when you say "you," do
10 you mean the company as a whole?
11  Q. No. You as the decision maker. You were the
12 decision maker in this case, weren't you? You made
13 the decision to terminate Mr. Spikes?
14  A. Correct.
15  Q. Have you ever been implicated as a decision
16 maker in any other discrimination case?
17  A. I don't believe so.
18  Q. Let me just go back to one thing. It's still
19 unclear to me. Initially I believe you testified that
20 you told Debby to relieve Mr. Spikes of his duties and
21 to tell him to come and see you?
22  A. Correct.
23  Q. And your initial thought was to come and talk
24 to him about it?

42 (Pages 162 to 165)

**EXHIBIT 12**

**EXHIBIT 12**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Equal Employment Opportunity Commission

v.

# Initial Security

C.A. # 04-1309

Transcript of:

## Lola Granberry

May 24, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497

Page 50

1  BY MS. SMITH:
2  Q.  Granberry-4 you have browsed through?
3  A.  Yes.
4  Q.  Granberry-3, which is Bates stamped EEOC117,
5  are you unfamiliar with this document?
6  A.  Yes.
7  Q.  So is it safe to say that before today you
8  have never seen this document?
9  A.  Not this one, no.
10  Q.  So let's go to Granberry-4, the one that you
11  do remember.
12  A.  Uh-huh.
13  Q.  Reporting late or leaving early, I'm reading
14  from Page 327, 3.4, "When either of these occur twice
15  -- meaning reporting late -- "in 30 days, it will be
16  classified as one unexcused absence and will be
17  accompanied by a written reprimand."
18       To your knowledge, did Mr. Spikes ever
19  say to you or tell you that he had received a verbal
20  reprimand for the lateness of September 5th, 2002?
21  A.  No.
22  Q.  After that lateness, would you as a console
23  operator expect that you would be getting some sort of
24  reprimand or some sort of written warning from Initial

Page 51

1  Security if you were late as far as your understanding
2  of the progressive discipline policy that you recall
3  from Granberry-4?
4       MS. SALGADO:  Objection.  You can answer.
5       THE WITNESS:  Repeat that again.
6  BY MS. SMITH:
7  Q.  If you were late, would you expect to be
8  getting the written reprimand or the progressive
9  discipline applied to you, as we just read in
10  Granberry-4, would you expect that that would be the
11  policy that Initial Security would follow with regards
12  to a security officer being late?
13       MS. O'BOYLE:  Meaning the verbal, then
14  the written?
15       THE WITNESS:  Yes.
16       MS. O'BOYLE:  Is that your understanding?
17       THE WITNESS:  Yes, uh-huh.
18  BY MS. SMITH:
19  Q.  Did you ever come to know or did anyone ever
20  tell you or do you have any understanding of why
21  Mr. Spikes was terminated by Initial Security?
22       MS. SALGADO:  Objection.  Asked and
23  answered.
24       MS. O'BOYLE:  You can answer.

Page 52

1       THE WITNESS:  Like I said, I don't know.
2  I think -- well, I'm trying to think, because of the
3  situation, I guess, with -- as a matter of fact, to
4  tell you the truth, I really don't know what really
5  happened, you know, per se.
6  BY MS. SMITH:
7  Q.  That's fine.  Your answer is you don't know?
8  A.  What led up to all of them for him to be
9  terminated, you know.  Like I said, he didn't get a
10  chance to talk to the officer that morning about it.
11       MS. O'BOYLE:  That's Diallo?
12       THE WITNESS:  Diallo, because he had left
13  because I relieved him.
14       As a matter of fact, after he left,
15  that's when Wayne told Bill about it.  So the officer
16  wasn't there.  So Bill told him I will talk to Diallo
17  when he comes in.  He did the twelve to eight shift.
18  So he would talk to him about it in the morning at
19  eight o'clock because Bill's always there before
20  everybody, you know.
21       So that was, you know, what happened that
22  time.
23  BY MS. SMITH:
24  Q.  Let me take you back to May and June of 2002,

Page 53

1  if you can recall.  So this was approximately four to
2  five months prior to Mr. Spikes' termination at Initial
3  Security, so this is the spring before he was
4  terminated.
5  A.  Okay.
6  Q.  And I wanted to know from you if Mr. Spikes
7  ever made you aware that he was going to the EEOC in
8  Philadelphia for an appointment with an investigator,
9  that he was interested in filing a charge?
10  A.  No, I didn't know nothing until at that
11  moment, at that time that I was supposed to go up
12  there.
13       MS. SALGADO:  For the fact-finding
14  conference.
15       THE WITNESS:  Prior to that, I didn't
16  know.
17  BY MS. SMITH:
18  Q.  Who told you about the fact-finding
19  conference?
20  A.  Mr. Spikes did, and someone gave me a call.
21  Q.  From the EEOC?
22  A.  I think Mr. Spikes' attorney, someone called
23  me.  That's why I'm trying to remember who called me.
24  I know someone called me was I able to make it, you